No. 2023-1123

# United States Court of Appeals for the Federal Circuit

SISVEL S.p.A.,

*Appellant*

v.

TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, HONEYWELL INTERNATIONAL INC., SIERRA WIRELESS, INC., THALES DIS AIS DEUTSCHLAND GMBH,

*Appellees.*

On appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2021-00678

**CORRECTED PRINCIPAL BRIEF OF APPELLANT SISVEL S.P.A.**

Timothy Devlin
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellant Sisvel S.p.A.*

February 27, 2023

Claim 1 of U.S. Patent No. 8,971,279 (the "'279 patent"):

1. A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system, the method comprising:

performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;

receiving, by the UE, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), where in the PDCCH signal includes a first field related to a resource allocation; and

performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for the SPS deactivation include: the RNTI is a SPS Cell RNTI (SPS C-RNTI); and the first field is entirely filled with '1'.

Appx157.

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1123

**Short Case Caption** Sisvel S.p.A. v. TCT Mobile International Limited

**Filing Party/Entity** Sisvel S.p.A.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/27/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Sisvel S.p.A. | | Sisvel International S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Timothy Devlin (Devlin Law Firm) | Neil Benchell (Devlin Law Firm) | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Sisvel Int'l SA v. Honeywell Int'l, Inc., 1:20-cv-00652 (D. Del.) | 3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd., 1:20-cv-00654 (D. Del.) | Sisvel Int'l SA v. VeriFone, Inc., 1:20-cv-00656 (D. Del.) |
| Sisvel Int'l SA v. Xirgo Techs., LLC, 1:20-cv-00659 (D. Del.) | Sisvel Int'l SA v. HMD Am., Inc., 1:20-cv-22051 (S.D. Fla.) | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i
TABLE OF AUTHORITIES .......... v
STATEMENT OF RELATED CASES .......... 1
JURISDICTIONAL STATEMENT .......... 1
INTRODUCTION .......... 2
STATEMENT OF THE ISSUES .......... 2
STATEMENT OF THE CASE .......... 3
I. The Parties .......... 3
II. Background Technology .......... 3
III. Relevant ’279 Patent Claims .......... 9
IV. Prior Art at Issue .......... 11
A. Samsung .......... 11
B. Nokia .......... 12
C. Dahlman .......... 12
V. Procedural History .......... 13
SUMMARY OF THE ARGUMENT .......... 18
ARGUMENT .......... 20
I. Standard of Review .......... 20
II. The Board’s Decision was erroneous .......... 21
A. Remand Is Warranted Because The Board Misconstrued The Claims And Sisvel’s Argument And Evidence .......... 21
B. The Board’s Finding That The Use of All “1s” Would Have Been Obvious In View Of Dahlman And Samsung Is Not Supported By Substantial Evidence .......... 30
III. CONCLUSION .......... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applications in Internet Time LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) ........ 26, 34, 39

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ........ 20

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003) ........ 38

*Chemours Co. FC, LLC v. Daikin Indus.*,
4 F.4th 1370 (Fed. Cir. 2021) ........ 20, 39

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........ 20

*Falkner v. Inglis*,
448 F.3d 1357 (Fed. Cir. 2006) ........ 35

*Finjan, Inc. v. Cisco Sys.*,
837 Fed. Appx. 799 (Fed. Cir. 2020) ........ 28

*Google LLC v. Conversant Wireless Licensing S.A.R.L.*,
753, Fed. Appx. 890 (Fed. Cir. 2018) ........ 27

*In re Chapman*,
595 F.3d 1330 (Fed. Cir. 2010) ........ 19

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ........ 34, 37

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ........ 26

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ........ 28

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ........ 30, 37

**Page(s)**

*Philips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 23

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) .......... 25, 26, 35, 39

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) .......... 20

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
993 F.3d 1374 (Fed. Cir. 2021) .......... 26, 38

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) .......... 25, 26

*TriVascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) .......... 21

**Statutes**

5 U.S.C. § 706 .......... 20

## STATEMENT OF RELATED CASES

This appeal concerns the final written decision ("FWD") issued by the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB" or the "Board") in Case No. IPR2021-00678 finding invalid claims 1, 3-5, 11, and 13-15 of U.S. Patent No. 8,971,279 ("the '279 patent").

No other appeal in or from that same proceeding was previously before this or any other appellate court. Except for the following matters that also concern the '279 patent, counsel is unaware of any other case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision:

*Sisvel Int'l S.A. v. Honeywell Int'l, Inc.,* No. 20-cv-0652 (D. Del.);

*Sisvel Int'l S.A. v. Xirgo Techs.,* No. 20-cv-00659 (D. Del.);

*Sisvel Int'l S.A. v. HMD Am., Inc..,* No. 20-cv-22051 (S.D. Fla.);

*Sisvel Int'l S.A. v. VeriFone,Inc.,* No. 20-cv-00656 (D. Del.);

*3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd.,* No. 20-cv-00656 (D. Del.).

## JURISDICTIONAL STATEMENT

The Board issued its final written decision ("FWD") on September 22, 2022, under its jurisdiction to conduct IPR proceedings pursuant to 35 U.S.C. § 314. Appellant Sisvel S.p.A. filed a timely notice of appeal under 35 U.S.C. §§ 141-142

and 37 C.F.R. § 90.2 on November 11, 2022. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

Sisvel appeals the Board's rulings that invalidated claims 1, 3-5, 11, and 13-15 (the "invalidated claims") of U.S. Patent No. 8,971,279 as obvious based on the Samsung, Nokia, and Dahlman references. Appx59-60.

The key disputes in this appeal relate to the faulty reasoning underlying the basis for the Board's ruling regarding the claim element "the first field is entirely filled with '1'" and the Board's lack of reasoning regarding certain arguments raised by Sisvel. Specifically, the Board disregarded the absence of key supporting calculations in the asserted prior art required by POSITA to use a "first field is entirely filled with '1'" as the SPS deactivation condition recited in the claims and the effect this would have on the non-obviousness of the '279 patent's innovations when considered by a POSITA. The Board's error stemmed from misinterpreting the claims, the law, and Sisvel's arguments. And the Board's conclusions were also against the substantial weight of evidence. The Board's errors warrant at least remand.

## STATEMENT OF THE ISSUES

1. Did the Board err by misconstruing the claims, the law, and Sisvel's arguments to conclude that a POSITA would have been motivated with a reasonable

expectation of success to combine Samsung with Dahlman to create the same first field "entirely filled with '1'" recited in the claims?

2. Was there substantial evidence to support the Board's conclusion that a POSITA would have been motivated with a reasonable expectation of success to combine Samsung with Dahlman to create the same first field "entirely filled with '1'" recited in the claims?

## STATEMENT OF THE CASE

### I. THE PARTIES

Sisvel is a world leader in fostering the development and management of intellectual property, including in the wireless 3GPP cell phone arena. Sisvel is also a well-known contributor to policy discussions with government bodies on intellectual property matters.

Appellees TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., TCL Communication Technology Holdings Limited, Honeywell International Inc., Sierra Wireless, Inc., and Thales DIS AIS Deutschland GmbH (collectively, "Honeywell") make and sell cellular products that use Sisvel's patented 3GPP technology.

### II. BACKGROUND TECHNOLOGY

The '279 patent relates to cell phone technology, specifically improvements in network communication efficiency in advanced "LTE" networks (one of the most prominent cell phone systems today). Appx151; Appx2537. In advanced cellular

networks (like high-speed LTE networks), network resources are precious commodities and therefore are allocated to user-equipment ("UE") like cell phones from a network "base station" (e.g., a cell phone tower) in certain ways to seamlessly allow for more bandwidth/traffic on the network. *See* Appx146. Two such allocation resources are time and frequency. *See id.* By allocating those resources, each UE (e.g., cell phone) on a network will be assigned certain time intervals in which to transmit data and certain frequencies for that transmission, just like members of a symphony who are told at what times to play their instruments and in what key. *See id.*

A basic way to assign time and frequency resources is to inform a UE (the cell phone) of its assigned time and frequency every time it pings a base station (cell tower) asking to transmit data. The downside of that so-called "non-persistent scheduling method" approach, however, is that constantly requiring a cell phone to always ask permission to transmit and always answering that call consumes significant network resources and overhead. Accordingly, a method called "semi-persistent scheduling" ("SPS") can be used. This method is more efficient by assigning a UE (e.g., a cell phone) a transmission time and frequency that is valid for a limited period—i.e., the time/frequency resources are "scheduled" for a limited time for each UE. *Id.*

Under an SPS regime, a UE is said to be "activated" while transmitting and receiving during time-frequency allocations and is considered "deactivated" when there is no longer a resource allocation for a particular UE. In the latter case, the base station will transmit a message called an "SPS deactivation signal" to the UE informing the UE that the assigned frequency of the UE was released and the UE is now "deactivated." *Id.* Receiving a proper SPS deactivation message is critical to the network infrastructure—if a UE does not understand the message properly, then the resources allocated to it might be allocated to another UE, resulting in network confusion and inoperability.

The patented inventions in the '279 patent address certain systems and methods related to efficient SPS deactivation signals. Appx146. One way the patent teaches to improve SPS deactivation efficiency is to use a preexisting "field" in a transmission message to a UE—in other words, piggyback on part of an existing message without forcing additional data down to the UE in an entirely new transmission "field." One such teaching in the '279 patent is a method of filling a preexisting binary field with all "1"s to serve as a SPS deactivation notice to the UE. Appx157. One such preexisting binary field is called the "Resource Indication Value" ("RIV") field, which would otherwise be used to convey a message about what resources a UE may be allocated (rather than not-allocated, i.e., deactivated). Appx151.

The ’279 patent’s “codeword” of all “1”s is able to serve as an SPS deactivation signal because, in the patented system, it will always be processed an invalid value in the relative field. Appx467. Put another way, in the RIV field for example, all 1s could never be mistaken for a valid resource allocation message, and thus can be used as a signal to detach a UE from SPS (i.e., deactivate it). *Id.* The fact that such a field of all “1”s could never be read any other way is a critical distinction because the need for certainty and stability is paramount in an LTE system, which is one of the dominant environments for cellular communications. *See* Appx145; Appx2277. Indeed, there is no dispute that in such a system, doubt is anathema:

> Q: And are the different mathematical calculations necessary if this is proposing all 1s?
>
> MR. DEMARCO: Objection, form.
>
> A. This is the worldwide phone system. *If there’s any doubt that all 1s will not work, you can’t use it.*”).[1]

Appx2277.

Moreover, because the size of a given field may vary based upon a variety of factors, it is important to have a SPS deactivation value that works in all circumstances for all field lengths—e.g., a value that is invalid for one field size may be valid for another. *See* Appx139 (discussing different potential values depending

[1] Unless otherwise noted, all emphasis in this brief is added.

on the size of the available field for SPS deactivation.) For the first time ever in LTE network systems, the ’279 patent taught a series of equations proving that the use of all “1”s as a SPS detachment value would be valid across all scenarios (including field size), including, for example, the following:

if $L-1 \leq \lfloor N_{RB}/2 \rfloor$ then

$$RIV = N_{RB}(L-1)+S$$

else

$$RIV = N_{RB}(N_{RB}-L+1)+(N_{RB}-1-S)$$

End

Required bits

$$N_{bit_required} = \lceil \log_2(RIV_{max}+1) \rceil$$

Without limitation

$$RIV_{max} = N_{RB} \cdot (N_{RB}+1)/2-1$$

With limitation $L^{Limit}$

$$RIV_{max} = \min\{N_{RB} \cdot (N_{RB}+1)/2-1, N_{RB} \cdot (L^{Limit}-1)+N_{RB}-L^{Limit}\}$$

Appx152; *see also* Appx466; Appx2429.

$$N \neq M, \text{ where, } N = \lceil \log_2(N_{RB}(N_{RB}+1)/2) \rceil, \quad M = \log_2(N_{RB}(N_{RB}+1)/2)$$

$$\frac{N_{RB}(N_{RB}+1)}{2}$$

Appx153; *see also* Appx466; Appx2430.

$$2^N \neq \frac{N_{RB}(N_{RB}+1)}{2}$$

Appx153; *see also* Appx466; Appx2430.

$$2^{N+1} \neq N_{RB}(N_{RB}+1)$$

Appx153; *see also* Appx466; Appx2430.

Thus, the ’279 patentees discovered (and taught) the critical element required by any POSITA for actually using all “1”s as a SPS deactivation signal in a preexisting field in an LTE system—that the field value would *always* return an invalid number and therefore always signal deactivation. The ’279 patentees substantiated their discovery even further by providing a chart (reproduced in Fig. 16 below) of numerous potential values for sizes of fields pertaining to various different resource block sizes processed through their equations. As this chart

shows, the validity of the values changes based upon the size of the field.

FIG. 16

| L \ S | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 2 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 |
| 3 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 |
| 4 | 60 | 61 | 63 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| 5 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
| 6 | 100 | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109 | 110 | 111 | 112 | 113 | 114 | 115 | 116 | 117 | 118 | 119 |
| 7 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 | 128 | 129 | 130 | 131 | 132 | 133 | 134 | 135 | 135 | 137 | 138 | 139 |
| 8 | 140 | 141 | 142 | 143 | 144 | 145 | 146 | 147 | 148 | 149 | 150 | 151 | 152 | 153 | 154 | 155 | 156 | 157 | 158 | 159 |
| 9 | 160 | 161 | 162 | 163 | 164 | 165 | 166 | 167 | 168 | 169 | 170 | 171 | 172 | 173 | 174 | 175 | 176 | 177 | 178 | 179 |
| 10 | 180 | 181 | 182 | 183 | 184 | 185 | 186 | 187 | 188 | 189 | 190 | 191 | 192 | 193 | 194 | 195 | 196 | 197 | 198 | 199 |
| 11 | 200 | 201 | 202 | 203 | 204 | 205 | 206 | 207 | 208 | 209 | 210 | 211 | 212 | 213 | 214 | 215 | 216 | 217 | 218 | 219 |
| 12 | 199 | 198 | 197 | 196 | 195 | 194 | 193 | 192 | 191 | 190 | 189 | 188 | 187 | 186 | 185 | 184 | 183 | 182 | 181 | 180 |
| 13 | 179 | 178 | 177 | 176 | 175 | 174 | 173 | 172 | 171 | 170 | 169 | 168 | 167 | 166 | 165 | 164 | 163 | 162 | 161 | 160 |
| 14 | 159 | 158 | 157 | 156 | 155 | 154 | 153 | 152 | 151 | 150 | 149 | 148 | 147 | 146 | 145 | 144 | 143 | 142 | 141 | 140 |
| 15 | 139 | 138 | 137 | 136 | 135 | 134 | 133 | 132 | 131 | 130 | 129 | 128 | 127 | 126 | 125 | 124 | 123 | 122 | 121 | 120 |
| 16 | 119 | 118 | 117 | 116 | 115 | 114 | 113 | 112 | 111 | 110 | 109 | 108 | 107 | 106 | 105 | 104 | 103 | 102 | 101 | 100 |
| 17 | 99 | 98 | 97 | 96 | 95 | 94 | 93 | 92 | 91 | 90 | 89 | 88 | 87 | 86 | 85 | 84 | 83 | 82 | 81 | 80 |
| 18 | 79 | 78 | 77 | 76 | 75 | 74 | 73 | 72 | 71 | 70 | 69 | 68 | 67 | 66 | 65 | 64 | 63 | 62 | 61 | 60 |
| 19 | 59 | 58 | 57 | 56 | 55 | 54 | 53 | 52 | 51 | 50 | 49 | 48 | 47 | 46 | 45 | 44 | 43 | 42 | 41 | 40 |
| 20 | 39 | 38 | 37 | 36 | 35 | 34 | 33 | 32 | 31 | 30 | 29 | 28 | 27 | 26 | 25 | 24 | 23 | 22 | 21 | 20 |

Appx139.

## III. RELEVANT ’279 PATENT CLAIMS

Relevant here, claims 1, 3-5, 11, and 13-15 of the ’279 patent address inventive SPS deactivation systems and methods and read as follows:

> 1. A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system, the method comprising:
>
> performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;
>
> receiving, by the UE, a Physical Downlink Control Channel (PDCCH_signal with a Radio Network Temporary Identifier (RNTI), where in the PDCCH signal includes a first field related to a resource allocate; and

performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for the SPS deactivation include: the RNTI is a SPS Cell RNTI (SPS C-RNTI); and the first field is entirely filled with '1'.

3. The method of claim 1, wherein the PDCCH signal carries the Downlink Control Information (DCI) format '0'.

4. The method of claim 1, wherein the first field indicates a Resource Indication Value (RIV).

5. The method of claim 1, further comprising;

Continuing, by the UE, the SPS transmission if the PDCCH signal does not satisfy the conditions for SPS deactivation.

11. A User Equipment (UE) used for in a wireless mobile communication system, the UE configured to:

perform a Semi-Persistent Scheduling (SPS) transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;

receive a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and

performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for SPS deactivation include: the RNTI is a SPS Cell RNTI (SPS C-RNTI); and the first field is entirely filled with '1'.

> 13. The UE of Claim 11, wherein the PDCCH signal carries Downlink Control Information (DCI) format ‘0’.
>
> 14. The UE of Claim 11, wherein the first field indicates a Resource Indication Value (RIV).
>
> 15. The UE of Claim 11, wherein the UE is further configured to continue the SPS transmission if the PDCCH signal does not satisfy the conditions for SPS deactivation.

Appx158-159.

## IV. PRIOR ART AT ISSUE

### A. Samsung

The 3GPP Technical Specification Group for Radio Access Network (an industry standards group) published an “SPS resource release” Technical Revision Specification R2-084455, 3GPP TSG-RAN2#63 Meeting, Jeju, South Korea, August 18th-22nd on August 12, 2008 (“Samsung”). Appx1744. Samsung is a single-page 3GPP meeting contribution which considered potential codes to SPS deactivation, and, while it proposed that “all 1s *could* be a good *candidate*” for such a code, the reference provides no technical backing for its assertion and, importantly, none of the technical proof required by a POSITA to actually use all 1s as an SPS deactivation code. Appx18; Appx297. So, unlike the ’279 patent, Samsung offers mere proposals for investigation of a potential codeword for SPS deactivation, and apart from a rudimentary assessment of numbers of *other potential codewords*, provides none of the certainty that a POSITA would require to go ahead and actually

use such code words in a real world operating LTE phone system. Appx1744; *see also* Appx2277 ("Q: And are the different mathematical calculations necessary if this is proposing all 1s? [] A. This is the worldwide phone system. *If there's any doubt that all 1s will not work, you can't use it.*").

**B. Nokia**

The 3GPP Technical Specification Group for Radio Access Network also published the "Missing details of semi-persistent scheduling" 5 Technical Revision Specification R1-083718, 3GPP TSG-RAN WG1 Meeting #54bis, Prague, Czech Republic, September 29-October 3, 2008 on September 24, 2008 ("Nokia"). Appx1742-1743. Nokia describes a mechanism for using a "code point" for purposes of "SPS release." Appx297. Like Samsung, Nokia offers nothing more than "proposals," positing that filling a field with all zeroes *could* serve as a codeword. *Id.*; Appx1742-1743. Nokia provides no rationale for why its proposal would be reliable—nor could it. Indeed, there is no apparent dispute that filling a field with all 0s will always results in a *valid* field input, not a negative/invalid one, and could *never* be used as an SPS deactivation codeword. Appx584-585 (citing Appx2303-2305.

**C. Dahlman**

A reference titled "3G Evolution: HSPA and LTE for Mobile Broadband," 2nd edition, Elsevier Ltd. ("Dahlman") was published on August 6, 2008.

Appx1091. Dahlman provides a high-level description of wireless technology, particularly a Resource Block allocation field. Appx205; Appx295. Below, Honeywell suggested that Dahlman disclosed how a UE may be provided with SPS activation or deactivation transmissions over a Physical Downlink Control Channel ("PDCCH") channel. *See* Appx24-25. Dahlman, however, does not disclose the hallmarks of classic SPS deactivation, such as the use of a Cell Radio Network Temporary Identifier ("C-RNTI"), which Dahlman describes only in terms of its usefulness as an identifier, but not for deactivation. *See* Appx487-488. Indeed, when asked whether there are "any indications in Dahlman stating that C-RNTI can be used for SPS deactivation," Honeywell's expert confirmed that he too "d[id] *not believe Dahlman discloses SPS, space, C-RNTI*." Appx2518-2519; Appx2519-2520. Dahlman also contains no reference to the use of a specific value, let alone all 1s, as a codeword for SPS deactivation. *See* Appx582 (describing Dahlman's constructing of resource blocks as distinct from filling a RIV field with a codeword for purposes of SPS deactivation).

## V. PROCEDURAL HISTORY

On March 26, 2021, Honeywell petitioned for *inter partes* review ("IPR") of claims 1, 3-5, 11, and 13-15 of the '279 patent. Appx175-256. Honeywell's Petition asserted four grounds of invalidity, all on a § 103 basis. Appx196. Sisvel filed a Preliminary Response addressing these asserted grounds of unpatentability on July

8, 2021. Appx281-315. The Board granted institution on all challenged claims on all four grounds. Appx356-389.

As Sisvel explained in its Response to institution (Appx452-499), however, Honeywell's obviousness claims failed because, *inter alia*, the prior art did not adequately teach the required "first field filled entirely with '1'." Appx478-485. Specifically, Sisvel detailed how there was no record evidence that a POSITA would have had a reasonable expectation of success that filling a field (such as a RIV field) entirely with 1s would yield a reliably useable SPS deactivation value (i.e., one that would always produce an invalid outcome). Appx480-481.

Indeed, as Sisvel explained, even Honeywell's expert, Mr. Lanning, admitted that Samsung (the reference relied upon by Honeywell for that "all 1s" limitation) did not contain any such disclosure:

> Q. And those other examples, those would require additional calculations by POSITA to determine, correct?
>
> A. Again—
>
> MR. PETERSON: Objection to form.
>
> THE WITNESS: Again, I said that typically, it starts with calculations; but a POSITA, in many cases would not need to do calculations. Typically, someone, somewhere has generated a list for each of the valid RB assignments for each of the different sizes of LTE system and it would be a matter of just picking a value that was not on the list of valid RB assignments.
>
> Q. And those lists you're referring to are not included in either the Nokia or Samsung reference, right?

A. No, the lists aren't included. . . .

Appx482 (citing Appx2549).

Instead, as Sisvel made clear to the Board, the teachings in the '279 patent were the first proof in the field that the use of all 1s would always yield an invalid result and thus they could be expected to succeed as deactivation codewords in an LTE system. *See* Appx480-481. Sisvel's expert, Dr. Smith, further emphasized the importance of such certainty, explaining that no POSITA could ever actually use all 1s until there was definitive proof (like the '279 patent) that such a codeword would always work—"[t]his is the worldwide phone system[;] [i]f there's any doubt that all 1s will not work, you can't use it." Appx2277.

In reply, Honeywell asserted that there was reasonable expectation of success in using Samsung's proposed "all 1s" as a deactivation codeword in an LTE system because Table 1 of the Samsung reference suggested using all 1s in a field without any supportive calculations. Appx548-549. In other words, Honeywell asked the Board to believe that, because Samsung *suggested* using all 1s, a POSITA would reasonably expect success using that codeword, even absent any calculations to show it was likely safe to do so in advanced LTE systems. *See* Appx548. Honeywell also suggested to the Board that this Court's precedent trumped what a POSITA in this particular field would actually desire (as a factual matter) to expect success in the real world (i.e., calculations demonstrating the codeword would always be invalid).

As Honeywell put it, the law is that that obviousness "does not require absolute predictability of success." Appx548. Honeywell further confused the issue by arguing that the claimed inventions purportedly do not even have to work "because the '279 claims recite filling the entire first field to all 1s, but do not recite that this value is invalid," and thus, Samsung's suggestion to try all 1s was good enough to instigate a POSITA to practice the claims with some expectation of success. Appx547; *see* Appx550.

Sisvel highlighted Honeywell's incongruous arguments for the Board in its Sur-Reply. *See* Appx568-596. Specifically, Sisvel detailed (again) how the claims required the "all 1s" to function as a SPS deactivation value, a POSITA would never use all 1s in the real world unless there was certainty (no doubt at all, Appx2277) that the code would work as such by always returning an invalid result, and Samsung admittedly did not provide any mathematical comfort to a POSITA of that truth (and therefore no reasonable expectation of success)—only the '279 patent did, because the '279 patentees were the first to prove that to be mathematically true. Appx575-576.

The Board issued its FWD on September 22, 2022, and held all challenged claims unpatentable. Appx1-54. In its decision, the Board largely adopted Honeywell's positions, but it confused the issues even further. For example, immediately after stating that the '279 claims do not "require performing any

calculations prior to filling the 'first field' entirely with 1s" (an argument *not* propounded by Appellant), the Board held that it did *not* need to decide the parties' dispute over whether a POSITA, in view of the prior art, would be able to reach the innovations of the '279 patent with reasonable certainty. Appx35. Despite Dr. Smith's testimony (materially unrebutted by Mr. Lanning) that a POSITA would be unable to determine from the prior art that the use of all 1s would be function reliable for SPS deactivation (and thus support a motivation to combine the prior art with a reasonable expectation of success), the Board also declared that a POSITA would have been reasonably confident enough to expect success in using all 1s in view of the prior art. Appx36. In doing so, though, the Board did not dispute Dr. Smith's uncontested statement that "[i]f there's any doubt that all 1s will not work, you can't use it." Appx2277. Instead, the Board ignored the undisputed fact that, in this particular field, a POSITA demands mathematical certainty that a codeword would always be invalid before potentially being motivated to combine a suggested prior-art codeword with reasonable expectations of success as an SPS deactivate signal into an LTE system. Rather, the Board agreed with Honeywell that this Court's caselaw does not require "absolute" certainty, just "reasonable" certainty, and since Samsung said all 1s could be a possible codeword value, one of ordinary skill in the art would have expected success in getting all 1s to work in the claimed system

regardless of whatever level of certainty a POSITA would have factually required. *See* Appx37-38.

This appeal followed.

**SUMMARY OF THE ARGUMENT**

The Board's decision was erroneous for at least two reasons.

First, the Board misconstrued the claims, the law, and Sisvel's arguments to conclude that a POSITA would have been motivated with a reasonable expectation of success to combine Samsung with Dahlman to create the same first field "entirely filled with '1'" as recited in the claims.

The Board oversimplified the requirements of the claims, presuming that simply filling the "first field" entirely with 1s would suffice. *See* Appx35. This falls short, however—the claims require that the first field be "entirely filled with '1'" so that it may function as a condition for SPS deactivation. *See* Appx157 (claim 1). Sisvel provided evidence that a POSITA would not have had a reasonable expectation of success in implementing any value to so function for SPS deactivation unless the POSITA knew it would function reliably across different field lengths (i.e., would be invalid under all circumstances). *See* Appx2277. As Sisvel demonstrated, the prior art lacked any such basis for a reasonable expectation that filling the field with all 1s would work reliably in all circumstances. *See* Appx2434-2444. This evidence and Sisvel's argument were ignored by the Board, which stated

it simply would not resolve the issue because the claims did not require any such calculations. Appx35. The Board also ignored Dr. Smith's testimony as irrelevant because "absolute" expectation of success is not required. Appx37. But here, that proof that there was no doubt regarding success of using all 1s as an SPS deactivation condition was a factual requirement specific to this field.

Second, there was no substantial evidence to support the Board's conclusion that a POSITA would have been motivated with a reasonable expectation of success to combine Samsung with Dahlman to create the same first field "entirely filled with '1'" as recited in the claims.

The Board based its finding on multiple disclosures within the Samsung reference which were flatly rebutted by Sisvel. Contrary to the Board's findings, Samsung did not offer a clear cut or "simple" solution, but rather evinced that, at best, persons of even extraordinary skill in the art were only able to come to the tepid conclusion that the use of all 1s *might* be considered for use. Moreover, Dr. Smith provided testimony that none of the prior art supplied a basis for a POSITA to reasonably expect the use of all 1s to be a reliable SPS deactivation value in all circumstances—something necessary for a POSITA to conclude for such use to be "reasonable." Indeed, while improperly discounting Dr. Smith's testimony, the Board relied instead on Mr. Lanning's statements that fall prey to hindsight bias.

The Board's decision thus was not supported by substantial evidence and, for that independent reason, should be vacated.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews Board decisions according to the standards of review set forth in the Administrative Procedure Act ("APA"). *In re Chapman*, 595 F.3d 1330, 1336-37 (Fed. Cir. 2010). Accordingly, this Court reviews the Board's legal conclusions *de novo*, and its factual findings for substantial evidence. *Id.; see* 5 U.S.C. § 706(2); *see also Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015); *Chemours Co. FC, LLC v. Daikin Indus*., 4 F.4th 1370, 1374 (Fed. Cir. 2021). Substantial evidence requires more than a "mere scintilla" and must be enough such that a reasonable mind could accept the evidence as adequate to support the conclusion. *Chemours* at 1374 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "When reviewing claim construction by the Board, [this Court] review[s] underlying factual determinations concerning extrinsic evidence for substantial evidence and the ultimate construction of the claim *de novo*." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016) (internal quotation marks omitted).

## II. THE BOARD'S DECISION WAS ERRONEOUS

### A. Remand Is Warranted Because The Board Misconstrued The Claims And Sisvel's Argument And Evidence

During the IPR proceedings, Sisvel argued that a POSITA would not have found using all "1s" in a RIV field as a specific value for SPS deactivation obvious because the calculations to determine a value that would be usable for every possible scenario had not yet found. *See* Appx34 (citing Appx478-484). Indeed, Sisvel argued below that Honeywell's asserted prior art provided none of the required calculations that would inform a POSITA that a particular value would be universally functional without a specific code that would be invalid in all circumstances. *See* Appx2262 (describing that in order to be a workable solution for communicating SPS deactivation, the value used in the RIV field would need to be invalid in all use cases); *see also* Appx476; Appx481 (asserting that neither Nokia nor Samsung provide examples of these calculations for a POSITA).

The Board in its Final Written Decision, however, stated simply that no calculations of unused code points prior to filling the "first field" entirely with 1s was necessary because all that was required by the claims was simply inserting 1s into the first field without any predicate condition. *See* Appx35 ("Claim 1 does not require performing any calculations prior to filling the 'first filed' entirely with 1s"). The Board then used that understanding of the claimed invention to avoid "settl[ing] the parties' dispute as to whether [a POSITA] would have been capable of

*calculating* unused code points in Samsung that could be used as SPS deactivation values"—a critical shortcoming of the prior art demonstrating non-obviousness. *See, e.g.*, Appx2440-2444. Indeed, the Board seemed to silently endorse Honeywell's position that reasoned, *inter alia*, nothing was required to be calculated at all "if you use all ones." Appx2541 (84:4-5).

The Board was legally and substantively wrong. The Board's assertions belie a misunderstanding of the claims, the law, and Appellant's arguments.

The claims do not merely require rote input of all 1s in a first field. They require a functional wireless mobile communication system seeking to deactivate Semi-Persistent Scheduling. Appx157 (claim 1). And they require not just filling a field with all 1s, but a field "entirely filled with '1'" to function as a "condition[] for the SPS deactivation." *See* Appx157 (claim 1) ("*wherein the conditions for SPS Deactivation include:* the RNTI is a SPS Cell RNTI (SPS C-RNTI); and *the first field is entirely filled with* ***'1'***.") Put simply, the claims require the field filled with 1s to actually function as an SPS deactivation condition.

This interpretation of the claims is consistent with the law. Claims must be interpreted "from the perspective of one of ordinary skill in the art." *Philips v. AWH Corp.*, 415 F.3d 1303, 1332 (Fed. Cir. 2005). Here, that paradigm is critical. A POSITA would understand the claim requirement of a field entirely filled with all

1s to actually function as an SPS deactivation condition to inherently require the very calculations that the Board said were not required at all.

For instance, as Dr. Smith repeatedly explained, a POSITA would not implement an SPS transmission system (like the system in the claims) with a condition for SPS deactivation (like the field filled entirely with 1s recited in the claims) unless there was no doubt that the condition would always work. *See* Appx2277 ("If there's any doubt that all 1s will not work, you can't use it."). To accept that such a condition would work requires knowing the "specific value[s]" that are "required to achieve SPS deactivation." Appx2442 (¶ 83). Thus, to know that a field filled with all 1s would work as required in the claims, there must be mathematical proof that "all 1s" must be invalid in all circumstances. Appx2261-2262 (69:12-70:17); Appx2277 (85:15-20); *see* Appx2440-2444. That means, to a POSITA reading the claims of the '279 patent, the field entirely filled all 1s recited in the claims functions in the claimed SPS transmission in the recited wireless mobile communication system only *because* it always produces an invalid value in all circumstances, and a POSITA would understand that such a field is included in the system as a condition of SPS deactivation only *because* the calculations have been provided to prove that point (like the '279 patentees did)—or else the invention would never have bene built and would not work as intended. *See id.*; *see also* Appx2261-2262 (69:12-70:17) (describing that in order to be a workable solution

for communicating SPS deactivation, the value used in the RIV field would need to be invalid in all use cases). In short, to a POSITA, the recitation of a field filled entirely with 1s as an SPS deactivation condition in the claims requires those calculations to have been done and the use of that field all 1s to always return an invalid outcome.

The argument and evidence presented by Sisvel on this point was erroneously—and critically—ignored by the Board. These calculations were precisely what was missing from Samsung. Indeed, Sisvel asserted that such calculations demonstrating that filling the RIV field with all "1s" did not exist and would not have been obvious to a POSITA prior to the '279 patent. Sisvel provided significant expert testimony from Dr. Smith reinforcing its arguments, none of which are addressed by the Board in its Final Written Decision. *See* Appx2440-2444 (providing expert testimony that a POSITA reviewing Samsung would not have found the use of all 1s in a RIV field obvious based on testimony from Honeywell's expert and the lack of certainty and calculations in the document; *see also* Appx2434-2439 (providing expert testimony that a POSITA reviewing Nokia would not have found the use of all 1s in a RIV field obvious based on testimony from Honeywell's expert and faulty mathematics in the Nokia reference).)

Sisvel's supported arguments provide substantial evidence contrary to the Board's findings, and must be addressed: "the Board must, as to issues made

material by the governing law, set forth a sufficiently detailed explanation of its determinations both to enable meaningful judicial review and to prevent judicial intrusion on agency authority." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017). Here, the Board failed to provide a "sufficiently detailed explanation" for its rejection Sisvel's arguments of nonobviousness—indeed, the only explanation for not addressing Sisvel's arguments appears to be a misunderstanding of the claims and Sisvel's arguments. This warrants remand. *See, e.g.*, *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) (the Board must provide a full "examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion."); *In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002) ("The Board's findings must extend to all material facts ...."); *id.* at 1346 (holding that agency tribunals "must make findings of relevant facts, and present its reasoning in sufficient detail that the court may conduct meaningful review of the agency action"); *see also Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) ("To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention," and when a reference "does not provide an enabling disclosure for a particular claim limitation," then "another reference in which that limitation is enabled" must be provided); *see also Applications in Internet Time LLC v. RPX Corp.*, 897 F.3d 1336, 1353 (Fed.

Cir. 2018) (quoting *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015)) ("Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it.").

Indeed, this Court has repeatedly held that the proper remedy for an incomplete decision by the Board that "fails to address key arguments and issues properly before it" is to vacate and remand the proceedings to the PTAB for further consideration of the arguments not addressed. *See Rovalma* at 1024. For instance, in *Google LLC v. Conversant Wireless Licensing S.A.R.L.*, 753 Fed. Appx. 890 (Fed. Cir. 2018), the Board's final written decision addressed only one of two arguments raised in the petition. *Id.* at 895. Although the Board recognized both arguments in its institution decision, the Board rendered its decision on one argument, and merely alluded to the other without rendering a decision. *Id.* at 895. This, the Court held, was sufficient to order remand. *Id.* at 895. This case is similar. Here, Sisvel's argument below that a POSITA would not have found the use of all "1s" in a RIV field obvious was recounted by the Board (Appx34, Appx36) but was ultimately not materially discussed or considered. *See* Appx35. As in *Google*, this warrants remand for further consideration.

This is also not a case of harmless error. For example, this Court in *Finjan, Inc. v. Cisco Sys.*, 837 Fed. Appx. 799 (Fed. Cir. 2020), held that the Board's potential misunderstanding of an appellant's argument led to at best a harmless error

and therefore was insufficient to reverse and remand. *Id.* at 808-09. But the Court in *Finjan* found that the Board (1) had actually addressed the argument alleged to have been misunderstood by the appellant and (2) that any discrepancies between the Board's finding and the appellant's argument amounted to a harmless error. *See, id.* at 809 (citing *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).) Here, though, the Board explicitly stated that it would not consider the relevant evidence and argument raised by Sisvel misconstruing Appellant's argument as needing the claims to require that certain calculations be executed in the inventive system itself (rather than as a prior condition of using a field filled with all 1s to begin with). Appx35.

Similarly, the Board also erroneously discounted critical testimony of Dr. Smith. In its Petition, Honeywell asserted that a POSITA "would have a reasonable expectation of success in setting the first field to all 1s to indicate SPS deactivation because all 1s is a permissible value of the first field and a POS[ITA] would" have the requisite skills to program the same. Appx248. Indeed, Honeywell asserted that simply filling the field with 1s (or 0s, as "there is nothing special" in interchanging the two values) would suffice to disclose the innovations of the '279 patent with sufficient reasonable expectation of success with nothing more. *Id.* In its Response, Sisvel rebutted this argument through the testimony of its expert, Dr. Smith. Dr. Smith expressly testified that Honeywell's arguments oversimplify significant issues in implementing systems such as SPS deactivation in a mobile

communications system. *See* Appx480 (citing Appx2411 (¶¶ 81-82)). Dr. Smith demonstrated that the ’279 patent did not arrive at the use of all 1s in a field for SPS deactivation because it was a convenient value, but because the patentees mathematically proved that it would function in any context and therefore could be included as an SPS deactivation condition in an SPS transmission for a functional wireless mobile communication system. *See* Appx479-480; Appx2436-2441(¶¶ 63-82). In his deposition, Dr. Smith elaborated even further and provided unrebutted testimony that such proof would be a prerequisite, as a factual matter, for a POSITA to have a reasonable expectation of success in using all 1s in a field for SPS deactivation. *See* Appx2261-2262 (69:12-70:17); Appx2277 (85:15-20).

The Board discounted Dr. Smith’s testimony, though, because motivation to combine with a reasonable expectation of success does not require “absolute” success. Appx37 (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). But, again, the Board misconstrued the evidence and argument before it. Dr. Smith did not testify that the *law* requires absolute expectation of success. Rather, Dr. Smith testified that, *as a factual matter*, mathematical certainty is what a POSITA would demand when constructing an SPS transmission for a functional wireless mobile communication system (which Samsung failed to provide). Again, Dr. Smith testified that for a POSITA to reasonably expect the use of “all 1s” to work as an SPS deactivation condition (like in the claims) there must be proven

mathematical evidence that "*all* 1s" must be invalid in *all* circumstances. Appx2261-2262 (69:12-70:17); Appx2277 (85:15-20). In short, Dr. Smith's factual position (and Sisvel's too) was that a POSITA would never use (or be motivated to use and expect success from) a suggested SPS deactivation value (such as all 1s) without calculations proving that such a value could, without "any doubt," function as a SPS deactivation condition as the claims require. *See* Appx2261-2262 (69:12-70:17); Appx2277 (85:15-20). In other words, Dr. Smith plainly testified (and seemingly without material rebuttal on point) that, as a *factual matter* based on the specific requirements in this field, a POSITA would never be motivated to combine Samsung's proposal of all 1s as a potential candidate for use in SPS deactivation and reasonably expect success in the endeavor unless the predicate condition of mathematical certainty (without "any doubt") was met. This lack of expected success was even confirmed by Honeywell's own expert, Mr. Lanning, who testified that a POSITA would not have derived support for a usable SPS deactivation value based on Samsung, let alone support for filling a first field with 1s. *See* Appx2443 (92:5-24) (testifying that Samsung lacks lists of values used in calculations to determine an always-invalid SPS deactivation value); Appx2569-2570 (112:19-113:13) (testifying that Samsung lacks a chart usable by a POSITA to determine whether a number could be used to fill a RIV field and trigger SPS deactivation).

The Board's refusal to consider these critical factual matters, like the other argument and evidence discussed above, at least warrants remand. Accordingly, Sisvel respectfully requests that the Final Written Decision be vacated and the proceedings be remanded to the PTAB for further consideration of Sisvel's arguments.

### B. The Board's Finding That The Use of All "1s" Would Have Been Obvious In View Of Dahlman and Samsung Is Not Supported By Substantial Evidence

The lack of substantial evidence supporting the Board's conclusions regarding the obviousness of the element "first field is entirely filled with '1'" in view of Dahlman and Samsung independently warrants remand.

According to the Board, "Samsung's statement that 'all 1s ***could*** be a good candidate' for indicating SPS deactivation does not cut against the use of all 1s, but rather suggests it," and the reference also states that all 1s is "valid for DCI format," which is discussed in Dahlman. Appx36; Appx39. The Board additionally reasoned that, because Samsung is a 3GPP proposal by a 3GPP member, it "indicates a level of seriousness in the proposal and is itself evidence that one of an ordinary skill in the art would have seen the proposal as having a reasonable expectation of success . . . ." Appx38. And the Board suggested that Samsung's solution is "simple," offers no hesitation or doubt to a POSITA, and is confirmed by Mr. Lanning. Appx37. Based on those primary reasons, the Board concluded that there

was a motivation to combine Samsung's all 1s teaching with Dahlman with a reasonable expectation of success. But the Board's conclusions were not supported by substantial evidence.

Each of the Board's theories were flatly rebutted by Samsung itself and Dr. Smith's testimony (which the Board ignored based on its improper interpretation of the claims and law, *see supra* Argument at II.A). For instance, Samsung is a 3GPP working group publication, wherein the persons of *extraordinary* skill in the art at 3GPP were only able to *posit* that the use of all 1s *might* serve. *Id.* Dr. Smith also provided ample testimony about the difficulty this issue posed to those in the field:

> Q. Can you explain to me what a RIV field is?
>
> A. A RIV field—[] is a binary number. . . . So what I mean by that is, you have some information to convey using this RIV. It's the allocation of resources, resource elements. . . . And you can think of it as being a two-dimensional map, a chessboard, if you like. *And one part of the system has to tell the other part of the system which of the squares on that chessboard it can use*. Now, there are several ways you could do that. You could number—let's take that chessboard example, an 8 by 8 matrix, an 8 by 8 square. You could number every square 1 through 64, and *one part of the system could tell the other part of the system, you are allowed to use squares 4, 8, 16, and 20*.

Appx2331-2332.

The problem arises in real-world applications, where, to continue Dr. Smith's analogy, a given "chessboard" fluctuates in size, such that a coordinate which would have been *invalid* on an 8-by-8 board (e.g., square 74 on a 64-square board), would be valid on a 10-by-10 board (which has 100 squares). *See, e.g.,* Appx1744

(containing variable number of RB). As Dr. Smith testified, this issue creates the requirement—well understood by a POSITA—that whatever number used to indicate SPS deactivation (i.e., the coordinate square on the chessboard) *must be invalid in all circumstances* (i.e., across all possible board configurations). *See* Appx2440-2444. Otherwise, there would be circumstances where the RIV value received would be valid and the SPS deactivation signal would not be sent—creating significant unreliability.

Thus, Samsung's equivocating statement that "all 1s *could* be a good *candidate*" for use in a RIV field to indicate SPS resource release should carry little weight, particularly in light of Dr. Smith's testimony. The Board's finding that a POSITA "would thus have understood Samsung's teaching of all 1s as a promising way to implement SPS deactivation in Dahlman" is unsupported by the record, and ignores significant evidence and testimony to the contrary. At minimum, a remand is required for the Board to reconsider this ignored testimony, as the Board has a duty to "consider all evidence of obviousness *and nonobviousness* before reaching a determination." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012). Indeed, besides ignoring large swaths of it based on legal error and misinterpretations (*see supra* Argument at II.A), the Board's sole response to the weight of Dr. Smith's testimony on this point was to merely say it was "factually unsupported" (Appx37), despite Dr. Smith's thorough

citation to documents in the record and deposition transcripts and his considerable experience. *See, e.g.*, Appx2440-2444. That too was improper. *See, e.g.*, *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1353 (Fed. Cir. 2018) ("[S]elective weighing of the record evidence does not pass muster under the APA."); *Princeton Vanguard*, 786 F.3d at 970 (quoting *Falkner v. Inglis,* 448 F.3d 1357, 1363 (Fed. Cir. 2006) ("[S]ubstantial evidence review 'requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion.'").

Indeed, while the Board seemed to declare *ipse dixit* that Dr. Smith's testimony was "factually unsupported," it simultaneously relied on testimony from Dr. Smith to assert that a POSITA would somehow have a reasonable expectation of success in the use of all 1s because "even if all 1s were, in the terms of the '279 patent, a valid value," that would not be an absolute bar on its use because "some other technique" could be used to communicate SPS deactivation. Appx38. The Board's finding in this regard adds even more confusion. On the subject of whether one could use a *valid* input into a field to achieve SPS deactivation (as opposed to an *invalid* one as taught by the '279 patent), Dr. Smith testified "[] the answer to that is no, not unless you do something else." Appx38 (quoting Appx2287 (95:7-10)). But Dr. Smith provides no description of such a technique, and if he did, no such additional technique appears within the claims of the '279 patent or the prior art.

The Board's reliance on Honeywell's expert, Mr. Lanning, was also unsupported. Mr. Lanning testified that simply adopting a method of filling a RIV field with all 1s "would avoid any calculations and be a simple choice." Appx36 (citing Appx2550). But this opinion of Mr. Lanning's, relied upon by the Board, falls prey to hindsight bias. Mr. Lanning states that filling the field with 1s would be a simple matter for a POSITA to consider, but absent is an explanation *why*, particularly in light of the testimony of Dr. Smith as discussed above. A POSITA at the time of invention considering the issue of a universally invalid field would face the same issues that left the persons of *extraordinary* skill in the art at 3GPP with the tepid conclusion that filling the RIV field with all ones only *could* be a good *candidate* for future consideration. *See* Appx2440-2444. Moreover, Mr. Lanning confirmed that Samsung itself did not provide any teaching from which a POSITA would be able to determine a usable RIV value. *See* Appx2444 (citing Appx2569-2570). And while the Board noted that Samsung considered the possibility of the "need for different length fields of 1s" (Appx35), once more, what is missing is any description of how or why a POSITA would understand this information to lead to the innovations of the '279 patent, which conclusively determined that filling the RIV field with all "1s" would yield a universally invalid result. Appx2443 (92:5-24); *see also* Appx2569-2570 (112:19-113:13).

The Board also couched its findings in the language of this Court's precedent holding that a POSITA's expectation of success in attempting a given method "need only be reasonable, not absolute." *See* Appx37 (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). The Board again identified its basis for a POSITA's reasonable expectation of success as the testimony of Honeywell's expert, Mr. Lanning, who had suggested that the prior art included Samsung's identification of "all 1s" as a "good candidate" for SPS deactivation and that Dahlman identified that unused code points generally could serve for SPS deactivation purposes. Appx36-37. But also, again, as discussed above, there is one crucial element missing for a POSITA to reasonably expect the use of "all 1s" to work: there must be evidence that "all 1s" *must be invalid in all circumstances* (i.e., across all possible chessboard configurations). Appx2440-2444. The Board was unable to identify *any* such evidence; indeed, the Board's reliance on Samsung undermines its holding, as it illustrates that even persons of extraordinary skill in the art were unable to do more than just suggest the use of "all 1s" could be viable without the proof required by a POSITA to actually try such a suggestion in a real world SPS deactivation transmission (proof that the '279 patentees first provided). *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1081 (quoting *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003)) ("While absolute certainty is not necessary to establish a reasonable expectation of

success, there can be little better evidence negating an expectation of success than actual reports of failure”).

Put simply, Samsung does not provide any indication for a POSITA to know that filling a field with 1s will be an “unused code point” (i.e., invalid) in every instance, and thus its reliability for SPS deactivation is uncertain so no POSITA would ever use, try, or incorporate such a field as an SPS deactivation condition in a wireless mobile communication system without such proof. *See also Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) (“To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention,” and when a reference “does not provide an enabling disclosure for a particular claim limitation,” then “another reference in which that limitation is enabled” must be provided). Dahlman provides no such proof—it has no disclosure whatsoever on the subject of the use of all 1s, regardless of however common its “signaling structure” (Appx39) may be. *See, e.g.*, Appx493-494; Appx2454. That proof required a POSITA did not exist until discovered by the ’279 patentees.

This critical evidence that the Board ignored (*see supra* Argument at II.A) not only was required to be considered, but also establishes that there could be no substantial evidence to support the purported obviousness of the element “first field is entirely filled with ‘1’” through a motivated combination of Dahlman and

Samsung with the level of reasonable success a POSITA in this field would require (without "any doubt"). At least remand is warranted on this independent ground. *See, e.g.*, *Applications in Internet Time*, 897 F.3d at 1353 (quoting *Princeton Vanguard,* 786 F.3d at 970) ("Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it.").

Indeed, substantial evidence requires more than a "mere scintilla," and failing to "adequately grapple with why a skilled artisan would find" the innovations of a patent obvious despite challenges in the record is indicative of the Board's obviousness determination being unsupported by substantial evidence. *Chemours Co.*, 4 F.4th at 1376 (error to ignore disclosures in the prior art read in context of a POSITA). Those indications are strong here where the Board failed to fully consider all the record evidence that a POSITA would not have found the innovations of the '279 patent obvious because it improperly discounted the equivocation in a disclosure made by persons of extraordinary skill in the art and expert testimony explaining why a mere POSITA would have found such a disclosure unhelpful. In both scenarios, the Board ignored text within the disclosures, but the Board also failed to adequately consider supporting expert testimony as well. The Board's determination ignores the substantial weight of evidence and, for that reason, the Board's decision should be vacated.

## III. CONCLUSION

For the foregoing reasons, the Court should vacate the Board's Final Written Decision and remand to the PTAB for further consideration and clarification of the material issues appealed herein.

February 27, 2023

Respectfully submitted,

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*

Timothy Devlin
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
tdevlin@devlinlawfirm.com

*Attorney for Appellant*
*Sisvel S.p.A.*

# ADDENDUM TABLE OF CONTENTS


| Date | Description | Appx Nos. |
|---|---|---|
| 9/22/2022 | Final Written Decision | Appx00001 |
| | US Patent No. 8971279 | Appx00123 |

Trials@uspto.gov
571-272-7822

Paper 47
Entered: September 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, CRADLEPOINT, INC., HONEYWELL INTERNATIONAL, INC., SIERRA WIRELESS, INC., and THALES DIS AIS DEUTSCHLAND GMBH,
Petitioner,

v.

SISVEL S.P.A.,
Patent Owner.

---

IPR2021-00678
Patent 8,971,279 B2

---

Before JAMESON LEE, MIRIAM L. QUINN, and AARON W. MOORE, *Administrative Patent Judges*.

QUINN, *Administrative Patent Judge*.

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., TCL Communication Technology Holdings Limited, Cradlepoint, Inc., Honeywell International, Inc., Sierra Wireless, Inc., and Thales DIS AIS Deutschland GmbH (collectively "Petitioner")[1] filed a Petition (Paper 7, "Petition" or "Pet.") requesting an *inter partes* review of claims 1, 3–5, 11, and 13–15 ("the challenged claims") of U.S. Patent No. 8,971,279 B2 (Ex. 1001, "the '279 patent"). Sisvel S.p.A. ("Patent Owner") filed a Preliminary Response. Paper 12 ("Preliminary Response" or "Prelim. Resp."). After considering the merits of the Petition and the arguments against institution by Patent Owner, we instituted *inter partes* review. Paper 18 ("Dec. on Inst.").

During the trial phase, Patent Owner filed a Response (Paper 27, "PO Resp."), Petitioner filed a Reply (Paper 33, "Reply"), and Patent Owner filed a Sur-reply (Paper 35, "Sur-reply"). We held oral argument on June 29, 2002, the transcript of which is filed in the record. Paper 46 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. We issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons explained below, Petitioner has shown by a preponderance of the evidence

[1] In the Petition, Petitioner also named ZTE Corporation and ZTE (USA) Inc. ("the ZTE entities"), as well as Dell Inc. ("Dell"), as Petitioner constituents. Pet. 1. However, we granted (Papers 15, 26) respective joint motions from the ZTE entities and Patent Owner (Paper 13), and Dell and Patent Owner (Paper 23), to terminate this proceeding with respect to the ZTE entities and Dell and dismiss them from it. Because the ZTE entities and Dell are no longer parties to this proceeding, we do not identify them herein.

that claims 1, 3–5, 11, and 13–15 of the ’279 patent are unpatentable. *See* 35 U.S.C. § 316(e) (2018).

## II. BACKGROUND

### *A. Real Parties in Interest*

Petitioner identifies as real-parties-in-interest the Petitioner entities identified above, as well as Dell Inc., “Dell Marketing L.P., Dell Products L.P., Dell Technologies Inc., Denali Intermediate Inc., Sierra Wireless America, Inc., ZTE Corporation, and ZTE (USA) Inc., Thales DIS AIS USA, LLC, Telefonaktiebolaget LM Ericsson, and Ericsson Inc.” *See* Paper 29. Patent Owner identifies itself, Sisvel S.p.A., as the real party in interest. Paper 9. However, the Dell and ZTE entities were terminated before issuance of this Final Written Decision. Papers 15, 26.

### *B. The ’279 Patent*

The ’279 patent relates to “scheduling radio resources for semi-persistent uplink/downlink packet data transmission in a cellular wireless communication system.” Ex. 1001, 1:21–29. The ’279 patent describes a “method and apparatus for informing a UE of [semi-persistent scheduling (SPS)] deactivation without adding a new bit field or a new control channel format in a communication system for allocating resources.” *Id.* at 3:67–4:3. The method includes “receiving, by a user equipment (UE), a downlink control channel including resource allocation information, and releasing resource allocation for the UE when a binary field indicating the resource allocation information is entirely filled with 1.” *Id.* at 4:5–11. According to the ’279 patent, “[t]he downlink control channel may be a physical downlink control channel (PDCCH),” and the resource allocation information may be a binary field representing a resource indication value

(RIV), which indicates a start resource block and the length of consecutively allocated resource blocks (RBs). *Id.* at 5:8–9, 5:12–15, 13:35–38. The '279 patent describes using a conventional RIV table to determine whether the RIV is valid or invalid: RIVs defined in the table are referred to as valid RIVs, whereas RIVs undefined in the table are referred to as invalid RIVs. *Id.* at 17:47–53. The '279 patent further describes that "when a downlink control signal format based on the compact-type RB allocation scheme is used for signaling SPS activation and/or SPS deactivation, an RIV contained in the PDCCH from which the SPS [cell radio network temporary identifier] (SPS C-RNTI) is detected may be used as signaling information for SPS deactivation indication" if it "[has] any one of values capable of being used as the above-mentioned invalid RIVs." *Id.* at 21:33–41.

For example, "according to the RIV construction method shown in Table 1, a valid RIV indicating a generable RB allocation combination may be any one of RIVs from 0 to 209 (where this RIV '209' is a maximum valid RIV)," whereas "an invalid RIV may be any one of RIVs from 210 to 255." *Id.* at 21:42–46, Table 1. "If the RIV . . . belongs to the invalid RIV, the UE recognizes that signaling information indicating SPS deactivation is transmitted." *Id.* at 21:46–50. "Specifically, in the case where the RIV . . . is determined to be the . . . specific value acquired when the entirety of the binary field is filled with 1, it can be recognized that signaling information indicating SPS deactivation is transmitted on the basis of the above specific value." *Id.* at 21:55–60. For example, "[a]s shown in FIG. 17, if the RIV binary field is composed of 8 bits, a binary number RIV (=$11111111_2$) is acquired," which "may indicate that signaling information indicating SPS deactivation was transmitted." *Id.* at 21:63–67, Fig. 17.

### *C. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify judicial matters that would affect, or be affected by, a decision in this proceeding. In particular, the Parties indicate that the ’279 patent is involved in the following district court cases:

| Case Number | Venue | Filing Date |
|---|---|---|
| 3:20-cv-01289 | N.D. Tex. | May 18, 2020 |
| 1:20-cv-00649 | D. Del. | May 15, 2020 |
| 1:20-cv-00651 | D. Del. | May 15, 2020 |
| 1:20-cv-00652 | D. Del. | May 15, 2020 |
| 1:20-cv-00653 | D. Del. | May 15, 2020 |
| 1:20-cv-00654 | D. Del. | May 15, 2020 |
| 1:20-cv-00655 | D. Del. | May 15, 2020 |
| 1:20-cv-00656 | D. Del. | May 15, 2020 |
| 1:20-cv-00658 | D. Del. | May 15, 2020 |
| 1:20-cv-00659 | D. Del. | May 15, 2020 |
| 1:20-cv-22050 | S.D. Fla. | May 15, 2020 |
| 1:20-cv-22051 | S.D. Fla. | May 15, 2020 |
| 1:20-cv-22054 | S.D. Fla. | May 15, 2020 |

Pet. 3–4; Paper 9, 1.

### *D. Illustrative Claim*

Petitioner challenges claims 1, 3–5, 11, and 13–15 of the ’279 patent. Pet. 9. Claims 1 and 11 are independent. Claim 1 is illustrative and reproduced below (with italicized portion identified for emphasis).

> 1. A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system, the method comprising:

> performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;
>
> receiving, by the UE, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and
>
> performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,
>
> *wherein the conditions for SPS deactivation include:*
> *the RNTI is a SPS Cell RNTI (SPS C-RNTI); and*
> *the first field is entirely filled with '1'.*

Ex. 1001, 26:2–17 (emphasis added). We refer hereinafter to the italicized portion of the claim as the "SPS deactivation conditions."

Claim 11 is substantively similar to claim 1 and, therefore, both claims are analyzed together in the Petition and in our analysis below.

### *E. Asserted Grounds and Testimony*

Petitioner presents the challenges summarized in the chart below. Pet. 12.

| Claim(s) Challenged | 35 U.S.C. § | Reference/Basis |
|---|---|---|
| 1, 3–5, 11, 13–15 | 103(a)[2] | Dahlman,[3] Samsung[4] |

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. § 103 that became effective after the effective filing date of the challenged claims. Therefore, we apply the pre-AIA version of 35 U.S.C. § 103.

[3] Erik Dahlman et al., *3G Evolution: HSPA and LTE for Mobile Broadband* 1–608 (2d ed. 2008) (Ex. 1003, "Dahlman").

[4] Tdoc R2-084455, *SPS resource release*, 3GPP TSG-RAN2#63 Meeting, Jeju, South Korea, 18–22 August 2008 (Ex. 1005, "Samsung").

| Claim(s) Challenged | 35 U.S.C. § | Reference/Basis |
| --- | --- | --- |
| 1, 3–5, 11, 13–15 | 103(a) | Nokia,[5] Samsung |
| 1, 3–5, 11, 13–15 | 103(a) | Nokia |
| 1, 3–5, 11, 13–15 | 103(a) | Dahlman, Samsung, Nokia |

Petitioner supports its unpatentability challenge with a declaration of Mark R. Lanning, filed as Exhibit 1002 ("Lanning Decl."). Petitioner also supports its assertions concerning the status of the prior art as printed publications with declarations from James L. Mullins, Ph.D. (Ex. 1006) and Craig Bishop (Ex. 1007).

Patent Owner supports its response with testimony from Michael Smith, Ph.D., filed as Exhibit 2005 ("Smith Decl.").

## III. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art (POSA) "at or about the time of the alleged invention would have had a degree in electrical engineering, computer engineering, computer science or a similar discipline, with at least three years of relevant industry or research experience, including experience designing or implementing wireless radio systems for data transmission," and that "[a] POSA would also have familiarity with the 3GPP specifications, including LTE." Pet. 23–24 (citing Ex. 1001, 1:31–35; Lanning Decl. ¶ 31).

Patent Owner contends that "[a] person having ordinary skill at the time of invention, November 13, 2008, in the relevant art would be one with a bachelor's degree in electrical engineering, computer sciences, or

[5] R1-083718, *Missing details of semi-persistent scheduling*, 3GPP TSG-RAN WG1 Meeting #54bis, Prague, Czech Republic, 29 September–3 October 2008 (Ex. 1004, "Nokia").

telecommunications, along with a minimum of three to five years of practical experience in the field," and that "[a] combination of more experience in the field and less education or more education and less experience in the field would also suffice." PO Resp. 11–12.

At the institution stage, we adopted Petitioner's assessment of the level of skill in the art, which encompasses that proposed by Patent Owner and is consistent with the specification of the '279 patent and asserted prior art of record. Our Decision stated that "Patent Owner's argument that a person of ordinary skill in the art would not have needed to be a *member* of a standard-setting organization does not address the standard actually proposed by Petitioner – *familiarity* with the 3GPP specifications, including LTE." Dec. on Inst. 7–8. We stated that the '279 patent devotes a significant portion of its disclosure to discussing 3GPP LTE communications systems and, thus, we find familiarity with 3GPP specifications would have been expected of a person of ordinary skill in the art. *Id.* at 8. And we stated that the asserted prior art addresses and describes 3GPP specifications, and, therefore, it is reasonable to conclude that a person of ordinary skill in the art would have had familiarity with such specifications. *Id.*

Patent Owner responds to our determination by disagreeing "that a POSITA would have 'familiarity with the 3GPP specifications' to the extent Petitioner [is] using the concept of 'familiarity' to import arguments that are not based on the asserted prior art references." PO Resp. 12. Further, Patent Owner "does not agree that a POSITA's understanding that '3GPP specifications' exist implies that a 'specific functional area of the standard' exists for any given argument asserted by Petitioners." *Id.*

Patent Owner's argument does not point out why a person of ordinary skill in the art would not have familiarity with the 3GPP specifications existing at the time of the invention. Patent Owner's objection does little to identify which aspect of the 3GPP familiarity would not have been known to a person of ordinary skill in the art despite the evidence of record in the patent at issue itself and the presented prior art. *See* Reply 4 (Petitioner arguing that various 3GPP standards were cited as relevant prior art on the face of the patent and that the references and the '279 patent specifically address the 3GPP specifications as a central focus of the field in the art). Nor does Patent Owner dispute that such familiarity is evident from the present record. Accordingly, we find unpersuasive the objection to the concept of "familiarity" without identifying which knowledge of a person of skill in the art would be insufficiently present to make a difference in the outcome of this proceeding. Patent Owner's objection, stated differently, goes to how Petitioner addresses the unpatentability grounds in light of what is known in the art – rather than disputing the actual level of a person of ordinary skill in the art.

Based on the evidence of record, the specification of the '279 patent, and the prior art of record, Dahlman, Samsung, and Nokia, we determine that Petitioner's articulated level of ordinary skill in the art is proper, including that familiarity with 3GPP specifications would be part of the knowledge such a person would have had at the time of the invention.

### *B. Claim Construction*

In *inter partes* review proceedings based on petitions filed on or after November 13, 2018, such as this one, we construe claims using the same claim construction standard that would be used in a civil action under

35 U.S.C. § 282(b), as articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. *See* 37 C.F.R. § 42.100(b).

Petitioner asserts that "all claim terms should be accorded their plain and ordinary meaning, as understood by a POSA consistent with the specification and file history of the '279 patent." Pet. 23. Patent Owner took no position regarding claim construction in the Response. PO Resp. 13. However, in the Sur-reply, Patent Owner for the first time raised what appears to be a claim scope dispute pertaining to the term "Resource Indication Value (RIV)," recited in claims 4 and 14. Sur-reply 5–6. According to Patent Owner, "[a]n RIV is defined in the '279 patent's specification based on a series of calculations (e.g., an 'RIV construction method')." *Id.* at 5. Patent Owner cites the '279 patent specification at columns 16 and 18, almost in their entirety, as support for such a statement and refers back to the section in Patent Owner's Response that describes a summary of the '279 patent. *Id.* (citing Ex. 1001, 16:1–18:51 and PO Resp. 8–11). In short, it appears that Patent Owner desires the term "Resource Indication Value (RIV)" to be construed to implement the equations disclosed in that specific portion of the specification as an "RIV construction method" unique to the '279 patent, and, therefore, to the claim. *See also* Tr. 48:23–51:12. We decline to construe the term to have the meaning urged by Patent Owner.

Defining the term "Resource Indication Value (RIV)" to include the specific calculations disclosed in columns 16 through 18 of the '279 patent, without a cogent and properly supported explanation for why the term should be thus construed, would amount to improperly importing a limitation into the claim from a preferred embodiment. *Phillips v. AWH*

*Corp.,* 415 F.3d 1323 (noting courts must "avoid the danger of reading limitations from the specification into the claim"). There is no language in the claim itself that alludes to how the values are calculated or how they are to be interpreted. And as Petitioner points out, the '279 patent specification provides a broader description of the term, by stating that the "resource indication value (RIV) indicat[es] a start resource block and the length of consecutively-allocated resource blocks (RBs)." *Id.* at 13:35–38; Pet. 42; *see also* Reply 4–5 (arguing that the calculation of an invalid RIV value is irrelevant to the claims because the claims do not require any method of calculating such values); Tr. 22:1–23:25 (arguing that a RIV is a value denoting a start resource block and the length of consecutively allocated resource blocks as stated in the '279 patent specification).

Accordingly, we determine that the "Resource Indication Value (RIV)" recited in claims 4 and 14, does not require a RIV calculation method of the type Patent Owner argues.

There are no other terms that the parties dispute and, we do not need to expressly construe any further claim limitations to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*C. Public Accessibility*

Petitioner asserts that Dahlman, Samsung, and Nokia qualify as prior art because each document was published and publicly available on the 3GPP website prior to November 13, 2008, the earliest effective filing date

of the U.S. application for the '279 patent. Pet. 2–3, 10–11 (citing Ex. 1006 ¶ 54; Ex. 1007 ¶¶ 6–48, 52, 60), 16 (citing Lanning Decl. ¶ 116). Petitioner cites the Mullins Declaration for establishing the public availability of Dahlman, and the Bishop Declaration for establishing the public availability of the Samsung and Nokia documents, by describing in detail how a member of the public could access such documents prior to the effective filing date of the '279 patent. Pet. 10–11 (citing Ex. 1006 ¶ 54; Ex. 1007 ¶¶ 6–48, 52, 60); *see also* Ex. 1006 ¶¶ 50–53; Ex. 1007 ¶¶ 49–51, 52–59, 61, 62.

More specifically, Petitioner asserts that Dahlman (Ex. 1003), titled "3G Evolution: HSPA and LTE for Mobile Broadband," qualifies as prior art because it was published and publicly available on August 6, 2008. Pet. 10 (citing the Elsevier database catalog web page for Dahlman). Petitioner further asserts that its expert, Dr. Mullins, "provides a detailed explanation of library publication practices and the dates that publications are available to the public in his declaration" and "verified that Exhibit 1003 is an authentic copy of Dahlman and that Dahlman was publicly available on the bookshelves of the University of Arizona Library by November 4, 2008, at the latest." *Id.* at 10–11 (citing Ex. 1006 ¶ 54). Petitioner next asserts that Nokia qualifies as prior art because it was published by the 3GPP Technical Specification Group for Radio Access Network on or before September 24, 2008, as verified by Petitioner's expert, Mr. Craig Bishop, who "provides a detailed explanation of 3GPP's policies and practices for publishing and making available technical submissions in his declaration." *Id.* at 11 (citing Ex. 1007 ¶¶ 6–48, 52). Petitioner also asserts that Samsung qualifies as prior art because it was published by the 3GPP Technical Specification Group for Radio Access Network on August 12, 2008, as verified by Petitioner's expert, Mr. Bishop. *Id.* at 11 (citing Ex. 1007 ¶ 60).

At the preliminary stage, prior to institution, Patent Owner challenged Petitioner's showing that Dahlman was publicly accessible. Prelim. Resp. 10–11. We disagreed with Patent Owner in our Decision on Institution and preliminarily determined that Dahlman, published by an established publisher, Academic Press, was on the shelves of the University of Arizona by no later than November 4, 2008, which was before the priority date of the '279 patent. Dec. on Inst. 9–11.

Patent Owner reiterates during trial that Dahlman has no date and is "not prior art because it is a book that does not have a release date into circulation, i.e., no specific date of public accessibility." PO Resp. 15. Patent Owner also argues that the testimony of Dr. Mullins is "insufficient to satisfy the clear and convincing standard for the asserted prior art." *Id.*

We do not agree with Patent Owner. For a reference to qualify as a printed publication, "before the critical date the reference must have been sufficiently accessible to the public interested in the art." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed. Cir. 1988). When there is an established publisher there is a presumption of public accessibility as of the publication date. *Vidstream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1065 (Fed. Cir. 2020); *see also Giora George Angres, Ltd. v. Tinny Beauty & Figure, Inc.*, No. 96-1507, 1997 WL 355479, at *7 (Fed. Cir. July 24, 1997) ("[A]s Memoirs was published (in England) by an established publisher, there is no reason to suspect that it was not publicly available, including to one skilled in the art, and no evidence was presented that it was not." (citing *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986)) (emphasis omitted)).

In our Decision on Institution we noted that Dahlman is a book published by Academic Press (an established publisher) with a copyright of

2008 for the second edition, and the record shows a publication date of August 6, 2008, evidenced by the listing on the cited Elsevier catalog. Pet. 10 (citing https://www.elsevier.com/books/3g-evolution/dahlman/978-0-12-374538-5); Ex. 1003). As stated above, when there is an established publisher, as we have here, there is a presumption of public accessibility as of the publication date. *Vidstream,* 981 F.3d at 1065. The evidence that Dahlman was published as of August 6, 2008, and the *Vidstream* presumption have not been rebutted. *See* PO Resp. 15 (arguing that the Dahlman itself shows no publication date, and not addressing the Elsevier catalog proffered by Petitioner). Accordingly, we determine Dahlman is a printed publication with a public accessibility as of the publication date, August 6, 2008.

In any event, even if Dahlman was not publicly accessible by August 6, 2008, the record supports the alternative contention of Petitioner that Dahlman was publicly accessible by November 4, 2008. We credit the testimony of Dr. Mullins, a professional librarian, which details how the date of Dahlman's public *accessibility* was established, including the determination that cataloging at the University of Arizona library was completed by October 25, 2008, and that Dahlman would have been labeled and on the shelf of that library by no later than November 4, 2008. Ex. 1006 ¶¶ 50–51. There is no evidence of record rebutting this testimony or calling into question Dr. Mullins's qualification to testify as to this matter. Thus, we find that Dahlman was publicly accessible by no later than November 4, 2008. The earliest priority of the '279 patent is November 13, 2008, according to Patent Owner. PO Resp. 15. Based on these dates, Dahlman pre-dates the '279 patent and is therefore prior art.

### *D. Overview of the Asserted References*

Petitioner relies primarily on three references as prior art that each teaches various features of the claimed invention. We summarize each reference below.

#### *1. Overview of Dahlman (Ex. 1003)*

Dahlman relates to "the evolution of the 3G mobile communication as developed in the 3GPP (*Third Generation Partnership Project*) standardization, looking at the radio access and access network evolution." Ex. 1003, xxix.[6] In relevant part, Dahlman describes various Long Term Evolution (LTE) network concepts including LTE radio interface architecture, downlink and uplink transmission schemes, LTE access procedures, and LTE transmission procedures. *See id.* at 277–546.[7] In an LTE system, the scheduler determines which terminals receive data and on which set of resource blocks. *Id.* at 465. The basic operation is *dynamic* scheduling, where the base station (eNodeB) sends scheduling information in each Transmission Time Interval (TTI) to the selected set of terminals. *Id.* at 465–466. With dynamic scheduling, a new scheduling decision is taken in each subframe, and allows for flexibility in terms of the resources used and large variations in the amount of data to transmit at the cost of the scheduling decision being sent on a physical downlink control channel (PDCCH) in each subframe. *Id.* at 476–477. However, in some services that involve regularly occurring transmission of relatively small payloads, like Voice over IP services, reducing the control signaling overhead is

---

[6] For consistency with the parties' briefings, we cite to the actual page numbers of Dahlman rather than the corresponding Exhibit page numbers.
[7] These numbers (and all pinpoint cites to Dahlman) refer to the original page numbers of Dahlman.

accomplished in LTE through *semi-persistent* scheduling in addition to dynamic scheduling. *Id.* at 477. Thus, to reduce "the control signaling overhead" a scheduler may use *semi-persistent* scheduling. *Id.* at 466.

With regard to semi-persistent scheduling, Dahlman describes an LTE radio-access architecture in which an eNodeB (base station) sends scheduling information on the PDCCH to one or more terminals (UEs) for controlling uplink and downlink transmission activity. *See, e.g.*, *id.* at 299–301, 313, 331, 465–466; *see also id.* at 312 (describing "physical channels without a corresponding transport channel. . . as Ll/L2 control channels . . . used for downlink control information (DCI), providing the terminal with the necessary information for proper reception and decoding of the downlink data transmission"). Dahlman explains:

> With semi-persistent scheduling, the terminal is provided with the scheduling decision on the PDCCH, together with an indication that this applies to every *n*th subframe until further notice. . . . The periodicity of semi-persistently scheduled transmissions, that is, the value of *n,* is configured by [radio resource control (RRC)] signaling in advance, while activation (and deactivation) is done using the PDCCH.

*Id.* at 477.

Figure 19.15 of Dahlman is reproduced below.




Figure 19.15 of Dahlman depicts an example of semi-persistent scheduling. *Id.* As shown in Figure 19.15, the periodicity of the UE's SPS transmission is configured by RRC, which grants time resources having a particular periodicity (for example, 20 ms). *Id.* Figure 19.15 also shows that the

persistent scheduling resources are indicated on the PDCCH, such that the UE may perform transmissions according to the configured periodicity (for example, every 20 ms). *Id.*

According to Dahlman, "[a]fter enabling semi-persistent scheduling, the terminal continues to monitor the PDCCH for uplink and downlink scheduling commands." *Id.* If a dynamic scheduling command is detected, it takes precedence over the semi-persistent scheduling in that particular subframe. *Id.* Dahlman explains that "for VoIP in parallel with web browsing it may be useful to override the semi-persistent resource allocation with a larger transport block when downloading the web page." *Id.*

Dahlman also describes that the PDCCH may be used to carry one or more formats of downlink control information (DCI) such as scheduling and control commands to provide the terminal (UE) with the necessary information for proper reception and decoding of the downlink data transmission. *Id.* at 312, 338, 340–341, Fig. 16.17. Dahlman explains that "[a] flag in the message is used to inform the terminal whether the message is an uplink scheduling grant (DCI format 0) or a downlink scheduling assignment (DCI format 1A)." *Id.* at 349. Notably, "[t]he information fields of DCI format 1A include[]" a "Resource-block allocation . . . field indicat[ing] the resource blocks upon which the terminal should transmit the PUSCH" and an "Identity (RNTI) of the terminal for which the POSCH transmission is intended [16 bit]." *Id.* at 349–350; *see also id.* at 342–43, 345, Fig. 16.18. Dahlman also describes, in the context of PDCCH processing, that "for normal unicast data transmission, the terminal-specific C-RNTI is used." *Id.* at 352; *see also id.* at 314 ("One or several IP addresses have been assigned to the mobile terminal, as well as an identity

of the terminal, the *Cell Radio-Network Temporary Identifier* (C-RNTI)."), 432, 443–44.

*2. Overview of Samsung (Ex. 1005)*

Samsung, entitled "SPS resource release," is a published 3GPP meeting contribution that "proposes to use all 1s in [the] RB assignment field in [an] SPS resource allocation DCI to release the SPS resource." Ex. 1005, 1. Samsung explains that "[a]ny of the unused code point[s]" in the RB assignment field "could indicate the SPS resource release," and "[t]o make the relevant text simple, all 1s could be a good candidate." *Id.* The authors of Samsung also "[n]ote that the proposal is valid for DCI format 0/1A" and "believe the proposal works both for the uplink and for the downlink." *Id.*

*3. Overview of Nokia (Ex. 1004)*

Nokia, entitled "Missing details of semi-persistent scheduling," is a published 3GPP meeting contribution that "discusses some further details of semi-persistent DL and UL scheduling and contains several proposals to complete the specification of semi-persistent scheduling." Ex. 1004, 1. As an initial matter, Nokia describes the concept of releasing semi-persistent resources by stating that "semi-persistent resources are released explicitly by PDCCH," and proposing that the "SPS release is sent on PDCCH using SPS C-RNTI and by setting the content of PDCCH (except the CRC) into a known code word, *e.g.*, all bits set to zero." *Id.* Nokia applies its proposed semi-persistent scheduling technique to user equipment (UE), stating that "[w]hen the UE receives the persistent UL grant, then the UE stores the parameters and is allowed to use these parameters persistently." *Id.* at 2.

In the context of UL persistent scheduling, Nokia describes:

> As agreed, the persistent scheduling is configured by RRC signalling, i.e., the feature is turned on/off by RRC signalling and the periodicity of the persistent scheduling is given by RRC signalling. The exact timing as well as the resources and transport format parameters are sent on L1/L2 control channel (PDCCH) as normal UL grant (with SPS C-RNTI). If the UL grant is missed (there is no UL transmission), eNB can send it again.

*Id.* Nokia also describes that "the explicit release sent on PDCCH should be acknowledged by the UE by sending an ACK on UL control channel corresponding to the PDCCH." *Id.* Nokia proposes, in relevant part, that the "UL SPS release is sent on PDCCH using SPS C-RNTI and by setting the content of PDCCH (except the CRC) into a known code word which does not give a valid allocation. For Format 0 the following fields are set to zero: Hopping flag, Resource block assignment . . . ." *Id.*

### *E. Challenge Based on Dahlman and Samsung*

Petitioner contends that the challenged claims would have been obvious over Dahlman and Samsung. Pet. 24–46. For the reasons that follow, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 3–5, 11, and 13–15 would have been obvious over Dahlman and Samsung.

#### *1. Independent Claims 1 and 11*

The Dahlman and Samsung ground turns on whether the combination teaches or suggests the two claimed SPS deactivation conditions: "*the RNTI is a SPS Cell RNTI (SPS C-RNTI)*; and *the first field is entirely filled with '1.'*" Ex. 1001, 26:15–17, 27:13–15 (emphases added). But first, we address the remaining claimed limitations, for which Patent Owner does not present argument.

The Petition sets forth, and we find, that the combination of Dahlman and Samsung teaches the following recitations of claim 1[8]:

a. "A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system": Dahlman teaching SPS deactivation in the context of an LTE system (Pet. 28–29 (citing Ex. 1003, 43, 59–61, 299–301, 433, 441, 477, 495, 505, 563–564, Figs. 4.17–4.19, 15.1, 18.8, 18.13, 24.1; Lanning Decl. ¶¶ 205, 209)); and Samsung teaching deactivation of an uplink SPS allocation in what a person of ordinary skill in the art would understand to be an LTE system, and suggesting the proposal works for both uplink and downlink allocations (*id.* at 30 (Ex. 1005; Lanning Decl. ¶¶ 218, 223–226)). Thus, each of Dahlman and Samsung teaches the recitation of the preamble.[9]

---

[8] Because claim 11 recites substantially similar limitations, our analysis refers to claim 1, but applies equally to claim 11.

[9] We make this finding notwithstanding that we have not determined that the preamble is a limitation and neither party argues that it is.

b. "performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal": Dahlman teaching a UE performing SPS transmission in every *n*th subframe, where the periodicity is configured by RRC signaling. Pet. 30–31 (citing Ex. 1003, 299, 317–318, 477, Figs. 16.2, 19.15; Lanning Decl. ¶¶ 247–249). Petitioner provides an annotated Figure 19.15, reproduced below, that shows an example of semi-persistent scheduling transmission (*id.* at 31):




**Figure 19.15** *Example of semi-persistent scheduling.*

Figure 19.15 depicts an SPS transmission by the UE in yellow (Persistently schedule transmission) that the RRC configured to occur at a given periodicity (shown in blue). This annotated Figure 19.15 also shows that the frequency resources are received from a PDCCH signal (shown in orange), which activates semi-persistent scheduling. After this activation, the UE transmits (shown in red) as instructed. Each radio frame contains multiple subframes. *Id.* at 32 (citing Lanning Decl. ¶ 248). These explanations in the Petition and by Dr. Lanning are persuasive and we find that Dahlman teaches the claim requirement of a UE performing an SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal.

c. "receiving, by the UE, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation": Dahlman teaching a PDCCH signal includes DCI, such as for scheduling decisions, where scheduling grants use an RB allocation field (Pet. 33–34 (citing Ex. 1003, 312–313, 338, 477; Lanning Decl. ¶¶ 260–262)), and further teaching including a RNTI in the PDCCH (*id.* at 34–35 (citing Ex. 1003, 312, 318, 342–343, 345, 348–350, Fig. 16.18; Lanning Decl. ¶¶ 263–264)). More specifically, Dahlman describes a downlink scheduling assignment using a DCI format 1A that includes the identity (RNTI) of the terminal for which the PDSCH transmission is intended. Ex. 2003, 349; *see also* Pet. 34–35 (annotating Figure 16.18 showing that for resource allocation type 2, the downlink format DCI 1A is used and the uplink format

DCI 0 is used, which also includes a RNTI). This DCI is transmitted in the PDCCH signal, and the DCI format 0, used for uplink scheduling, contains the RB allocation field. Pet. 33; Lanning Decl. ¶ 262 (testifying that the downlink control information is a first field related to a resource allocation because the grants and power-control commands in the DCI are all examples of resource allocations from the PDCCH); Fig. 16.18 (denoting that for resource allocation type 2, using DCI formats 1A and 0, the resource blocks will be assigned using start/length fields). Accordingly, we are persuaded that Dahlman teaches a PDCCH signal received by the UE, where the signal includes a RNTI and a first field related to a resource allocation.

d. "performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation": Dahlman teaching that the PDCCH provides SPS scheduling decisions, including activation and deactivation. Pet. 35–36 (citing Ex. 1003, 220, 477, Fig. 19.15; Lanning Decl. ¶¶ 270–272, 274). As shown in Figure 19.15, above, the UE continues to transmit "persistently" on the assigned subframes until it receives a deactivation signal in the PDCCH. Ex. 1003, 477 ("activation (and deactivation) is done using the PDCCH"). Petitioner contends, and we agree, that "[t]he UE responds to the deactivation by discontinuing further transmissions using the resources that were allocated for SPS." Pet. 36 (citing Lanning Decl. ¶ 272; Fig. 1915; Ex. 1003, 477). Accordingly, we are persuaded that Dahlman teaches a procedure for deactivating the SPS transmission if the PDCCH signal satisfies

conditions for SPS deactivation—for instance, because Dahlman teaches that deactivation of SPS transmission is signaled using the PDCCH and the UE responds by discontinuing the transmission. However, although this claim limitation recites "conditions," the remaining claim limitations address the specific "conditions" that must be satisfied for SPS deactivation. We analyze below those conditions in connection with the further recited limitations.

e. As stated above, the disputes concerning the Dahlman and Samsung ground concern whether Petitioner has shown sufficiently that the combination teaches the following SPS deactivation conditions: "*the RNTI is a SPS Cell RNTI (SPS C-RNTI)*; and *the first field is entirely filled with '1.'*" We analyze each in turn.

*(i) "the RNTI is a SPS Cell RNTI (SPS C-RNTI)"*

Regarding the first SPS deactivation condition, Petitioner contends that Dahlman transmits a DCI on the PDCCH that includes the RNTI, as noted above for the "receiving" limitation, and that "[t]he specific RNTI used for signaling purposes of normal unicast transmissions between the base station and UE is the C-RNTI." Pet. 37 (citing Ex. 1003, 314). Further, Petitioner contends that a person of ordinary skill in the art "would have understood that for deactivation, the DCI sent on the PDCCH must include the C-RNTI which would be considered to be an SPS C-RNTI." *Id.* at. 38 (citing Lanning Decl. ¶ 280).

Patent Owner argues that Dahlman does not disclose an SPS C-RNTI. In particular, Patent Owner alleges that Petitioner's expert, Mr. Lanning,

admitted that Dahlman does not disclose an SPS C-RNTI. PO Resp. 28–29 (quoting Ex. 2006, 61:9–63:5) (citing Smith Decl. ¶¶ 107–108). Further, Patent Owner asserts that "Dahlman only refers to C-RNTI for identification of the terminal—nothing else," and "Dahlman never refers to C-RNTI for deactivation." *Id.* at 31 (citing Smith Decl. ¶¶ 117–118). Accordingly, Patent Owner argues, although Dahlman mentions "C-RNTI" a number of times, none of these relate to SPS deactivation, and "a POSITA would not consider the C-RNTI of Dahlman to be a SPS C-RNTI." *Id.* at 31–33 (quoting Ex. 1003, 314, 352, 432, 442–423, 443–444) (citing Smith Decl. ¶¶ 120–122). Patent Owner argues that, outside the knowledge of the '279 patent, there is insufficient evidence in the record to conclude that one of ordinary skill in the art would have used an SPS C-RNTI in the PDCCH for SPS deactivation signaling. *See id.* at 34–36.

In reply, Petitioner argues that, contrary to Patent Owner's allegation, Mr. Lanning did not admit that Dahlman fails to disclose an SPS C-RNTI, and, in any case, that Petitioner did not contend Dahlman expressly teaches an SPS C-RNTI. Reply 19, 22. Rather, Petitioner asserts that Mr. Lanning testified that one of ordinary skill in the art "would understand Dahlman refers to SPS C-RNTI." *Id.* at 20 (citing Ex. 2006, 126:13–20). Specifically, Petitioner argues that Dahlman teaches both the use of a C-RNTI and performing SPS deactivation, and that one of ordinary skill in the art "would have understood that for an active call to be deactivated, the DCI sent on the PDCCH must include the C-RNTI," and that "[t]he SPS C-RNTI is the C-RNTI used for SPS connections." *Id.* at 20–21 (citing Ex. 1003, 314, 477; Lanning Decl. ¶ 280; Ex. 2006, 124:13–16). That is, "[a]ll the C-RNTIs are the same, and the SPS is just used to show 'it's being used now for an SPS connection.'" *Id.* at 21 (quoting Ex. 2006, 124:17–125:3).

We are persuaded that Dahlman suggests to a person of ordinary skill in the art using an SPS C-RNTI in the deactivation of the semi-persistent scheduling. The parties' dispute over whether Dahlman expressly discloses an SPS C-RNTI is immaterial, because Petitioner's ground relies on what Dahlman would have suggested to a person of ordinary skill in the art, reading the reference as a whole. *See* Reply 22 ("Petitioner never argued that Dahlman expressly teaches an SPS C-RNTI.") (citing Pet. 38); Ex. 2006 (Lanning Deposition), 62:22–23 ("I know that Dahlman doesn't specifically say SPS, space, C-RNTI"). Accordingly, we look at the relevant portions of Dahlman that Petitioner relies upon in contending a person of ordinary skill in the art "would have understood that for deactivation, the DCI sent on the PDCCH must include the C-RNTI which would be considered to be an SPS C-RNTI." Pet. 37–38 (citing Ex. 1003, 314, 342, 348–350, 352, 477).

In describing "the transmission of the DCI message on a PDCCH," Dahlman discloses that "the identity of the terminal (or terminals) addressed, that is, the RNTI, is included in the CRC calculation but not explicitly transmitted," and that "for normal unicast data transmission, the terminal-specific C-RNTI is used." Ex. 1003, 352; *see also id.* at 314 ("One or several IP addresses have been assigned to the mobile terminal, as well as an identify of the terminal, the *Cell Radio-Network Temporary Identifier* (C-RNTI), used for signaling purposes between the mobile terminal and the network."). Dahlman also discloses that for "semi-persistent scheduling, the terminal is provided with the scheduling decision on the PDCCH," and that "activation (and deactivation) is done using the PDCCH." *Id.* at 477. Accordingly, Dahlman discloses signaling SPS deactivation using the PDCCH signal, and that DCI messages on the PDCCH include the RNTI, which is a C-RNTI in cases of unicast data transmission. This disclosure,

however, requires making two connections to arrive at the claimed subject matter at issue: 1) that the PDCCH signaling for SPS deactivation includes a RNTI that is a C-RNTI; and 2) that the C-RNTI is an SPS C-RNTI.

First, regarding the use of a C-RNTI for SPS signaling, Mr. Lanning testifies that Dahlman teaches using the PDCCH for downlink control information, including scheduling decisions (Lanning Decl. ¶ 262 (citing Ex. 1003, 313, 338)), and that "Dahlman teaches a DCI format 0 for the uplink scheduling grant, and DCI format 1A for the downlink scheduling grant and each include the RNTI for the UE" (*id.* ¶ 263 (citing Ex. 1003, 312, 318, 342, 345, 348–349, Fig. 16.18)). Mr. Lanning also notes that "[t]he specific RNTI used for signaling purposes of normal unicast transmissions between the BS and UE is the C-RNTI." *Id.* ¶ 279 (citing Ex. 1003, 314, 352). Mr. Lanning ties this testimony on using RNTIs, including the C-RNTI, in the PDCCH to SPS signaling by noting that "Dahlman also teaches that deactivation of SPS is signaled using the PDCCH." *Id.* ¶ 278 (citing Ex. 1003, 477).

Patent Owner's expert, Dr. Smith, opined that "Dahlman's general explanation of RNTIs in data transmissions [does not] provide a framework for a POSITA to draw a meaningful connection between C-RNTI and deactivation." Smith Decl. ¶ 121. But Patent Owner does not specifically explain why Dahlman does not suggest using a C-RNTI when performing SPS signaling on the PDCCH, given Dahlman's disclosure of using the PDCCH for scheduling decisions with DCI formats that include RNTIs and, in particular, C-RNTIs in the case of unicast transmissions. Patent Owner points to no testimony or other evidence that Dahlman's SPS signaling is not accomplished with unicast data transmissions, which Dahlman describes as using C-RNTIs. *See* Ex. 1003, 352.

On balance, we credit the testimony of Mr. Lanning over that of Dr. Smith because it is supported by evidence of record and provides explanation sufficient to understand the relationship between the PDCCH signaling used for SPS deactivation and the content of that signal with respect to the identity of the terminal, the C-RNTI. *See* Lanning Decl. ¶¶ 262–263, 278–280. The proffered testimony of Dr. Smith characterizes Dahlman's disclosures as limited to what it expressly discloses, and not for what they would suggest to a person of ordinary skill in the art. Smith Decl. ¶¶ 115–120. Dr. Smith's testimony also does not explain or rebut the Lanning testimony on which RNTI Dahlman suggests for use in the PDCCH signal for SPS activation and deactivation. *Id.* Indeed, Dr. Smith's testimony is silent as to what Dahlman's teachings of using the PDCCH for SPS activation and deactivation would have taught or suggested to a person of ordinary skill in the art. Merely opining that Dahlman limits its discussion of C-RNTI as an identify of the terminal is insufficient to rebut the testimony of Mr. Lanning that the PDCCH transmits DCI which includes the RNTI and that a person of ordinary skill in the art would understand that for DCI 1A transmission that RNTI would be a C-RNTI. Lanning Decl. ¶¶ 278–280. Thus, Petitioner's position that a person of ordinary skill in the art "would have understood that for deactivation, the DCI sent on the PDCCH must include the C-RNTI" (Pet. 38) is supported by expert testimony that is consistent with Dahlman's teachings. Mr. Lanning's testimony also makes a logical connection between Dahlman's disclosure of using RNTIs, and particularly a C-RNTI, in the DCI (of the PDCCH) and Dahlman's disclosure of using the PDCCH for SPS deactivation signaling (*see* Ex. 1003, 314, 352, 477).

Second, regarding the conclusion that a C-RNTI would be an SPS C-RNTI, in connection with SPS deactivation, Mr. Lanning testified as follows:

> Q. Is one of the types of C-RNTIs an SPS C-RNTI?
>
> A. That is correct for an SPS connection.
>
> Q. So for an SPS connection, you would use a C-RNTI, correct?
>
> A. It would be a – it follows the same rules of a C-RNTI, but they just put the SPS in front of it to imply it's being used now for an SPS connection.
>
> But a C-RNTI would be the same number of bits calculated the same way even if it were being used for something different than an SPS connection.
>
> . . .
>
> Q. . . . So the SPS is just used there to signal that it's for an SPS allocation; is that correct?
>
> A. It would be for an SPS-oriented message and one of those messages would be an allocation, but it could also be a deactivation or an activation signal.
>
> . . .
>
> Q. So would a person of ordinary skill in the art reading [Dahlman] understand that for SPS allocation or de-allocation, you would use an SPS C-RNTI?
>
> . . .
>
> A. I believe they would. Because as I just described that, that's a group of C-RNTIs that are used specifically for semi-persistent scheduling connections.

Ex. 2006, 124:13–126:20.

Patent Owner does not provide persuasive argument based on evidence that rebuts the above quoted testimony. In fact, Patent Owner's expert, Dr. Smith, provided testimony consistent with Mr. Lanning's understanding of an SPS C-RNTI:

> . . . The SPS C-RNTI, as an example of an RNTI, is – can be thought of as just a number or a label.
>
> . . .
>
> And that number I can check to see if that number is the SPS C-RNTI, and if that number is the SPS C-RNTI, I know that that message is intended for me, and that message is intended to be – is related to something to do with SPS.

Ex. 1017, 108:5–19.

Patent Owner asserts that Mr. Lanning relies on information from a Web site that post-dates the ’279 patent. *See* PO Resp. 35 (referring to Exhibit 1013, which is printout of a webpage at howltestuffworks.blogspot.com). This Web site information, however, is discussed in a technology overview section of the declaration (*see* Lanning Decl. ¶¶ 33–55). Furthermore, our analysis of Mr. Lanning’s testimony and the Petition do not rely on the background LTE information provided as a tutorial on the technology. Rather, we focus on Petitioner’s challenge and what Dahlman would have suggested to a person of ordinary skill in the art concerning whether an SPS deactivation signaled on the PDCCH would have suggested the use of a C-RNTI, and further, an SPS C-RNTI (*see* Pet. 37–38; Reply 19–24).

Patent Owner also argues that the 3GPP Release 8 specification cited in our Decision on Institution (*see* Dec. on Inst. 19), and relied on by Mr. Lanning (*see* Lanning Decl. ¶ 68), “does not provide a POSITA with sufficient technical details about mapping SPS C-RNTI on the PDCCH for use in a deactivation procedure.” PO Resp. 36 (citing Smith Decl. ¶ 138). At the very least, however, the 3GPP Release 8 specification shows the use of a “Semi-Persistent Scheduling C-RNTI,” where, for uplink grants, “[w]hen the UE has a C-RNTI, Semi-Persistent Scheduling C-RNTI, or

Temporary C-RNTI, the UE shall . . . if [PDCCH condition for deactivation of SPS]: - clear the configured uplink grant (if any)." *See* Ex. 1014, 19; *see also id* at 16–17 (disclosing procedures for downlink assignments that include use of a Semi-Persistent Scheduling C-RNTI). This specification involving the use of an SPS C-RNTI lends credence to Mr. Lanning's testimony that Dahlman would have suggested to a person of ordinary skill in the art to use an SPS C-RNTI because that is the type of C-RNTI used specifically for SPS allocation and de-allocation and Dahlman discloses SPS allocation or deallocation using a PDCCH signal. *See* Ex. 2006, 126:13–20.

Finally, we note that there is no contrary evidence of how Dahlman would have operated to deactivate semi-persistent scheduling using signaling in the PDCCH without using an SPS C-RNTI. Petitioner proffered sufficient evidence to explain Dahlman's operation as it would have been understood by a person of ordinary skill in the art and we have been provided no contrary evidence. In Dr. Smith's deposition, when asked "is there any other C-RNTI that you would use to activate or deactivate the SPS other than the SPS C-RNTI?," he answered, "No." Ex. 1017, 109:4–7. Asked differently—"would a person of ordinary skill in the art know that you would use an SPS C-RNTI to activate or deactivate the SPS?"—Dr. Smith answered that "[a] person of skill in the art would know that using a message with the SPS C-RNTI was a possible way to control, including deactivating the SPS." *Id.* at 110:1–8. When Patent Owner was asked at the oral argument why it would not be the case that the C-RNTIs reserved for SPS deactivation would have been "SPS C-RNTIs," Patent Owner essentially pointed to Dahlman's lack of express reference to an "SPS C-RNTI." *See* Tr. 55:21–57:23. But the lack of express disclosure of using an SPS C-RNTI does not amount to evidence that explains how Dahlman

would have operated without using an SPS C-RNTI. Petitioner's challenge is based on what Dahlman would have suggested to one of ordinary skill in the art, not that Dahlman expressly references an "SPS C-RNTI."

Accordingly, we determine, based on the entire record, that Dahlman would have suggested to one of ordinary skill in the art that for the SPS deactivation condition "the RNTI is a SPS Cell RNTI (SPS C-RNTI)," as recited in claim 1.

*(ii) "the first field is entirely filled with '1'"*

Regarding the second SPS deactivation condition, Petitioner contends that the combination of Dahlman and Samsung teaches "the first field is entirely filled with '1.'" Pet. 38. In particular, Petitioner asserts that "Dahlman teaches the PDCCH's DCI includes several fields, such as the resource allocation field and Samsung discloses setting the field to all 1s." *Id.* (citing Ex. 1003, 348–350, Fig. 16.4.5; Ex. 1005). For a reason to combine the references, Petitioner contends that, given Dahlman's lack of explanation on exactly how SPS deactivation is accomplished, one of ordinary skill in the art "would further look for a way to deactivate the SPS in an efficient manner, with no new signaling needed other than what was already capable of being transmitted as part of the DCI on the PDCCH," and Samsung teaches such a solution. Pet. 26 (citing Lanning Decl. ¶ 173).

Patent Owner argues that "Samsung does not disclose the 'first field' technical details required by the '279 patent for SPS deactivation in claims 1 and 11." PO Resp. 21. Specifically, Patent Owner argues that Samsung only discloses that "all 1s could be a good candidate," which means it "has an unknown, unproven status among other candidates, and that "a POSITA would need the details of the '279 patent's specification to determine any

values for SPS deactivation." *Id.* at 22. Accordingly, Patent Owner argues that one of ordinary skill in the art looking at Samsung would need additional references, including 3GPP specifications, to make the required calculations for a specific value of Samsung's unused code points to use in SPS deactivation. *See id.* at 22–26. Patent Owner further argues that "[a]t best, Samsung is a 'proposal' that does not provide a POSITA with the technical details necessary to fill the RB field of the DCI with all 1s." *Id.* at 27.

In reply, Petitioner argues that Samsung teaches what is required by the disputed limitation, "that a PDCCH resource allocation field be filled entirely with 1s." Reply 13 (citing Ex. 1001, 26:10–11, 26:17). Specifically, Petitioner argues that "Samsung expressly teaches SPS release (*e.g.* deactivation) by filling the RB assignment field with all 1s, exactly the same as described and claimed by the '279 patent." *Id.* (citing Ex. 1005, 1). Petitioner argues Samsung's disclosure that "all 1s could be a good candidate" would lead one to such solution. *Id.* at 15. With respect to Patent Owner's argument that one of ordinary skill in the art would need additional references for calculating unused code points in Samsung, Petitioner argues that the claims do not require finding invalid values of the "first field" (*id.* at 14 (citing Ex. 1001, 26:10, 17; Ex. 2006, 113:15–114:8), and in any case, Petitioner asserts that its expert testified that one could easily determine the unused code points with Samsung's Table 1 (*id.* at 16–17 (citing Ex. 1005, 1; Ex. 2006, 79:9–80:7, 107:17–108:13)). Further, Petitioner asserts this point "is irrelevant because Samsung teaches using all 1s (an invalid value/unused code point) to signal SPS release." *Id.* at 17.

In sur-reply, Patent Owner argues that "the '279 patent's specification teaches that filling the first field entirely with '1' is based on a specific

value, as embodied by the RIV" and that "Petitioners have failed to demonstrate how any combination of [the references] teaches any specific value for SPS deactivation." Sur-reply 5.

We are persuaded that the combination of Dahlman and Samsung teaches "the first field is entirely filled with '1.'" As noted above with respect to the "receiving" limitation, Petitioner sets forth adequate support to show that Dahlman teaches the "PDCCH signal includes a first field related to a resource allocation," as recited in claim 1—namely, the RB allocation field in Dahlman—and Patent Owner presents no specific argument to the contrary. Samsung discloses "a mechanism using a code point of RB assignment field in DCI" in order to perform SPS resource release in which "[a]ny of the unused code point[s] could indicate the SPS resource release." Ex. 1005, 1. In particular, Samsung discloses "all 1s could be a good candidate," and so proposes that "**all 1s in RB assignment field in SPS resource allocation DCI releases the SPS resource currently configured**." *Id.* Samsung further notes that "the proposal is valid for DCI format 0/1A." *Id.* We are also persuaded by Petitioner's argument and evidence that, given Dahlman's lack of explanation on exactly how SPS deactivation is accomplished, one of ordinary skill in the art "would further look for a way to deactivate the SPS in an efficient manner, with no new signaling needed other than what was already capable of being transmitted as part of the DCI on the PDCCH," and that Samsung teaches such a solution and with a reasonable expectation of success. Pet. 26; Lanning Decl. ¶¶ 173–174.

We are not persuaded by Patent Owner's argument that one of ordinary skill in the art would need to perform calculations to determine a specific value for SPS deactivation, and that Samsung does not provide the

technical details necessary to achieve this. *See* PO Resp 21–27. Claim 1 does not require performing any calculations prior to filling the "first field" entirely with 1s. Nor does the claim specify any particular length of the field based on any calculations. Accordingly, we need not settle the parties' dispute as to whether one of ordinary skill in the art would have been capable of *calculating* unused code points in Samsung that could be used as SPS deactivation values, particularly without the use of additional references. *See, e.g.*, PO Resp. 22–23 (asserting that "Petitioner's expert opined that a POSITA would need additional references, such as 3GPP specifications to make any calculations based on the code points"); Reply 13–14 (arguing that "[i]t is a matter of simple subtraction to figure out the invalid points, if that was required"); Ex. 2006, 118:14–22 (Lanning Deposition) (testifying that one of ordinary skill in the art could "use one of multiple methods to determine what those other unused or invalid code points would be").

While the length of an RB allocation field may vary according to the implementation (*see, e.g.*, Ex. 1003, 339 ("The actual message size depends on the cell bandwidth as, for larger bandwidths, a larger number of bits are required to indicate the resource-block allocation.")), we find that one of ordinary skill in the art would have been capable of using Samsung's teaching in Dahlman by simply filling the RB allocation field in a given implementation, whatever its length, with all 1s. Samsung acknowledges that different numbers of resource blocks are used depending on system bandwidth (*see* Ex. 1005, Table 1), and so Samsung's proposal to use all 1s envisions the need for different length fields of 1s. Patent Owner's arguments to the contrary do not show why varying the number of 1s in Dahlman's RB allocation field, depending on system bandwidth, would

require additional teachings, beyond those provided in Dahlman and Samsung, and the knowledge of one of ordinary skill in the art.

We are also not persuaded by Patent Owner's argument that using all 1s has an "unknown, unproven status," and is merely a proposal. PO Resp. 22, 27. Samsung and Dahlman both relate to SPS deactivation, and Samsung teaches a particular way of accomplishing it, namely, by filling the RB assignment field for SPS resource allocation with all 1s. Samsung's statement that "all 1s could be a good candidate" for indicating SPS deactivation does not cut against the use of all 1s, but rather suggests it. As Petitioner's expert testifies, using all 1s would avoid any calculations and be a simple choice. *See* Ex. 2006, 93:11–16 ("So any one of those unused code points could be used to release the SPS resource with the UE and they're just saying to make it simple that, let's just use all ones and not have to figure out which one of these other unused code points we should use."); *see also id.* at 84: ("[Y]ou don't have to calculate anything if you use all ones."). Thus, one of ordinary skill in the art would thus have understood Samsung's teaching of all 1s as a promising way to implement SPS deactivation in Dahlman. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). And the record lacks evidence to the contrary or that using all 1s in an RB allocation field as employed for SPS scheduling in Dahlman would have been "uniquely challenging or difficult for one of ordinary skill in the art." *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

Nor does the record show a lack of a reasonable expectation of success in using all 1s. Patent Owner has relied on Dr. Smith's opinion that he would have had doubt that Samsung's solution would have worked because he would have preferred more certainty and more proof. For example, Dr. Smith testified that "[t]his is the worldwide phone system," so "[i]f there's any doubt that all 1s will not work, you can't use it." Ex. 1017, 85:19–20 (Smith Deposition). Further, regarding whether the Samsung authors knew all 1s was an unused code point, Dr. Smith testified that "[t]here's no proof in here, there's no explanation, no derivation, nothing." *Id.* at 86:7–9; *see also id.* at 88:14–17 ("So when I read this Samsung proposal, I am a very long way from knowing that all 1s will always work."). However, "the expectation of success need only be reasonable, not absolute." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). And, as we have stated above, Petitioner's reasons to combine and Mr. Lanning's testimony in support persuasively convey that the use of all 1s as taught by Samsung would have been expected to work with Dahlman because Samsung uses the same DCI format for signaling the SPS deactivation that Dahlman expressly utilizes. Lanning Decl. ¶ 174. Unused code points would have been those that result in no resource allocation, and, therefore, their use is reasonably suited for how Samsung proposes to signal SPS deactivation. *Id.* Furthermore, Samsung presents its solution as a "simple release mechanism" and that "any of the unused code points could indicate" the release and "all 1s could be a good candidate." Ex. 1005. There is no hesitation or doubt as to the solution offered or whether it would work as intended. And other than Dr. Smith's factually unsupported testimony, there is no evidence of record supporting the contention that Samsung's proposal would not work. Accordingly, we do not credit Dr.

Smith's testimony on whether all 1s would work because it is at odds with Samsung's disclosure.

Again, Samsung states: "Any of the unused code point[s] could indicate the SPS resource release. To make the relevant text simple, all 1s could be a good candidate." Ex. 1005, 1. The context of Samsung's disclosure suggests that all 1s is understood to be one of the unused code points, i.e., it "could be a good candidate" from among "[a]ny of the unused code point[s]." *Id.* Also, the fact that Samsung was a 3GPP member (*see* Ex. 1017, 87:4–6 ("The members that wrote this proposal were members of the 3GPP, correct? A Correct, Samsung, yes, is a member.")) indicates a level of seriousness in the proposal and is itself evidence that one of ordinary skill in the art would have seen the proposal as having a reasonable expectation of success when combined with a functioning 3GPP system, like that described in Dahlman. But, even if one of ordinary skill in the art could reasonably have had doubt as to the success of Samsung's proposal based on whether all 1s was actually an unused code point, Dr. Smith allows that a valid value could possibly be used, in combination with some other technique: "I think what you're asking is, could you use a valid RIV in this scheme for SPS deactivation? And the answer to that is no, not unless you do something else." Ex. 1017, 95:7–10. In other words, even if all 1s were, in the terms of the '279 patent, a valid value (*see, e.g.*, Ex. 1001, 21:30–31 ("[T]he invalid RIVs may be used for an event requesting no RB allocation.")), that would not be an absolute bar against its use for indicating SPS deactivation.

In any case, the fact that 3GPP member Samsung proposed using all 1s for SPS deactivation, labeling it as potentially "a good candidate," is sufficient to show that one of ordinary skill in the art would have tried using

all 1s with a reasonable expectation of success, even if there were no guarantee of creating a flawless system. The record supports Petitioner's contention that one of ordinary skill in the art would have found that the references would have been combined with predictable results, given the common signaling structure. Lanning Decl. ¶ 174. In particular, Samsung describes the proposal to use all 1s as being "valid for DCI format 0/1A," and Dahlman describes using the PDCCH "to carry DCI such as scheduling decisions," including DCI formats 0 and 1A, where SPS "activation (and deactivation) is done using the PDCCH." Ex. 1005, 1; Ex. 1003, 338–339, 477.

Accordingly, we determine, based on the entire record, that the combination of Dahlman and Samsung teaches the SPS deactivation condition that "the first field is entirely filled with '1,'" as recited in claim 1.

*(iii) Conclusion as to Claims 1 and 11*

We have considered Petitioner's contentions and evidence and Patent Owner's arguments and evidence in opposition, and, on the full record before us, we determine that Petitioner has shown by a preponderance of the evidence that claim 1, and similar claim 11, are unpatentable as obvious over Dahlman and Samsung.

*2. Dependent Claims 3 and 13*

Claim 3 depends from claim 1 and recites "wherein the PDCCH signal carries a Downlink Control Information (DCI) format '0.'" Ex. 1001, 26:27–28. Claim 13 depends from claim 11 and recites a similar limitation. *Id.* at 27:24–25. Petitioner contends that Dahlman teaches the limitations in claims 3 and 13 by disclosing uplink scheduling grants that use DCI format

0. Pet. 40 (citing Ex. 1003, 348–349, Fig. 16.18). Petitioner further contends that Samsung teaches these limitations by disclosing a proposal valid for DCI format 0. *Id.* at 41 (citing Ex. 1005, 1; Lanning Decl. ¶ 309). Patent Owner does not present argument concerning claims 3 and 13. For the reasons set forth in the Petition, we determine that Petitioner has shown by a preponderance of the evidence that claims 3 and 13 are unpatentable as obvious over Dahlman and Samsung.

### *3. Dependent Claims 4 and 14*

Claim 4 depends from claim 1, and further recites "wherein the first field indicates a Resource Indication Value (RIV)." Ex. 1001, 26:29–30. Claim 14 recites a similar limitation. *Id.* at 27:26–27. Petitioner contends that in Dahlman the resource-block allocation field in the DCI indicates allocations of resource blocks, and, in particular, uses a type of resource-block allocation signaling that specifies a start and a length of the allocated resource blocks. Pet. 42–44 (citing Ex. 1003, 339, 343–346, 349, Fig. 16.18; Lanning Decl. ¶¶ 315–317, 319). Petitioner asserts that, while Dahlman does not expressly use the term "RIV," Dahlman's disclosure meets the limitation of an RIV based on how that term is used in the '279 patent—i.e., as "indicating a start resource block and a length of consecutively allocated resource blocks." *Id.* at 41–42 (citing Ex. 1001, 13:35–40; Lanning Decl. ¶¶ 103, 314).

In the Sur-reply, Patent Owner argues that Petitioner's contentions fail to distinguish between the "first field" of claims 1 and 11 and the "RIV" of claims 4 and 14, where the RIV "is not simply any resource block assignment field." Sur-reply 6–7. Rather, Patent Owner asserts that the claimed "RIV" is a value that is distinct from the RIV field that may contain different RIVs, as explained in the Specification. *See id.* at 7–9 (citing

Ex. 1001, 6:23–25, Table 6, Fig. 17; Smith Decl. ¶ 38; Ex. 1017, 52:2–53:13). According to Patent Owner, the claimed "RIV" requires the calculations described in the Specification because "an RIV cannot exist without them." *Id.* at 5–6. In particular, Patent Owner argues these calculations require determining a RIVmax, which is the maximum valid RIV, because only an invalid RIV can result in SPS deactivation. *See id.* at 9–11. Patent Owner argues Petitioner's contention that Dahlman teaches the claimed "RIV" "appl[ies] an incorrect meaning to RIV that does not properly consider the '279 patent's Specification." *Id.* at 11.

We have determined in connection with claim construction, *supra* Section III.B, that Patent Owner's arguments concerning the scope of the term "Resource Indication Value (RIV)" would require calculations disclosed in the '279 patent. Therefore, we find Patent Owner's arguments concerning this limitation unpersuasive, because they rely on an interpretation of the term that we do not agree with.

Instead, we are persuaded that Dahlman teaches "the first field indicates a Resource Indication Value (RIV)," as recited in claims 4 and 14. The Specification of the '279 patent provides the following: "the resource allocation field may include a resource indication value (RIV) indicating a start resource block and the length of consecutively-allocated resource blocks (RBs)." Ex. 1001, 13:35–38. Dahlman describes the DCI on the PDCCH as being "categorized into different *DCI formats*, where a format corresponds to a certain message size and usage." Ex. 1003, 339. In particular, "DCI format 1A, also known as the 'compact' downlink assignment, supports allocation of frequency-contiguous resource blocks only." *Id.* at 340. Uplink grants in DCI format 0 also use contiguous allocations. *Id.* A common field among the DCI formats is the resource-

block allocation field. *See id.* at 342. Dahlman further describes three different types of signaling for resource-block allocations, where "type 2 supports contiguous allocations only," and is used for DCI formats 1A and 0. *Id.* at 343, Fig. 16.18. "Unlike the other two types of resource-block allocation signaling, type 2 does not rely on a bitmap. Instead, it encodes the resource allocation as *a start position and length of the resource-block allocation*." *Id.* at 346 (emphasis added).

As summarized above, Dahlman's disclosure of type 2 signaling for the resource-block allocation field for certain DCI formats on the PDCCH meets the limitation of a "RIV." That is, type 2 signaling specifies the "start position and length," just as the '279 patent describes a RIV as "indicating a start resource block and the length of consecutively-allocated resource blocks (RBs)." Ex. 1001, 13:36–38. The Petition does not improperly fail to distinguish the claimed "RIV" from the "first field," as Patent Owner argues (Sur-reply 6–7), because Petitioner contends that Dahlman teaches: "the resource block allocation field of the DCI, which is the first field, encodes the resource allocation as a start position and length" (Pet. 44). In other words, Petitioner distinguishes between the field and what it encodes. We agree with Petitioner's contention because one of ordinary skill in the art would understand that some value must fill the resource-block allocation field in Dahlman, and that this value encodes information in a particular way, for example, according to the type 2 signaling. *See* Ex. 1003, 346, Fig. 16.18.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 4 and 14 are unpatentable as obvious over Dahlman and Samsung.

*4. Dependent Claims 5 and 15*

Claims 5 depends from claim 1 and recites "continuing, by the UE, the SPS transmission if the PDCCH signal does not satisfy the conditions for SPS deactivation." Ex. 1001, 26:32–34. Claim 15 depends from claim 11 and recites a similar limitation. *Id.* at 27:29–30. Petitioner contends Dahlman teaches that SPS grants "are available until the base station notifies the UE that they are no longer available," and so, "if the UE does not receive a PDCCH signal that satisfies the conditions for SPS deactivation, it would continue the SPS transmission." Pet. 45–46 (citing Ex. 1003, 477, Fig. 19.15; Lanning Decl. ¶¶ 327–328). Petitioner further contends "Samsung teaches that if the UE does not receive a PDCCH signal that satisfies the conditions for SPS deactivation, it would continue the SPS transmission." *Id.* at 46 (citing Ex. 1005, Title, Introduction; Lanning Decl. ¶ 334). Patent Owner does not present argument concerning claims 5 and 15. For the reasons set forth in the Petition, we determine that Petitioner has shown by a preponderance of the evidence that claims 5 and 15 are unpatentable as obvious over Dahlman and Samsung.

*5. Conclusion of Dahlman and Samsung Ground*

We have addressed above Petitioner's challenge based on the combination of teachings of Dahlman and Samsung. We have determined that Petitioner has demonstrated by a preponderance of the evidence that challenged claims 1, 3−5, 11, 13−15 are unpatentable for obviousness over Dahlman and Samsung.

*F. Challenge Based on Nokia and Samsung*

Petitioner contends that the challenged claims would have been obvious over Nokia and Samsung. Pet. 47–62. For the reasons that follow, we are persuaded that Petitioner has demonstrated by a preponderance of the

evidence that claims 1, 3–5, 11, and 13–15 would have been obvious over Nokia and Samsung.

*1. Independent Claims 1 and 11*

The Nokia and Samsung ground turns on whether Samsung teaches the second claimed condition for SPS deactivation, i.e., "the first field is entirely filled with '1.'" Ex. 1001, 26:15–17, 27:13–15. For this limitation, Petitioner relies on Samsung in similar fashion as for the Dahlman and Samsung ground—i.e., Petitioner contends Samsung teaches "the first field is entirely filled with '1'" by disclosing the use of all 1s in the RB assignment field for SPS deactivation. Pet. 58. Patent Owner presents the same arguments against Petitioner's reliance on Samsung in combination with Nokia as discussed above for the Dahlman and Samsung ground. *See* PO Resp 21–28; Sur-reply 4–5. Those arguments are unpersuasive when considered in the context of the Nokia and Samsung ground for similar reasons as discussed above, but we provide the following additional analysis.

Nokia describes a proposal in which "SPS release is sent on PDCCH using SPS C-RNTI and by setting the content of PDCCH into a known code word, e.g., all bits set to zero," specifically, "a known code word which does not give a valid allocation." Ex. 1004, 1. As noted above, Samsung discloses setting the RB assignment field in the DCI to all 1s to indicate SPS release. Ex. 1005, 1. Petitioner contends, and we agree, that one of ordinary skill in the art would have been motivated to perform the simple substitution of Samsung's all 1s in the RB assignment field for Nokia's setting multiple bit fields in the PDCCH to zero. Pet. 51 (citing Lanning Decl. ¶ 198).

We also find that one of ordinary skill in the art would have been capable of combining Samsung's teaching with Nokia by filling the resource

block assignment field with all 1s. Nokia and Samsung both relate to SPS release, and simply disclose different techniques for performing this function. Nokia sets multiple fields to zero, including the resource block assignment field (Ex. 1004, 2), while Samsung sets just the RB assignment field to all 1s (Ex. 1005, 1). All that would be required in Petitioner's combination would be to change the values used for SPS release in Nokia's proposal from zeros in multiple fields to all 1s in the resource block assignment field. *See* Lanning Decl. ¶ 198.

Further, we find that one of ordinary skill in the art would have had a reasonable expectation of success in this combination given the common signaling structure in Nokia and Samsung. *See* Ex. 1004, 1–2 ("For Format 1A the following fields are set to zero: . . ."; "For Format 0 the following fields are set to zero: . . ."); Ex. 1005, 1 ("[T]he proposal is valid for DCI format 0/1A"). And, as discussed above with respect to the Dahlman and Samsung ground, we find Samsung suggests that all 1s is understood to be one of the unused code points. *Supra* III.E.1.ii. Based on this understanding, one or ordinary skill in the art would have reasonably expected all 1s in the resource block assignment field to function properly to signal SPS release where Nokia's proposal relies on "a known code word which does not give a valid allocation." Ex. 1004, 1. Moreover, we are persuaded by the reasons to combine proffered by Petitioner, which stand unrebutted, that Samsung's technique serves as an improvement because it "only requires setting a single bit field (the RB assignment field) of the PDCCH to a particular value to indicate deactivation rather than adjusting multiple bit fields of the PDCCH." Pet. 51.

In addition to Patent Owner's arguments that are common to the Dahlman and Samsung ground, Patent Owner argues that "Petitioners'

argument surrounding Nokia is based on the following premise: all 0s is an invalid code," but that, in fact, "all 0s is a valid code." PO Resp. 16 (citing Smith Decl. ¶¶ 50–53); Sur-reply 13–14. We do not agree that Petitioner's argument is based on the premise that 0s would be an invalid code word. Instead, the argument is that Nokia suggests using "a known code word which does not give a valid allocation," and that all 1s, as in Samsung, would be such a code word. *See* Pet. 47–48. Thus, Patent Owner's arguments focusing on whether the "0s" would be a valid code are unpersuasive.

We further agree with Petitioner that "a POSA would have understood that there were a finite number of code words that could be used for deactivation, and each would have been obvious to try." *Id.* (citing Lanning Decl. ¶ 192). The record expressly provides that 1s would have been a "good candidate"—thus providing an actual proposal with a value that Samsung states would be an "unused code point." Ex. 1005 (stating also that the proposal would be valid for DCI format 0/1A and for both the uplink and for the downlink). We conclude, therefore, that the evidence persuasively shows that a person of ordinary skill in the art would have been motivated to try the implementation of all 1s (one of the finite unused code points) as taught in Samsung for purposes of indicating SPS deactivation because all 1s was known to be an unused code point and Samsung recommends it as a "good candidate" for signaling SPS deactivation. *See* Lanning Decl. §§ 192–196.

Patent Owner does not specifically argue the other claimed limitations, and we briefly address them here. The Petition sets forth, and

we find, that the combination of Nokia and Samsung teaches the following limitations of claim 1[10]:

a. "A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system": Nokia teaching deactivating an SPS transmission in what one of ordinary skill in the art would have understood to be an LTE system (Pet. 52–54 (citing Ex. 1004, 1–2; Lanning Decl. ¶¶ 211, 213, 214, 216)); Samsung teaching the preamble for the same reasons presented for the Dahlman and Samsung ground (*see id.* at 54).

b. "performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal": Nokia teaching the configuration of persistent scheduling by RRC signaling with the exact timing "sent on L1/L2 control channel (PDCCH) as normal UL grant (with SPS C-RNTI)," where one of ordinary skill in the art would have understood that a "UE performs a transmission based on the grant at an interval of a subframe period," so "[w]hen the RRC turns the SPS on and grants the periodicity, it is creating a grant that allows the UE to perform an uplink transmission at an interval . . . of a subframe period." Pet. 54–55 (citing Ex. 1004, 2; Lanning Decl. ¶ 253).

c. "receiving, by the UE, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI),

[10] Because claim 11 recites substantially similar limitations, our analysis refers to claim 1, but applies equally to claim 11.

wherein the PDCCH signal includes a first field related to a resource allocation": Nokia teaching the PDCCH using a RNTI, where the PDCCH includes a resource block assignment field. Pet. 56–57 (citing Ex. 1004, 2; Lanning Decl. ¶ 267).

d. "performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation": Nokia teaching deactivating an SPS transmission if the PDCCH includes a known code word set to an invalid allocation. Pet. 57 (citing Ex. 1004, 1–2; Lanning Decl. ¶ 275).

e. "wherein the conditions for SPS deactivation include: the RNTI is a SPS Cell RNTI (SPS C-RNTI)": Nokia teaching SPS release with the PDCCH using an SPS C-RNTI. Pet. at 58 (citing Ex. 1004, 2; Lanning Decl. ¶ 282).

We have considered Petitioner's contentions and evidence and Patent Owner's arguments and evidence in opposition, and, on the full record before us, we determine that Petitioner has shown by a preponderance of the evidence that claim 1, and similar claim 11, are unpatentable as obvious over Nokia and Samsung.

*1. Dependent Claims 3 and 13*

Petitioner contends that Nokia teaches the limitations in claims 3 and 13 by disclosing "[f]or Format 0 the following fields are set to 0," where a person of ordinary skill in the art would understand Format 0 to be DCI Format 0. Pet. 59 (quoting Ex. 1004, 2) (citing Lanning Decl. ¶ 307). Petitioner further contends Samsung teaches these limitations for the same

reasons provided with respect to the Dahlman and Samsung ground. *Id.* Patent Owner does not present argument concerning claims 3 and 13. For the reasons set forth in the Petition, we determine that Petitioner has shown by a preponderance of the evidence that claims 3 and 13 are unpatentable as obvious over Nokia and Samsung.

*2. Dependent Claims 4 and 14*

Petitioner contends that although Nokia does not explicitly disclose RIVs, Nokia discloses that the SPS is allocated on the PDCCH. Pet. 60–61; Lanning Decl. ¶ 322. According to Petitioner, Nokia teaches that the RB assignment field is a field of the PDCCH, so that Nokia teaches that the "first field" indicates an RIV as recited in claims 4 and 14. Pet. 61; Ex. 1004, 2 ("For format 0 the following fields are set to zero . . . Resource block assignment . . . ."). Mr. Lanning opines, and we agree, that Nokia's disclosure of format 0 sent on the PDCCH combined with the knowledge of a person of ordinary skill in the art that the resource block (RB) assignment field is part of the DCI in the PDCCH, teaches that the RB assignment field indicates an RIV. Lanning Decl. ¶ 323 (citing Ex. 1015 and explaining that the resource allocation for the PDCCH DCI format 0 is a resource allocation field in the scheduling grant that consists of an RIV corresponding to a starting block and a length in terms of contiguously allocated resource blocks).

For the Nokia and Samsung combination, Patent Owner argues that Samsung does not disclose the RIV limitation of dependent claims 4 and 14. PO Resp. 21–28. Petitioner, however, has relied on Nokia as teaching the limitation further recited in claims 4 and 14, and Patent Owner has not presented argument challenging Petitioner's reliance on Nokia.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 4 and 14 are unpatentable as obvious over Nokia and Samsung.

*3. Dependent Claims 5 and 15*

Petitioner contends that Nokia teaches the limitations in claims 5 and 15 by disclosing "that if the SPS release is not acknowledged by the UE, the base station still needs to wait to make sure the UE does not send further SPS transmissions," where a reason for an SPS release not to be acknowledged "is that the PDCCH signal did not satisfy the conditions for SPS deactivation." Pet. 62 (citing Ex. 1004, 2; Lanning Decl. ¶ 332). Petitioner further contends that Samsung teaches these limitations for the same reasons provided with respect to the Dahlman and Samsung ground. *Id.* Patent Owner does not present argument concerning claims 5 and 15. For the reasons set forth in the Petition, we determine that Petitioner has shown by a preponderance of the evidence that claims 5 and 15 are unpatentable as obvious over Nokia and Samsung.

*4. Conclusion of Nokia and Samsung Ground*

We have addressed above Petitioner's challenge based on the combination of teachings of Nokia and Samsung. We have determined that Petitioner has demonstrated by a preponderance of the evidence that challenged claims 1, 3−5, 11, 13−15 are unpatentable for obviousness over Nokia and Samsung.

## IV. CONCLUSION

Having reviewed the argument and supporting evidence of record, and after a full and fair hearing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 3–5, 11, and 13–15 are

unpatentable as obvious over Dahlman and Samsung and also as obvious over Nokia and Samsung.[11] We do not reach the other grounds of unpatentability for these same claims based on obviousness over Nokia alone and obviousness based on Dahlman, Samsung, and Nokia. *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x. 984, 990 (Fed. Cir. 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 3–5, 11, 13–15 | 103(a) | Dahlman, Samsung | 1, 3–5, 11, 13–15 | |
| 1, 3–5, 11, 13–15 | 103(a) | Nokia, Samsung | 1, 3–5, 11, 13–15 | |
| 1, 3–5, 11, 13–15 | 103(a)[12] | Nokia | | |
| 1, 3–5, 11, 13–15 | 103(a)[13] | Dahlman, Samsung, Nokia | | |
| **Overall Outcome** | | | 1, 3–5, 11, 13–15 | |

## V. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1, 3–5, 11, 13–15 of the ’279 patent are determined to be unpatentable;

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[12] We do not address whether the challenged claims are obvious under this additional ground because we have determined those same claims unpatentable under another ground.

[13] *See supra* n.12.

For PETITIONER:

Benjamin E. Weed
Erik J. Halverson
Brian Paul Bozzo
K & L GATES LLP
benjamin.weed.ptab@klgates.com
erik.halverson@klgates.com
brian.bozzo@klgates.com

Amanda Tessar
Daniel Keese
PERKINS COIE LLP
tessar-ptab@perkinscoie.com
dkeese@perkinscoie.com

John R. Hutchins
C. Andy Mu
Craig W. Kronenthal
Wesley Jones
Shambhavi Patel
BANNER & WITCOFF, LTD.
jhutchins@bannerwitcoff.com
amu@bannerwitcoff.com
ckronenthal@bannerwitcoff.com
wjones@bannerwitcoff.com
spatel@bannerwitcoff.com

Meredith Martin Addy
Robert P. Hart
Gregory B. Gulliver
ADDYHART P.C.
meredith@addyhart.com
robert@addyhart.com
gbgulliver65@gmail.com

Jeremy D. Peterson
Bradford A. Cangro
PV LAW LLP

jeremy.pewterson@pvuslaw.com
bradford.cangro@pvuslaw.com

Jacob K. Baron
Allison M. Lucier
HOLLAND & KNIGHT
jacob.baron&hklaw.com
allison.lucier@hklaw.com

For PATENT OWNER:

Timothy Devlin
Devlin Law Firm LLC
td-ptab@devlinlawfirm.com

US008971279B2

(12) **United States Patent**
**Seo et al.**

(10) **Patent No.: US 8,971,279 B2**
(45) **Date of Patent: Mar. 3, 2015**

(54) **METHOD AND APPARATUS FOR INDICATING DEACTIVATION OF SEMI-PERSISTENT SCHEDULING**

(71) Applicant: **LG Electronics Inc.**, Seoul (KR)

(72) Inventors: **Dong Youn Seo**, Anyang-Si (KR); **Ki Jun Kim**, Anyang-Si (KR); **Dae Won Lee**, Anyang-Si (KR); **Young Woo Yun**, Anyang-Si (KR); **Joon Kui Ahn**, Anyang-Si (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 166 days.

(21) Appl. No.: **13/791,421**

(22) Filed: **Mar. 8, 2013**

(65) **Prior Publication Data**

US 2013/0182679 A1 Jul. 18, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/050,680, filed on Mar. 17, 2011, now Pat. No. 8,411,633, which is a continuation of application No. 12/581,584, filed on Oct. 19, 2009, now Pat. No. 8,009,606.

(60) Provisional application No. 61/114,440, filed on Nov. 13, 2008, provisional application No. 61/119,375, filed on Dec. 3, 2008.

(30) **Foreign Application Priority Data**

Jul. 24, 2009 (KR) ........................ 10-2009-0067796

(51) **Int. Cl.**
***H04W 4/00*** (2009.01)
***H04W 72/04*** (2009.01)

(52) **U.S. Cl.**
CPC ........ ***H04W 72/0446*** (2013.01); ***H04W 72/042*** (2013.01)
USPC .......................................................... **370/329**

(58) **Field of Classification Search**
CPC ........... H04W 72/042; H04W 72/0446; H04L 1/0072; H04L 1/0079; H04L 5/0053; H04L 1/004; H04L 1/0061; H03M 13/09
USPC ............ 370/319, 329, 321, 349; 455/17, 560, 455/561
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0090583 | A1 | 4/2008 | Wang et al. |
| 2008/0117891 | A1 | 5/2008 | Damnjanovic et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 101111009 | A | | 1/2008 |
| CN | 101132596 | A | | 2/2008 |
| EP | 2207394 | | * | 4/2009 |
| JP | 2007-166295 | A | | 6/2007 |

(Continued)

OTHER PUBLICATIONS

"3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Evolved Universal Terrestrial Radio Access (E-UTRA); Radio Resource Control (RCC); Protocol Specification (Release 8)", 3GPP Organizational Partners, 3GPP TS 36.331 V8.4.0, Dec. 2008.

*Primary Examiner* — Raj Jain
(74) *Attorney, Agent, or Firm* — Robert D. Shedd; Joseph J. Opalach

(57) **ABSTRACT**

A method and apparatus for performing semi-persistent scheduling (SPS) deactivation in a wireless mobile communication system are disclosed. A base station (BS) transmits a downlink control channel to a user equipment (UE), and deactivates the SPS when a binary field indicating resource allocation information contained in the downlink control channel is entirely filled with '1'.

**20 Claims, 20 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2008/0130590 | A1 | 6/2008 | Kim et al. | |
| 2008/0232284 | A1 | 9/2008 | Dalsgaard et al. | |
| 2009/0257408 | A1* | 10/2009 | Zhang et al. | 370/336 |
| 2010/0085881 | A1 | 4/2010 | Tanigawa et al. | |
| 2010/0111026 | A1 | 5/2010 | Hsu | |
| 2010/0177716 | A1 | 7/2010 | Harada et al. | |
| 2013/0322350 | A1* | 12/2013 | Gaur et al. | 370/329 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2010-503342 | A | 1/2010 |
| JP | 2010-522467 | A | 7/2010 |
| KR | 10-2008-0032825 | A | 4/2008 |
| WO | WO 2005/072073 | A2 | 8/2005 |
| WO | WO 2008/023649 | A1 | 2/2008 |
| WO | WO 2008/030936 | A2 | 3/2008 |
| WO | WO 2008/038530 | A1 | 4/2008 |

* cited by examiner

FIG. 1


Radio frame, $T_f$=307200$T_s$ = 10 ms
Slot, $T_{slot}$=15360$T_s$ = 0.5 ms
#0
#1
#2
#3
...
#18
#19
Subframe

FIG. 2



Radio frame, $T_f$=307200$T_s$ = 10 ms
Half frame, $T_s$ =153600T = 5 ms
Slot
$T_{slot}$=15360$T_s$
30720$T_s$
Subframe
30720$T_s$
Subframe#0
Subframe#2
Subframe#3
Subframe#4
Subframe#5
Subframe#7
Subframe#8
Subframe#9
DwPTS
GP
UpPTS
DwPTS
GP
UpPTS

FIG. 3



Uplink slot $T_{slot}$
$N_{symb}^{UL}$ SC-FDMA Symbol
$k = N_{RB}^{UL} N_{sc}^{RB}-1$
Resource block
$N_{symb}^{UL} \times N_{sc}^{RB}-1$ Resource element
$N_{RB}^{UL} \times N_{sc}^{RB}$ Subcarrier
$N_{sc}^{RB}$ Subcarrier
Resource element (k,l)
k = 0
l = 0
$l = N_{symb}^{UL}-1$

FIG. 4



Downlink slot $T_{slot}$
$N^{DL}_{symb}$ OFDM Symbol
$k = N^{DL}_{RB} N^{RB}_{sc} - 1$
Resource block
$N^{DL}_{symb} \times N^{RB}_{sc} - 1$ Resource element
$N^{DL}_{RB} \times N^{RB}_{sc}$ Subcarrier
$N^{RB}_{sc}$ Subcarrier
Resource element (k,l)
k = 0
l = 0
$l = N^{DL}_{symb} - 1$

FIG. 5


502
E-UMTS
Core Network (CN)
Access Gateway (AG)
505
E-UTRAN
501
504a
504n
BS
BS
UE
503

FIG. 6


RRC
RLC
MAC
PHY
UE
RRC
RLC
MAC
PHY
E-UTRAN

FIG. 7


PDCP
RLC
MAC
PHY
UE
PDCP
RLC
MAC
PHY
E-UTRAN

FIG. 8


Initial cell search
P/S-SCH & [DL RS] & PBCH
S801
system information acquisition
PDCCH/ PDSCH (BCCH)
S802
random access process
PRACH
S803
PDCCH/ PDSCH
S804
PRACH
S805
PDCCH/ PDSCH
S806
General DL/UL Tx/Rx
PDCCH/ PDSCH
S807
PUSCH/ PUCCH
S808
· DL/UL ACK/NACK
· UE's CQI/ PMI/ Rank Report using PUSCH and PUCCH

FIG. 9



901
Scrambling
902
Modulation Mapper
903
Transform Precoder
904
Resource Element Mapper
905
SC-FDMA signal generation

FIG. 10


code words
1001
Scrambling
1001
Scrambling
1002
Modulation mapper
1002
Modulation mapper
1003
Layer mapper
layers
1004
Precoding
1005
Resource element mapper
1005
Resource element mapper
1006
OFDMA signal generation
1006
OFDMA signal generation
antenna ports

FIG. 11


* CP : Cyclic Prefix
* PS : Pulse Shaping
* M > N
One block
Serial
Parallel
1101
N-point DFT module
1102
Zero('0')
{ X_k }
Zero('0')
Subcarrier mapper
M-1
0
Subcarrier
1103
{ X̃_l }
M-point IDFT module
1104
{ X̃_m }
Parallel
Serial
/CP addition
1105
One block
SC-FDMA :
OFDMA :

FIG. 12


time
frequency
slot
subcarrier
7
6
5
4
3
2
1
0
DVRB2
DVRB1
DVRB0
1201
PRB=LVRB
RE
PRB index
subframe

FIG. 13


RB start=2
RB length=6
0
1
2
3
4
5
6
7
8
9
10
11
12
13
...
S
...
$N_{RB}$-3
$N_{RB}$-2
$N_{RB}$-1
RB start=0
Number of possible length of RBs=$N_{RB}$
RB start=1
Number of possible length of RBs=$N_{RB}$-1
RB start=S
Number of possible length of RBs=$N_{RB}$-S
RB start=$N_{RB}$-1
Number of possible length of RBs=1
Number of hypotheses of resource allocation = $N_{RB}(N_{RB}+1)/2$
Required number of bits for hypotheses = ceiling($\log_2(N_{RB}(N_{RB}+1)/2)$)

FIG. 14


RB start=1
RB length=2
DVRB1
DVRB2
DVRB index
PRB index
Diversity order = 2
Gap=3
1801
1802
1803
1804
1805

FIG. 15


RB start=1
RB length=2
DVRB1
DVRB2
DVRB index
PRB index
1501
1502
1503
Gap=3
Diversity order = 4

FIG. 16

| L \ S | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 2 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 |
| 3 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 |
| 4 | 60 | 61 | 63 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| 5 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
| 6 | 100 | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109 | 110 | 111 | 112 | 113 | 114 | 115 | 116 | 117 | 118 | 119 |
| 7 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 | 128 | 129 | 130 | 131 | 132 | 133 | 134 | 135 | 135 | 137 | 138 | 139 |
| 8 | 140 | 141 | 142 | 143 | 144 | 145 | 146 | 147 | 148 | 149 | 150 | 151 | 152 | 153 | 154 | 155 | 156 | 157 | 158 | 159 |
| 9 | 160 | 161 | 162 | 163 | 164 | 165 | 166 | 167 | 168 | 169 | 170 | 171 | 172 | 173 | 174 | 175 | 176 | 177 | 178 | 179 |
| 10 | 180 | 181 | 182 | 183 | 184 | 185 | 186 | 187 | 188 | 189 | 190 | 191 | 192 | 193 | 194 | 195 | 196 | 197 | 198 | 199 |
| 11 | 200 | 201 | 202 | 203 | 204 | 205 | 206 | 207 | 208 | 209 | 210 | 211 | 212 | 213 | 214 | 215 | 216 | 217 | 218 | 219 |
| 12 | 199 | 198 | 197 | 196 | 195 | 194 | 193 | 192 | 191 | 190 | 189 | 188 | 187 | 186 | 185 | 184 | 183 | 182 | 181 | 180 |
| 13 | 179 | 178 | 177 | 176 | 175 | 174 | 173 | 172 | 171 | 170 | 169 | 168 | 167 | 166 | 165 | 164 | 163 | 162 | 161 | 160 |
| 14 | 159 | 158 | 157 | 156 | 155 | 154 | 153 | 152 | 151 | 150 | 149 | 148 | 147 | 146 | 145 | 144 | 143 | 142 | 141 | 140 |
| 15 | 139 | 138 | 137 | 136 | 135 | 134 | 133 | 132 | 131 | 130 | 129 | 128 | 127 | 126 | 125 | 124 | 123 | 122 | 121 | 120 |
| 16 | 119 | 118 | 117 | 116 | 115 | 114 | 113 | 112 | 111 | 110 | 109 | 108 | 107 | 106 | 105 | 104 | 103 | 102 | 101 | 100 |
| 17 | 99 | 98 | 97 | 96 | 95 | 94 | 93 | 92 | 91 | 90 | 89 | 88 | 87 | 86 | 85 | 84 | 83 | 82 | 81 | 80 |
| 18 | 79 | 78 | 77 | 76 | 75 | 74 | 73 | 72 | 71 | 70 | 69 | 68 | 67 | 66 | 65 | 64 | 63 | 62 | 61 | 60 |
| 19 | 59 | 58 | 57 | 56 | 55 | 54 | 53 | 52 | 51 | 50 | 49 | 48 | 47 | 46 | 45 | 44 | 43 | 42 | 41 | 40 |
| 20 | 39 | 38 | 37 | 36 | 35 | 34 | 33 | 32 | 31 | 30 | 29 | 28 | 27 | 26 | 25 | 24 | 23 | 22 | 21 | 20 |

FIG. 17


Ex) 20 RB
→0≤ Valid RIV for RB allocation ≤ 20·21/2-1=209<2^8
→210≤ SPS deactivation ≤ 2^8 -1=255=11111111_2
RIV field
DCI format x with compact type RB allocation
Other control information field
1 1 1 1 1 1 1 1
→ SPS deactivation

**FIG. 18**


Ex) 50 RB →0≤ Valid RIV for RB allocation ≤ 50·51/2-1=1274<2^11
→1275≤ SPS deactivation ≤ 2^11-1=2047=11111111111_2
DCI format 1A with compact type RB allocation
RIV field 11bits
1801
(a) LVRB
Other control information field
→ SPS deactivation
Same bit pattern
Ex) 50 RB →0≤ Valid RIV for RB allocation ≤ 784<2^11-1
→785≤ SPS deactivation ≤ 2^11-1=1023=1111111111 2
RIV field 10bits
1803
1802
Gap
(b) DVRB, Gap1
Other control information field
→ SPS deactivation
RIV field
1803
1802
Gap
(c) DVRB, Gap2
Other control information field
→ SPS deactivation

FIG. 19


DCI format 0
(a) VRB
Hopping Flag
0
Other control information field
1 1 1 1 1 1 1 1 1 1 1
RIV field 11bits
1901
SPS deactivation
Same bit pattern
(b)
Hopping Flag
1
Other control information field
x x 1 1 1 1 1 1 1 1 1
Hopping Info.
1902
RIV field 9bits
1903
SPS deactivation
(c)
Hopping Flag
1
Other control information field
1 1 1 1 1 1 1 1 1 1 1
Hopping Info.
1902
RIV field
1903
SPS deactivation

FIG. 20


50
51
53
RF UNIT
PROCESSOR
54
DISPLAY UNIT
MEMORY
55
USER INTERFACE UNIT
52

FIG. 21


BS
UE
Fill the entirety of binary field indicating resource allocation information contained in downlink control channel with '1'
S2101
S2103
S2102
Perform SPS deactivation when binary field indicating resource allocation information contained in downlink control channel is entirely filled with '1'
S2104

# METHOD AND APPARATUS FOR INDICATING DEACTIVATION OF SEMI-PERSISTENT SCHEDULING

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. patent application Ser. No. 13/050,680 filed on Mar. 17, 2011, which is a Continuation of U.S. patent application Ser. No. 12/581,584 (now U.S. Pat. No. 8,009,606, issued on Aug. 30, 2011) filed on Oct. 19, 2009, which claims the benefit of Korean Patent Application No. 10-2009-0067796, filed on Jul. 24, 2009, and also claims the benefit of U.S. Provisional Application Ser. Nos. 61/114,440, filed on Nov. 13, 2008 and 61/119,375, filed on Dec. 3, 2008. The entire contents of all of the above applications are hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a wireless communication system, and more particularly, to a method for scheduling radio resources for semi-persistent uplink/downlink packet data transmission in a cellular wireless communication system, a structure of scheduling information, a scheme for transmitting the scheduling information, and an apparatus using the above-mentioned method and scheme as well as the scheduling information structure.

2. Discussion of the Related Art

A 3rd Generation Partnership Project Long Term Evolution (3GPP LTE) communication system (hereinafter referred to as an "LTE system" for convenience of description) will hereinafter be described as an example of a mobile communication system applicable to the present invention.

A frame structure for use in the LTE system will hereinafter be described. The 3GPP LTE system supports a type 1 radio frame structure applicable to frequency division duplex (FDD), and a type 2 radio frame structure applicable to time division duplex (TDD).

FIG. **1** shows a structure of a type 1 radio frame used in the LTE system. The type 1 radio frame includes 10 subframes, each of which consists of two slots. A time length of each constituent unit is shown in FIG. **1**.

FIG. **2** shows a structure of a type 2 radio frame used in the LTE system. The type 2 radio frame includes two half-frames, each of which is composed of five subframes, a downlink piloting time slot (DwPTS), a guard period (GP), and an uplink piloting time slot (UpPTS), in which one subframe consists of two slots. That is, one subframe is composed of two slots irrespective of the radio frame type. A time length of each constituent unit is shown in FIG. **2**.

A resource grid structure for use in the LTE system will hereinafter be described in detail.

FIG. **3** shows an uplink (UL) time-frequency resource grid structure for use in the 3GPP LTE system.

Referring to FIG. **3**, an uplink signal transmitted from each slot can be described by a resource grid including $N_{RB}^{UL} N_{SC}^{RB}$ subcarriers and $N_{symb}^{UL}$ Single Carrier—Frequency Division Multiple Access (SC-FDMA) symbols. Here, $N_{RB}^{UL}$ represents the number of resource blocks (RBs) in an uplink, $N_{SC}^{RB}$ represents the number of subcarriers constituting one RB, and $N_{symb}^{UL}$ represents the number of SC-FDMA symbols in one uplink slot. $N_{RB}^{UL}$ varies with an uplink transmission bandwidth constructed in a cell, and must satisfy $N_{RB}^{min,UL} \leq N_{RB}^{UL} \leq N_{RB}^{max,UL}$. Here, $N_{RB}^{min,UL}$ is the smallest uplink bandwidth supported by the wireless communication system, and $N_{RB}^{max,UL}$ is the largest uplink bandwidth supported by the wireless communication system. Although $N_{RB}^{MIN,UL}$ may be set to 6 ($N_{RB}^{min,UL}=6$) and $N_{RB}^{max,UL}$ may be set to 110 ($N_{RB}^{max,UL}=110$), the scopes of $N_{RB}^{min,UL}$ and $N_{RB}^{msc,UL}$ are not limited thereto. The number of SC-FDMA symbols contained in one slot may be differently defined according to the length of a Cyclic Prefix (CP) and the spacing between subcarriers.



Each element contained in the resource grid is called a resource element (RE), and can be identified by an index pair (k,l) contained in a slot, where k is an index in a frequency domain and is set to any one of 0, . . . , $N_{RB}^{UL}N_{sc}^{RB}-1$, and l is an index in a time domain and is set to any one of 0, . . . , $N_{symb}^{UL}-1$.

A Physical Resource Block (PRB) is defined by $N_{symb}^{UL}$ consecutive SC-FDMA symbols in a time domain and $N_{SC}^{RB}$ consecutive subcarriers in a frequency domain. $N_{symb}^{UL}$ and $N_{SC}^{RB}$ may be predetermined values, respectively. Therefore, one PRB in an uplink may be composed of $N_{symb}^{UL} \times N_{SC}^{RB}$ resource elements. In addition, one PRB may correspond to one slot in a time domain and 180 kHz in a frequency domain. A PRB number $n_{PRB}$ and a resource element index (k,l) in a slot can satisfy a predetermined relationship denoted by

$$n_{PRB} = \left\lfloor \frac{k}{N_{sc}^{RB}} \right\rfloor.$$

FIG. **4** shows a downlink (DL) time-frequency resource grid structure for use in the LTE system.

Referring to FIG. **4**, a downlink signal transmitted from each slot can be described by a resource grid including $N_{RB}^{DL}N_{SC}^{RB}$ subcarriers and $N_{symb}^{DL}$ OFDM symbols. Here, $N_{RB}^{DL}$ represents the number of resource blocks (RBs) in a downlink, $N_{SC}^{RB}$ represents the number of subcarriers constituting one RB, and $N_{symb}^{DL}$ represents the number of OFDM symbols in one downlink slot. $D_{RB}^{DL}$ varies with an uplink transmission bandwidth constructed in a cell, and must satisfy $N_{RB}^{min,DL} \leq N_{RB}^{DL} \leq N_{RB}^{max,DL}$. Here, $N_{RB}^{min,DL}$ is the smallest uplink bandwidth supported by the wireless communication system, and $N_{RB}^{max,DL}$ is the largest uplink bandwidth supported by the wireless communication system. Although $N_{RB}^{min,DL}$ may be set to 6 ($N_{RB}^{min,DL}=6$) and $N_{RB}^{max,DL}$ may be set to 110 ($N_{RB}^{max,DL}=110$), the scopes of $N_{RB}^{min,DL}$ and $N_{RB}^{max,DL}$ are not limited thereto. The number of OFDM symbols contained in one slot may be differently defined according to the length of a Cyclic Prefix (CP) and the subcarrier spacing. When transmitting data or information via multiple antennas, one resource grid for each antenna port may be defined.

Each element contained in the resource grid is called a resource element (RE), and can be identified by an index pair (k,l) contained in a slot, where k is an index in a frequency domain and is set to any one of 0, . . . , $N_{RB}^{DL}N_{sc}^{RB}-1$, and l is an index in a time domain and is set to any one of 0, . . . , $N_{symb}^{DL}-1$.

Resource blocks (RBs) shown in FIGS. **3** and **4** are used to describe a mapping relationship between certain physical channels and resource elements (REs). The RBs can be classified into physical resource blocks (PRBs) and virtual resource blocks (VRBs). Although the above mapping relationship between the VRBs and the PRBs has been disclosed on a downlink basis, the same mapping relationship may also be applied to an uplink.

One PRB is defined by $N_{symb}^{DL}$ consecutive OFDM symbols in a time domain and $N_{SC}^{RB}$ consecutive subcarriers in a

frequency domain. $N_{symb}^{DL}$ and $N_{SC}^{RB}$ may be predetermined values, respectively. Therefore, one PRB may be composed of $N_{symb}^{DL} \times N_{SC}^{RB}$ resource elements. One PRB may correspond to one slot in a time domain and may also correspond to 180 kHz in a frequency domain, but it should be noted that the scope of the present invention is not limited thereto.

The PRBs are assigned numbers from 0 to $N_{RB}^{DL}-1$ in the frequency domain. A PRB number $n_{PRB}$ and a resource element index (k,l) in a slot can satisfy a predetermined relationship denoted by

$$n_{PRB} = \left\lfloor \frac{k}{N_{sc}^{RB}} \right\rfloor.$$

The VRB may have the same size as that of the PRB. Two types of VRBs are defined, the first one being a localized VRB (LVRB) and the second one being a distributed type (DVRB). For each VRB type, a pair of VRBs in two slots of one subframe may assigned a single VRB number $n_{VRB}$.

The VRB may have the same size as that of the PRB. Two types of VRBs are defined, the first one being a localized VRB (LVRB) and the second one being a distributed VRB (DVRB). For each VRB type, a pair of PRBs may have a single VRB index (which may hereinafter be referred to as a 'VRB number') and are allocated over two slots of one subframe. In other words, $N_{RB}^{DL}$ VRBs belonging to a first one of two slots constituting one subframe are each assigned any one index of 0 to $N_{RB}^{DL}-1$, and $N_{RB}^{DL}$ VRBs belonging to a second one of the two slots are likewise each assigned any one index of 0 to $N_{RB}^{DL}-1$.

In the LTE system based on an Orthogonal Frequency Division Multiple Access (OFDMA) scheme, a resource area in which each UE is able to transmit or receive data to and from a base station (BS) is allocated from the BS to the UE. In this case, not only a time resource but also a frequency resource must be simultaneously allocated to the UE so as to complete resource allocation.

The so-called non-persistent scheduling method can simultaneously indicate time-frequency resource domains allocated to the UE. Therefore, if there is a need for the UE to use resources for a long period of time, it must repeatedly perform signaling for resource allocation, so that signaling overhead may be considerably generated.

In contrast, the so-called semi-persistent scheduling method first allocates a time resource to a UE. In this case, the semi-persistent scheduling method may allow the time resource allocated to a specific UE to have periodicity. Then, the semi-persistent scheduling method allocates a frequency resource to the UE when necessary to complete time-frequency resource allocation. The above-mentioned frequency resource allocation may be referred to as 'activation'. When using the semi-persistent scheduling method, resource allocation can be maintained for a predetermined period by only one signaling process, so that resources need not be repeatedly allocated, resulting in reduction in signaling overhead. Thereafter, if the necessity of performing resource allocation for a UE disappears, a base station can transmit a signaling message for releasing the frequency resource allocation to the UE. In this way, the above-mentioned release of the frequency resource domain may be referred to as 'deactivation'. In this case, it is preferable that the signaling overhead needed for the deactivation be reduced.

## SUMMARY OF THE INVENTION

An object of the present invention devised to solve the problem lies in a method and apparatus for informing a UE of SPS deactivation without adding a new bit field or a new control channel format in a communication system for allocating resources using a compact scheme.

The object of the present invention can be achieved by providing a method for releasing resource allocation in a wireless mobile communication system, the method including receiving, by a user equipment (UE), a downlink control channel including resource allocation information, and releasing resource allocation for the UE when a binary field indicating the resource allocation information is entirely filled with '1'.

In another aspect of the present invention, there is provided a method for transmitting a signal for releasing resource allocation in a wireless mobile communication system, the method including fills, by a base station (BS), a binary field indicating resource allocation information contained in a downlink control channel with '1', and transmitting the downlink control channel to a user equipment (UE), wherein the binary field entirely filled with the value of '1' indicates a release of resources allocated to the UE.

In another aspect of the present invention, there is provided a method for deactivating semi-persistent scheduling (SPS) in a wireless mobile communication system including receiving, by a user equipment (UE), a downlink control channel, and deactivating the semi-persistent scheduling (SPS) when a binary field indicating resource allocation information contained in the downlink control channel is entirely filled with '1'.

In another aspect of the present invention, there is provided a method for transmitting a signal for semi-persistent scheduling (SPS) deactivation in a wireless mobile communication system, the method including filling, by a base station (BS), a binary field indicating resource allocation information contained in a downlink control channel with '1', and transmitting the downlink control channel, wherein the binary field entirely filled with the value of '1' indicates the SPS deactivation.

In another aspect of the present invention, there is provided an apparatus capable of using a semi-persistent scheduling (SPS). The apparatus includes a radio frequency (RF) unit, and a processor electrically connected to the RF unit, wherein the processor is configured to receive a downlink control channel through the RF unit, and to perform the SPS deactivation when a binary field indicating resource allocation information contained in the downlink control channel is entirely filled with '1'.

In another aspect of the present invention, there is provided an apparatus capable of using a semi-persistent scheduling (SPS). The apparatus includes a radio frequency (RF) unit, and a processor electrically connected to the RF unit. The processor is configured to fill the entirety of a binary field indicating resource allocation information contained in a downlink control channel with '1' during the SPS deactivation, and to transmit the downlink control channel with the RF unit. The binary field entirely filled with '1' indicates the SPS deactivation.

In another aspect of the present invention, there is provided a user equipment (UE) for a wireless mobile communication system, the user equipment (UE) including a radio frequency (RF) unit, and a processor electrically connected to the RF unit, wherein the processor is configured to receive a downlink control channel including resource allocation information through the RF unit, and to release resource allocation for the UE when a binary field indicating the resource allocation information is entirely filled with '1'.

In another aspect of the present invention, there is provided a wireless communication apparatus including a radio fre-

quency (RF) unit, and a processor electrically connected to the RF unit, wherein the processor is configured to fill the entirety of a binary field indicating resource allocation information contained in a downlink control channel with '1', and to transmit the downlink control channel to a user equipment (UE), the binary field being entirely filled with the value of '1' indicates a release of resources allocated to the UE.

The downlink control channel may be a physical downlink control channel (PDCCH).

A downlink control information (DCI) format of the downlink control channel may be a 'format 0' or a 'format 1A'.

The wireless mobile communication system may use a scheduling based on a compact scheme, and the binary field may be composed of a field indicating a resource indication value (RIV).

The wireless mobile communication system may use a scheduling based on a compact scheme, and the binary field may be composed of a field indicating a resource indication value (RIV) and a field indicating 'Gap' information used for distributed allocation of resources.

The wireless mobile communication system may use a scheduling based on a compact scheme, and the binary field may be composed of a field indicating a resource indication value (RIV) and a field indicating hopping information.

The resource allocation information may be composed of resource block allocation information, or may be composed of resource block allocation information and hopping resource allocation information.

The resource block allocation information may be represented by the RIV. The RIV may indicate a pair of a start index (S) and a length (L) of consecutive VRBs capable of being combined with each other.

It is to be understood that both the foregoing general description and the following detailed description of the present invention are exemplary and explanatory and are intended to provide further explanation of the invention as claimed.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention, illustrate embodiments of the invention and together with the description serve to explain the principle of the invention.

In the drawings:

FIG. **1** shows a structure of a frequency division duplex (FDD) type radio frame used in an LTE system.

FIG. **2** shows a structure of a time division duplex (TDD) type radio frame used in an LTE system.

FIG. **3** shows an uplink (UL) resource grid structure for use in an LTE system.

FIG. **4** shows a downlink (DL) resource grid structure for use in an LTE system.

FIG. **5** is a block diagram illustrating an Evolved Universal Mobile Telecommunications System (E-UMTS) network structure as an example of a mobile communication system.

FIGS. **6** and **7** illustrate radio interface protocol structures between a UE and a UMTS Terrestrial Radio Access Network (UTRAN) that are based on a 3GPP LTE radio access network standard.

FIG. **8** shows physical channels used for an LTE system and a general signal transmission method capable of using the physical channels.

FIG. **9** is a conceptual diagram illustrating signal processing for enabling a UE to transmit an uplink signal.

FIG. **10** is a conceptual diagram illustrating signal processing for enabling a base station (BS) to transmit a downlink signal.

FIG. **11** is a conceptual diagram illustrating an SC-FDMA scheme for transmitting an uplink signal and an OFDMA scheme for transmitting a downlink signal in a mobile communication system.

FIG. **12** is a view illustrating an example of a method for mapping distributed virtual resource blocks (DVRBs) and localized virtual resource blocks (LVRBs) to physical resource blocks (PRBs).

FIG. **13** is a view illustrating an example of a method for allocating resource blocks (RBs) by a compact scheme.

FIG. **14** is a view illustrating an example of a method for mapping two DVRBs having consecutive indexes to a plurality of contiguous PRBs.

FIG. **15** is a view illustrating an example of a method for mapping two DVRBs having consecutive indexes to a plurality of spaced PRBs.

FIG. **16** is a view illustrating an example of RIVs when the number of available RBs is 20 according to one embodiment of the present invention.

FIG. **17** shows an exemplary structure of a PDCCH field for signaling SPS deactivation according to the present invention.

FIG. **18** shows individual fields acquired when DVRB allocation is carried out in a PDCCH having a 'DCI format 1A' according to the present invention.

FIG. **19** shows individual fields of a PDCCH having a 'DCI format 0' according to the present invention.

FIG. **20** is a block diagram illustrating constituent elements of a device applicable to the present invention.

FIG. **21** is a flowchart illustrating a method for deactivating a semi-persistent scheduling (SPS) according to the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

Reference will now be made in detail to the preferred embodiments of the present invention with reference to the accompanying drawings. The detailed description, which will be given below with reference to the accompanying drawings, is intended to explain exemplary embodiments of the present invention, rather than to show the only embodiments that can be implemented according to the invention.

The following detailed description includes specific details in order to provide a thorough understanding of the present invention. However, it will be apparent to those skilled in the art that the present invention may be practiced without such specific details. For example, the following description will be given centering upon a mobile communication system serving as an LTE system, but the present invention is not limited thereto and the remaining parts of the present invention other than unique characteristics of the LTE system are applicable to other mobile communication systems.

In some cases, in order to prevent ambiguity of the concepts of the present invention, conventional devices or apparatuses well known to those skilled in the art will be omitted and be denoted in the form of a block diagram on the basis of the important functions of the present invention. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

In the following description, a terminal may include mobile or fixed user equipments (UEs), for example, a user equipment (UE), a mobile station (MS) and the like, and may also be referred to in any of these ways as necessary. Also, the base station (BS) may be any of nodes included in a network

communicating with the UE, for example, a Node B (Node-B) and an eNode B (eNode-B), and may also be referred to in any of these ways.

In a mobile communication system, a UE can receive information from a base station (BS) via a downlink, and the UE can also transmit information via an uplink. Information transferred from—or received by—the UE may be data, other control information, and the like, and there are a variety of physical channels according to types and usages of this information transferred or received from or in the UE.

FIG. **5** shows an Evolved Universal Mobile Telecommunications System (E-UMTS) network structure serving as an example of a mobile communication system.

The E-UMTS system is an evolved version of the conventional Universal Mobile Telecommunications System (UMTS) system and basic standardization thereof is in progress under the 3rd Generation Partnership Project (3GPP). Generally, the E-UMTS is also referred to as a Long Term Evolution (LTE) system.

The E-UMTS network may be classified into an Evolved—UMTS Terrestrial Radio Access Network (E-UTRAN) **501** and a Core Network (CN) **502**. The E-UTRAN includes a UE **503**, a BS (eNB or eNode B) **504**, and an Access Gateway (AG) **505** which is located at an end of a network and is connected to an external network. The AG **505** can be divided into a part that handles processing of user traffic and a part that handles control traffic. Here, the AG part **505** for processing new user traffic and the AG part for processing control traffic can communicate with each other using a new interface.

One or more cells may exist for one eNB. An interface for transmitting user traffic or control traffic can be used between eNBs. A Core Network (CN) **502** may include the AG **505** and a node or the like for user registration of the UE **503**. An interface for discriminating between the E-UTRAN **501** and the CN **502** may be used.

Radio interface protocol layers between the UE and the network can be classified into an L1 layer (first layer), an L2 layer (second layer) and an L3 layer (third layer) on the basis of the lower three layers of the Open System Interconnection (OSI) reference model widely known in communication systems. A physical layer belonging to the L1 layer provides an information transfer service utilizing a physical channel. A Radio Resource Control (RRC) layer located at the L3 layer controls radio resources between the UE and the network. For this operation, RRC messages are exchanged between the UE and the network via the RRC layers. The RRC layers may be distributed among base stations (BSs) **504** and network nodes, or may be located only at a base station (BSs) **504** or the AG **505**.

FIGS. **6** and **7** illustrate radio interface protocol structures between a UE and a UTRAN that are based on a 3GPP LTE radio access network standard.

The radio interface protocol of FIG. **6** or FIG. **7** is divided horizontally into a physical layer, a data link layer and a network layer, and vertically into a user plane for transmitting data information and a control plane for transmitting a control signal such as a signaling message. In more detail, FIG. **6** shows individual layers of a radio protocol control plane and FIG. **7** shows individual layers of a radio protocol user plane. Protocol layers of FIGS. **6** and **7** can be classified into an L1 layer (first layer), an L2 layer (second layer) and an L3 layer (third layer) on the basis of the lower three layers of the OSI reference model widely known in communication systems.

The following is a detailed description of respective layers of the radio protocol control plane of FIG. **6** and the radio protocol user plane of FIG. **7**.



The physical layer, which is the first layer, provides an information transfer service to an upper layer using a physical channel. The physical layer (PHY) is connected to a Medium Access Control (MAC) layer, located above the physical layer, through a transport channel. Data is transferred between the MAC layer and the physical layer through the transport channel. In this case, the transport channel is classified into a dedicated transport channel and a common transport channel according to whether or not a channel is shared. Data transfer between different physical layers, specifically between the respective physical layers of a transmitter and a receiver, is performed through the physical channel.

A variety of layers exist in the second layer (L2 layer). The MAC layer maps various logical channels to various transport channels, and performs logical-channel multiplexing for mapping various logical channels to one transport channel. The MAC layer is connected to the RLC layer serving as an upper layer through a logical channel. The logical channel can be classified into a control channel for transmitting information of a control plane and a traffic channel for transmitting information of a user plane according to categories of transmission information.

The RLC layer of the second layer performs segmentation and concatenation on data received from an upper layer, and adjusts the size of data to be suitable for a lower layer transmitting data to a radio interval. In order to guarantee various Qualities of Service (QoSs) requested by respective radio bearers (RBs), three operation modes, i.e., a Transparent Mode (TM), an Unacknowledged Mode (UM), and an Acknowledged Mode (AM), are provided. Specifically, an AM RLC performs a retransmission function using an Automatic Repeat and Request (ARQ) function so as to implement reliable data transmission.

A Packet Data Convergence Protocol (PDCP) layer of the second layer (L2) performs a header compression function to reduce the size of an IP packet header having relatively large and unnecessary control information in order to efficiently transmit IP packets such as IPv4 or IPv6 packets in a radio interval with a narrow bandwidth. As a result, only information required for a header part of data can be transmitted, so that transmission efficiency of the radio interval can be increased. In addition, in the LTE system, the PDCP layer performs a security function, this security function is composed of a ciphering function for preventing a third party from eavesdropping on data and an integrity protection function for preventing a third party from handling data.

A Radio Resource Control (RRC) layer located at the top of the third layer (L3) is defined only in the control plane and is responsible for control of logical, transport, and physical channels in association with configuration, re-configuration and release of Radio Bearers (RBs). The RB is a logical path that the first and second layers (L1 and L2) provide for data communication between the UE and the UTRAN. Generally, Radio Bearer (RB) configuration means that a radio protocol layer needed for providing a specific service, and channel characteristics are defined and their detailed parameters and operation methods are configured. The Radio Bearer (RB) is classified into a Signaling RB (SRB) and a Data RB (DRB). The SRB is used as a transmission passage of RRC messages in the C-plane, and the DRB is used as a transmission passage of user data in the U-plane.

A downlink transport channel for transmitting data from the network to the UE may be classified into a Broadcast Channel (BCH) for transmitting system information and a downlink Shared Channel (SCH) for transmitting user traffic or control messages. Traffic or control messages of a downlink multicast or broadcast service may be transmitted

through a downlink SCH and may also be transmitted through a downlink multicast channel (MCH). Uplink transport channels for transmission of data from the UE to the network include a Random Access Channel (RACH) for transmission of initial control messages and an uplink SCH for transmission of user traffic or control messages.

Downlink physical channels for transmitting information transferred to a downlink transport channel to a radio interval between the UE and the network are classified into a Physical Broadcast Channel (PBCH) for transmitting BCH information, a Physical Multicast Channel (PMCH) for transmitting MCH information, a Physical Downlink Shared Channel (PDSCH) for transmitting downlink SCH information, and a Physical Downlink Control Channel (PDCCH) (also called a DL L1/L2 control channel) for transmitting control information, such as DL/UL Scheduling Grant information, received from first and second layers (L1 and L2). In the meantime, uplink physical channels for transmitting information transferred to an uplink transport channel to a radio interval between the UE and the network are classified into a Physical Uplink Shared Channel (PUSCH) for transmitting uplink SCH information, a Physical Random Access Channel for transmitting RACH information, and a Physical Uplink Control Channel (PUCCH) for transmitting control information, such as HARQ ACK or NACK Scheduling Request (SR) and Channel Quality Indicator (CQI) report information, received from first and second layers (L1 and L2).

FIG. **8** shows physical channels used for a 3GPP LTE system serving as an example of a mobile communication system and a general signal transmission method capable of using the physical channels.

If a UE is re-powered on after being powered off or newly enters a cell region, the UE performs an initial cell search process, such as synchronization with a base station (BS), at step S**801**. For the initial cell search process, the UE receives information of a Primary Synchronization Channel (P-SCH) and information of a Secondary Synchronization Channel (S-SCH) from the base station (BS), is synchronized with the BS, and is able to acquire information such as a cell ID or the like from the BS. After that, the UE receives information of a physical broadcast channel from the BS, such that it can acquire inter-cell broadcast information from the BS. In the meantime, the UE receives a downlink reference signal (DL RS) at the initial cell searching step, so that it can recognize a downlink channel status.

After performing the initial cell search process, the UE receives information of a Physical Downlink Control Channel (PDCCH) and information of a Physical Downlink Shared Control Channel (PDSCH) based on the PDCCH information, so that it can acquire more detailed system information at step S**802**.

In the meantime, if a UE initially accesses the BS or has no resources for uplink transmission, the UE can perform a Random Access Procedure (RAP), such as steps S**803** to S**806**, for the BS. For this operation, the UE transmits a specific sequence as a preamble through a Physical Random Access Channel (PRACH) at step S**803**, and receives a response message to the random access through a PDCCH and a PDSCH at step S**804**. In case of a competitive-based random access except for a handover case, a contention resolution procedure such as step S**805** or S**806** can then be carried out. At step S**805**, information is transmitted through an additional PRACH. At step S**806**, PDCCH/PDSCH information is received.

After performing the above-mentioned steps, as a procedure for transmitting UL/DL signals, the UE receives information of a PDCCH and a PDSCH at step S**807**, and transmits



information through a Physical Uplink Shared Channel (PUSCH) and a Physical Uplink Control Channel (PUCCH) at step S**808**.

In the LTE system, a signaling process for transmitting UL/DL signals is as follows.

FIG. **9** is a conceptual diagram illustrating signal processing for enabling a UE to transmit an uplink (UL) signal.

In order to transmit a UL signal, a scrambling module **901** of the UE can scramble a transmission signal using a specific scrambling signal of the UE. The scrambled signal is input to a modulation mapper **902**, and is converted into a complex symbol using a BPSK (Binary Phase Shift Keying)-, QPSK (Quadrature Phase Shift Keying)-, or 16 QAM (Quadrature Amplitude Modulation)-scheme according to categories of the transmission signal and/or a channel status. After that, the modulated complex symbol is processed by a transform precoder **903**, and is then input to the resource element mapper **904**. The resource element mapper **904** is able to map a complex symbol to a time-frequency element to be used for actual transmission. The processed signal may be transmitted to the base station (BS) via the SC-FDMA signal generator **905**.

FIG. **10** is a conceptual diagram illustrating signal processing for enabling the base station (BS) to transmit a downlink signal.

In the LTE system, the BS is able to transmit one or more codewords via a downlink. Therefore, one or more codewords may be processed as complex symbols by the scrambling module **1001** and the modulation mapper **1002** in the same manner as in the uplink case of FIG. **10**. Thereafter, the complex symbols are mapped to a plurality of layers by the layer mapper **1003**, and each layer may be multiplied by a predetermined precoding matrix selected depending on a channel status and may then be allocated to each transmission antenna by the precoding module **1004**. The processed transmission signal for each antenna is mapped to a time-frequency resource element to be used for transmission by the resource element mapper **1005**. After that, the mapped result can be transmitted via each antenna after passing through the Orthogonal Frequency Division Multiple Access (OFDMA) signal generator **1006**.

In the case where a UE for use in a mobile communication system transmits an uplink signal, a Peak to Average Power Ratio (PAPR) may become more serious than in the case where the BS transmits a downlink signal. Thus, as described in FIGS. **9** and **10**, the SC-FDMA scheme is used for uplink signal transmission in a different way from the OFDMA scheme used for downlink signal transmission.

In the LTE system, the SC-FDMA scheme for uplink signal transmission and the OFDMA scheme for downlink signal transmission will hereinafter be described in detail.

FIG. **11** is a conceptual diagram illustrating the SC-FDMA scheme for uplink signal transmission and the OFDMA scheme for downlink signal transmission in a mobile communication system.

Referring to FIG. **11**, not only a UE for transmitting an uplink signal but also a base station (BS) for transmitting a downlink signal includes a Serial-to-Parallel converter **1101**, a subcarrier mapper **1103**, an M-point IDFT module **1104**, a Parallel-to-Serial converter **1105**, and the like. However, a UE for transmitting a signal using the SC-FDMA scheme further includes an N-point DFT module **1102**, and compensates for a predetermined part of the IDFT processing influence of the M-point IDFT module **1104** so that a transmission signal can have single carrier characteristics.

In a cellular orthogonal frequency division multiplex (OFDM) wireless packet communication system, uplink/

downlink (UL/DL) data packet transmission is made on a subframe basis and one subframe is defined by a certain time interval including a plurality of OFDM symbols. Hereinafter, terms used in the detailed description of this application are defined as follows.

A 'resource element (RE)' represents a smallest frequency-time unit in which data or a modulated symbol of a control channel is mapped. Provided that a signal is transmitted in one OFDM symbol over M subcarriers and N OFDM symbols are transmitted in one subframe, M×N REs are present in one subframe.

A 'physical resource block (PRB)' represents a unit frequency-time resource for data transmission. In general, one PRB includes a plurality of consecutive REs in a frequency-time domain, and a plurality of PRBs is defined in one subframe.

A 'virtual resource block (VRB)' represents a virtual unit resource for data transmission. In general, the number of REs included in one VRB is equal to the length of REs included in one PRB, and, when data is transmitted, one VRB can be mapped to one PRB or some areas of a plurality of PRBs.

A 'localized virtual resource block (LVRB)' is one type of the VRB. One LVRB is mapped to one PRB. LVRBs having different logical indexes are mapped to PRBs having different physical indexes. An LVRB may be interpreted in the same as a PRB.

A 'distributed virtual resource block (DVRB)' is another type of VRB. One DVRB is mapped to some REs in a plurality of PRBs, and REs to which different DVRBs are mapped are not duplicated.

'$N_D$'='$N_d$' represents the number of PRBs to which one DVRB is mapped. FIG. **12** illustrates an example of a method for mapping DVRBs and LVRBs to PRBs. In FIG. **12**, $N_D$=3. As can be seen from FIG. **12**, an arbitrary DVRB can be divided into three parts and the divided parts can be mapped to different PRBs, respectively. At this time, the remaining part of each PRB, not mapped by the arbitrary DVRB, is mapped to a divided part of another DVRB. The LTE system has a system structure denoted by '$N_D$'='$N_d$'=2.

Semi-Persistent Scheduling (SPS) is a scheduling scheme for allocating resources to a specific UE such that the allocated resources can be persistently maintained during a specific time interval. In the case where a predetermined amount of data is transmitted during a specific time in the same manner as in a Voice over Internet Protocol (VoIP), control information need not be transmitted to each data transmission interval for resource allocation, such that an amount of wasted control information can be reduced by the SPS scheme.

'$N_{PRB}$' represents the number of PRBs in a system.

'$N_{LVRB}$' represents the number of LVRBs available in the system.

'$N_{DVRB}$' represents the number of DVRBs available in the system.

'$N_{LVRB_UR}$' represents the maximum number of LVRBs allocable to one user equipment (UE).

'$N_{DVRB_UE}$' represents the maximum number of DVRBs allocable to one UE.

'$N_{subset}$' represents the number of subsets.

'$N_{F\text{-}Block}$' represents the number of frequency bands used in a system capable of using a plurality of frequency bands.

Here, the "number of RBs" means the number of RBs classified on a frequency axis. That is, even in the case where RBs can be classified by slots constituting a subframe, the "number of RBs" means the number of RBs classified on the frequency axis of the same slot.

FIG. **12** shows an example of definitions of LVRBs and DVRBs.



As can be seen from FIG. **12**, each RE of one LVRB is mapped one-to-one to each RE of one PRB. For example, one LVRB is mapped to a PRB**0** (**1201**). In contrast, one DVRB is divided into three parts and the divided parts are mapped to different PRBs, respectively. For example, a DVRB**0** is divided into three parts and the divided parts are mapped to a PRB**1**, PRB**4** and PRB**6**, respectively. Likewise, a DVRB**1** and a DVRB**2** are each divided into three parts and the divided parts are mapped to the remaining resources of the PRB**1**, PRB**4** and PRB**6**. Although each DVRB is divided into three parts in this example, the present invention is not limited thereto. For example, each DVRB may be divided into two parts.

Downlink data transmission from a base station (BS) to a specific terminal (i.e., a specific UE) or uplink data transmission from the specific UE to the base station (BS) is performed through one or more VRBs in one subframe. In other words, the above-mentioned data transmission may be achieved through PRBs corresponding to one or more VRBs. When the base station (BS) transmits data to the specific UE, it has to notify the terminal of which VRB will be used for data transmission. Also, in order to enable the specific UE to transmit data, the base station (BS) has to notify the terminal of which VRB will be used for data transmission. Specific information indicating how to map VRBs to PRBs can be predetermined, so that the UE can automatically recognize which PRB will be searched when acquiring information of VRBs allocated to the UE itself.

Data transmission schemes can be broadly classified into a frequency diversity scheduling (FDS) scheme and a frequency selective scheduling (FSS) scheme. The FDS scheme is a scheme that obtains a reception performance gain through frequency diversity, and the FSS scheme is a scheme that obtains a reception performance gain through frequency selective scheduling.

In the FDS scheme, a transmission stage transmits one data packet over subcarriers widely distributed in a system frequency domain so that symbols in the data packet can experience various radio channel fadings. Therefore, an improvement in reception performance is obtained by preventing the entire data packet from being subject to unfavorable fading. In contrast, in the FSS scheme, an improvement in reception performance is obtained by transmitting the data packet over one or more consecutive frequency areas in the system frequency domain which are in a favorable fading state. In a cellular OFDM wireless packet communication system, a plurality of terminals is present in one cell. At this time, because the radio channel conditions of the respective terminals have different characteristics, it is necessary to perform data transmission using the FDS scheme with respect to a certain UE and data transmission using the FSS scheme with respect to a different UE even within one subframe. As a result, a detailed FDS transmission scheme and a detailed FSS transmission scheme must be designed such that the two schemes can be efficiently multiplexed within one subframe. On the other hand, in the FSS scheme, a gain can be obtained by selectively using a band favorable to a UE among all available bands. In contrast, in the FDS scheme, a comparison is not made as to whether a specific band is good or bad, and, as long as a frequency interval capable of adequately obtaining diversity is maintained, there is no need to select and transmit a specific frequency band. Accordingly, it is advantageous in terms of improvement in overall system performance to perform the frequency selective scheduling of the FSS scheme preferentially when scheduling.

In the FSS scheme, because data is transmitted using subcarriers consecutively contiguous in the frequency domain, it

is preferable that the data be transmitted using LVRBs. At this time, provided that $N_{PRB}$ PRBs are present in one subframe and a maximum of $N_{LVRB}$ LVRBs are available within the system, the base station can transmit bitmap information of $N_{LVRB}$ bits to each terminal to notify the terminal through which one of the LVRBs downlink data will be transmitted or through which one of the LVRBs uplink data can be transmitted. That is, each bit of the $N_{LVRB}$-bit bitmap information, which is transmitted to each terminal as scheduling information, indicates whether data will or can be transmitted through an LVRB corresponding to this bit, among the $N_{LVRB}$ LVRBs. This scheme is disadvantageous in that, when the number $N_{LVRB}$ becomes larger, the number of bits to be transmitted to each terminal becomes larger in proportion thereto.

In the meantime, physical downlink control channel (PDCCH) downlink control information (DCI) transferred to a UE may have a plurality of formats. A resource allocation field transferred over the PDCCH may have different structures according to Downlink Control Information (DCI) formats. Thus, the user equipment (UE) may interpret the resource allocation field according to a format of the received DCI.

The resource allocation field may have two parts, i.e., resource block allocation information and a resource allocation header field. A plurality of resource allocation types may be defined. For example, according to a first resource allocation type, the resource block allocation information may have a bitmap indicating one set of consecutive physical resource blocks (PRBs). In this case, one bit may be allocated to one resource block group (RBG). According to a second resource allocation type, resource block allocation information may have a bitmap indicating subsets or RBs allocated to the UE. According to a third resource allocation type, resource block allocation information may have a bitmap indicating consecutively allocated VRBs. At this time, the resource allocation field may include a resource indication value (RIV) indicating a start resource block and the length of consecutively-allocated resource blocks (RBs). Examples of the above-mentioned resource allocation types have been disclosed in the 3GPP TS 36.213 document.

For example, a DCI format 1A prescribed in 3GPP TS 36.213 may be used for compact scheduling of one physical downlink shared channel (PDSCH) codeword. This compact scheduling is a scheduling scheme for allocating one set of consecutive VRBs to a UE, and corresponds to the above third resource allocation type. Hereinafter, the above-mentioned compact scheduling in the present invention may be referred to as a compact scheme.

As described above, provided that a terminal (i.e., the UE) may be assigned only one set of contiguous RBs, information of the assigned RBs may be represented by the compact scheme denoted by both a start point of RBs and the number of the RBs.

FIG. **13** is a view illustrating an example of a method for allocating resource blocks by a compact scheme. If the number of available RBs is denoted by $N_{RB}=N_{VRB}$, the length of available RBs varies depending on respective start points as shown in FIG. **13**, such that the number of combinations for RB allocation is $N_{LVRB}(N_{LVRB}+1)/2$. Accordingly, the number of bits required for the combinations is 'ceiling (log 2($N_{LVRB}$ ($N_{LVRB}$+1)/2))'. Here, ceiling(x) means rounding "x" up to the nearest integer. This method is advantageous over the bitmap scheme in that the number of bits does not significantly increase with the increase in the number $N_{LVRB}$.

On the other hand, for a method for notifying a UE of DVRB allocation, it is necessary to reserve the positions of respective divided parts of DVRBs distributively transmitted for a diversity gain. Alternatively, additional information may be required to directly notify the positions. Preferably, provided that the number of bits for signaling for the DVRBs is set to be equal to the number of bits in LVRB transmission of the above-stated compact scheme, it is possible to simplify a signaling bit format in a downlink. As a result, there are advantages that the same channel coding can be used, etc.

Here, in the case where one UE is allocated a plurality of DVRBs, this UE is notified of a DVRB index of a start point of the DVRBs, a length (=the number of the allocated DVRBs), and a relative position difference between divided parts of each DVRB (e.g., a gap between the divided parts). The LTE system is able to select either of 'Gap**1**' and 'Gap**2**', each of which has a predetermined value according to the number of system resource blocks. Accordingly, a value of 1 bit may be separately allocated to indicate the selection of 'Gap**1**' or 'Gap**2**'.

The following table 1 shows a structure of the 'Gap' which can be used in the LTE system according to a system bandwidth. In the case where the number of available system resource blocks (system RBs) is less than 50, only the 'Gap**1**' (=1St is used, so that there is no need to allocate one bit for 'Gap' indication. In contrast, in the case where the number of available system RBs is equal to or greater than 50, either one of 'Gap**1**' (=1st Gap) and 'Gap**2**' (=2nd Gap) must be used, so that signaling of 1 bit is needed to indicate which one of 'Gap**1**'(=1st Gap) and 'Gap**2**'(=2nd Gap) is used.

TABLE 1

| | Gap ($N_{gap}$) | |
|---|---|---|
| System BW ($N_{RB}^{DL}$) | 1st Gap ($N_{gap,1}$) | 2nd Gap ($N_{gap,2}$) |
| 6-10 | $\lceil N_{RB}^{DL}/2 \rceil$ | N/A |
| 11 | 4 | N/A |
| 12-19 | 8 | N/A |
| 20-26 | 12 | N/A |
| 27-44 | 18 | N/A |
| 45-49 | 27 | N/A |
| 50-63 | 27 | 9 |
| 64-79 | 32 | 16 |
| 80-110 | 48 | 16 |

FIG. **14** illustrates an example of a method for mapping two DVRBs having consecutive indexes to a plurality of contiguous PRBs.

As shown in FIG. **14**, in the case where a plurality of DVRBs having consecutive indexes are mapped to a plurality of contiguous PRBs, first divided parts **1401** and **1402** and second divided parts **1403** and **1404** are spaced apart from each other by a gap **1405**, while divided parts belonging to each of the upper divided parts and lower divided parts are contiguous to each other, so that the diversity order becomes 2. In this case, frequency diversity can be obtained only by a gap. In FIG. **14**, $N_D=N_d=2$.

FIG. **15** illustrates an example of a method for mapping two DVRBs having consecutive indexes to a plurality of spaced PRBs.

In the method of FIG. **15**, DVRB indexes are constructed as shown in FIG. **15**. When mapping DVRBs to PRBs, consecutive DVRB indexes may be distributed without being mapped to contiguous PRBs. For example, a DVRB index '0' and a DVRB index '1' are not arranged contiguous to each other. In other words, in FIG. **15**, DVRB indexes are arranged in the order of 0, 8, 16, 4, 12, 20, . . . , and this arrangement can be obtained by inputting the consecutive indexes to a block interleaver. In this case, it is possible to obtain distribution

within each of the divided parts **1501** and **1502**, as well as distribution by a gap **1503**. Therefore, when a UE is allocated two DVRBs as shown in FIG. **15**, the diversity order increases to 4, resulting in an advantage that an additional diversity gain can be obtained. In FIG. **15**, $N_D=N_d=2$.

At this time, the value of the gap indicative of the relative position difference between the divided parts can be expressed in two ways. Firstly, the gap value can be expressed by a difference between DVRB indexes. Secondly, the gap value can be expressed by a difference between indexes of PRBs to which a DVRB is mapped. In the case of FIG. **15**, Gap=1 in the first way, while Gap=3 in the second way. FIG. **15** shows the latter case **1503**. Meanwhile, if the total number of RBs of the system is changed, the DVRB index arrangement may be changed accordingly. In this case, the use of the second way has the advantage of recognizing a physical distance between the divided parts.

In order to perform signaling of DVRB allocation, the above-mentioned LVRB compact scheme may be used. That is, if the compact scheme is applied to DVRBs signaled for one UE, PRBs mapped to the DVRBs may be distributed in a physical frequency domain, but these DVRBs have consecutive logical indexes in a virtual region (i.e., a logical region). In this case, a start point of consecutively-allocated RBs and length information of the RBs correspond to a start point of VRB indexes instead of PRB indexes and length information thereof, respectively.

As described above, in the compact scheme, LVRB signaling includes a start point of RBs and length information of the RBs. In order to perform the DVRB signaling, gap information may be additionally required in some cases. In order to constantly maintain the number of bits required for the entire signaling, there is a need to limit the length information such that an amount of information must be reduced. For example, when using 50 RBs or more, one bit of the RIV field must be assigned for 'Gap' indication, such that there is a need to reduce the number of bits required for transferring the RIV with the limitation in the length information.

On the other hand, in case of using RBs to perform the common signaling for several users, control signaling for notifying allocated RBs must allow all users present in a cell to read information of the allocated RBs. Thus, for this control signaling, a code rate may be reduced or a transmission power may be increased, such that the resultant control signaling information having a low code rate and a high transmission power may be transferred to several users. In order to reduce the code rate of the control signaling to which limited resources are allocated, an amount of control data must be reduced. In order to reduce the amount of control data, the number of bits required for RB allocation information must be reduced.

Likewise, control message data transferred to allocated RBs must allow all users present in the cell to read corresponding information, such that the control message data is transferred at a low code rate. Assuming that the code rate is 1/20, if an amount of data increases by 16 bits, an amount of codeword made after channel coding increases by 320 bits. In the Long Term Evolution (LTE), assuming that one TX antenna transmission (i.e., 1 Tx antenna transmission) is carried out and one OFDM symbol is used for a control signal, the number of symbols capable of transferring payload data within one RB (i.e., 1RB) is 148. Thus, assuming that a quadrature phase shift keying (QPSK) modulation is used, the number of transferable bits is 296. As a result, data increases by 16 bits, and data increases by 320 bits, such that two RBs are additionally needed.

That is, in order to maintain a low code rate, although the size of data increases slightly, the number of RBs required for transferring this data greatly increases, such that RBs need to be allocated with a granularity of one RB unit (i.e., a 1RB-based granularity).

Hereinafter, a resource allocation signaling structure for establishing a step for limiting a start position with a granularity of one-RB allocation (i.e., 1RB allocation) will be described in detail.

The following equation 1 shows an exemplary signaling method based on the compact scheme which notifies of a start point (S) of RBs and the number (=Length, L) of allocated RBs.

[Equation 1]

if $L-1\leq\lfloor N_{RB}/2\rfloor$ then

$$RIV=N_{RB}(L-1)+S$$

else

$$RIV=N_{RB}(N_{RB}-L+1)+(N_{RB}-1-S)$$

End

Required bits

$$N_{bit_required}=\lceil\log_2(RIV_{max}+1)\rceil$$

Without limitation

$$RIV_{max}=N_{RB}\cdot(N_{RB}+1)/2-1$$

With limitation $L^{Limit}$

$$RIV_{max}=\min\{N_{RB}\cdot(N_{RB}+1)/2-1,N_{RB}\cdot(L^{Limit}-1)+N_{RB}-L^{Limit}\}$$

In the following description, "mod(x,y)" means "x mod y", and "mod" means a modulo operation. Also, "⌊•⌋" means a descending operation, and represents a largest one of integers equal to or smaller than a numeral indicated in "⌊ ⌋". On the other hand, "⌈•⌉" means an ascending operation, and represents a smallest one of integers equal to or larger than a numeral indicated in "⌈ ⌉". Also, "round(•)" represents an integer nearest to a numeral indicated in "( )". "min(x,y)" represents a smaller value selected between x and y, whereas "max(x,y)" represents a larger value selected between x and y.

Assuming that the total number of available RBs is denoted by $N_{RB}$ and the beginning number of indexes to be assigned to the RBs is set to 0, indexes from 0 to $N_{RB}-1$ are sequentially assigned to the RBs. In this case, $N_{RB}$ may be the total number of all RBs contained in a system band, the number of all RBs used as VRBs, or the number of RBs contained in any limited area.

Thus, the range of S may be $0\leq S\leq N_{RB}-1$, and the range of allocable 'L' values is changed according to this S value. In another view, the L value is in the range of $1\leq L\leq N_{RB}$, and the range of available S values is changed according to the L value. Namely, a certain S value is unable to be combined with a specific L value.

A maximum value of each of the S and L values may be represented by a binary number irrespective of such impossible combinations. A bit field for this binary number may be constructed for each of the S and L values. In case of transmitting each of the bit fields, if $N_{RB}$ is 20 (i.e., $N_{RB}=20$), 20 is less than $2^5$ (i.e., $20<2^5$), so that 5 bits for the S value and 5 bits for the L values, namely, a total of 10 bits, are needed. However, these 10 bits include information of useless combinations incapable of being actually generated, such that overhead of unnecessary transmission bits is generated. Thus, the number of transmission bits can be reduced if each combination of generable S and L values is represented by 'RIV', this

RIV is converted into a binary number according to binary representation, and the resultant RIV of the binary number is then transferred.

FIG. **16** is a view illustrating an example of RIVs when $N_{RB}=20$.

As can be seen from FIG. **16**, 'RIV' is decided according to S and L values. In case of calculating 'RIV' related to $0 \le S \le N_{RB}-1$ in each of all L values using Equation 1, RIVs of FIG. **16** are formed. The value of each element shown in FIG. **16** is 'RIV' indicating a combination of S and L values corresponding to the above element. Values contained in a left upper part covering almost half of FIG. **16** correspond to combinations of generable S and L values if $N_{RB}=20$, and values contained in a right lower part colored in gray, covering the other half of FIG. **16**, correspond to combinations of S and L values incapable of being generated.

In this scheme, RIVs present in the gray-colored part under the condition of $L-1 \le \lfloor N_{RB}/2 \rfloor$, are mapped to RIVs under the other condition of $L-1 \le \lfloor N_{RB}/2 \rfloor$, such that no RIVs are wasted. For example, if $N_{RB}$ is set to 20 (i.e., $N_{RB}=20$), RIVs present in a specific part corresponding to $L<\lfloor N_{RB}/2 \rfloor+1=\lfloor 20/2 \rfloor+1=11$ among the right lower part of FIG. **12** are reused in another part corresponding to $L>\lfloor N_{RB}/2 \rfloor+1=\lfloor 20/2 \rfloor+1=11$ among the left upper part of FIG. **20**. In this case, a maximum value (i.e., a maximum RIV) among RIVs present in the left upper end is 209.

In this scheme, the maximum RIV may influence the number of transmission bits, RIVs below the maximum RIV may not be mapped to values incapable of being obtained by combinations of actual S and L values. That is, all values below the maximum RIV correspond to combinations of generable S and L values.

In case of separately transmitting the S value, a maximum S value is 19, such that 5 bits are needed to indicate this S value '19' (where $0 \le 19 < 2^5$). In case of separately transmitting the L value, a maximum L value is 20, such that 5 bits are needed to indicate this L value '20' (where $0 \le 20 < 2^5$). Therefore, in case of transmitting the S and L values independent of each other, 10 bits are needed in the end. However, the RIVs are in the range of $0 \le RIV \le 209 < 2^8$, such that 8 bits are needed to indicate these RIVs, as denoted by $N_{bit_required}=8$. As a result, it can be recognized that 2 bits are saved as compared to the above case of transmitting the S and L values independent of each other. In this case, a valid RIV is 209 and a maximum value capable of being indicated by 8 bits is 255, so that a total of 46 values of 210 ~ 255 are not actually used.

When using the conventional RIV table shown in FIG. **16**, RIVs undefined in this RIV table become invalid for an LTE terminal. For example, RIVs from 210 to 255 in FIG. **16** become invalid for a conventional LTE terminal. Therefore, RIVs defined in the conventional RIV table are referred to as valid RIVs, and other RIVs undefined in this RIV table are referred to as invalid RIVs. For example, in FIG. **16**, RIVs from 0 to 209 are valid RIVs, and RIVs from 210 to 255 are invalid RIVs.

Valid RIVs are able to indicate only allocation status information of RBs defined in the table of FIG. **16**, and invalid RIVs are able to indicate allocation status information of other RBs undefined in the table of FIG. **16**. In order to use invalid RIVs as described above, the assumption of the presence of invalid RIVs is needed. If the following equation 2 is satisfied, this means that RIVs that are not used as actual values while being capable of being transferred are always present.

[Equation 2]

$N \neq M$, where, $N=\lceil \log_2(N_{RB}(N_{RB}+1)/2) \rceil$, $M=\log_2(N_{RB}(N_{RB}+1)/2)$

In Equation 2,

$$\frac{N_{RB}(N_{RB}+1)}{2}$$

is a total number of valid RIVs when the number of resource blocks is $N_{RB}$. In Equation, N is a minimum length of a binary number for indicating all the valid RIVs. However, if

$$\frac{N_{RB}(N_{RB}+1)}{2}$$

is not a multiple of 2, it is impossible for M to be an integer, so that M may be set to any non-integer value. In this case, in order to accomplish Equation 2, the following equation 3 must be achieved.

$$2^N \neq \frac{N_{RB}(N_{RB}+1)}{2} \qquad \text{[Equation 3]}$$

Equation 3 can be represented by the following equation 4.

[Equation 4]

$$2^{N+1} \neq N_{RB}(N_{RB}+1)$$

In conclusion, if Equation 4 is accomplished, it can be seen that the aforementioned invalid RIVs exist.

Assuming that $2^{N+1}=N_{RB}(N_{RB}+1)$ is achieved, ($N_{RB}=2^a$) and ($N_{RB}+1=2^b$) must be established. That is, $2^a+1=2^b$ must be satisfied. In this case, in order to satisfy $2^a+1=2^b$, 'a' must be set to 0 (a=0) and 'b' must be set to 1 (b=1). Therefore, $2^{N+1}=N_{RB}(N_{RB}+1)$ is achieved only in the case of $N_{RB}=1$. However, because $6 \le N_{RB} \le 110$ is given in the LTE, $2^{N+1} \neq N_{RB}(N_{RB}+1)$ is achieved. Thus, in the LTE, $2^{N+1}=N_{RB}(N_{RB}+1)$ is not achieved. Therefore, $N=\lceil \log_2(N_{RB}^{UL}(N_{RB}^{UL}+1)/2) \rceil \neq M=\log_2(N_{RB}^{UL}(N_{RB}^{UL}+1)/2)$ is demonstrated, and the LTE always includes RIVs that are not used as actual values while being capable of being transmitted. Therefore, the above-mentioned proposed method can be used for the LTE at all times.

In the meantime, in the above-mentioned RIV construction method, if a maximum value ($=L^{limit}$) of allocable RBs is limited, i.e., if the L value is limited to $L^{limit}$ or less, the number of required bits may be reduced. In FIG. **12**, if $L^{limit}$ is set to 6 (i.e., $L^{limit}=6$), the range of generable L values is given as $1 \le L \le 6$, combinations having other L values having the range of $7 \le L \le 20$ are not in use. At this time, it can be recognized that a maximum RIV among RIVs is 114. That is, the range of generable RIVs is given as $0 \le RIV \le 114 < 2^7$, so that the number of required bits is 7 as denoted by $N_{bit_required_lim}=7$. In this case, a valid maximum RIV is 114 and a maximum value capable of being denoted by 7 bits is 127, such that a total of 13 values from 115 to 127 are not actually used.

The SPS method among various scheduling methods used in the LTE system will hereinafter be described in detail.

Presently, in order to perform uplink SPS and/or downlink SPS, the LTE system firstly informs a UE of radio resource control (RRC) signaling information, such that the UE can recognize which subframe(s) will be used for SPS transmission/reception on the basis of the received RRC signaling information. In other words, time resources from among time-frequency resources allocated for SPS is firstly designated through RRC signaling. In order to indicate available

subframes, for example, a period and offset of each subframe can be notified. However, because a UE is still assigned only the time resource domain through the RRC signaling, the UE cannot not transmit/receive data using the SPS. Therefore, the UE receives a PDCCH for indicating activation, and then allocates frequency resources according to RB allocation information included in the received PDCCH, and applies the modulation and the code rate depending on modulation and coding scheme (MCS) information, such that the UE starts transmitting/receiving data according to period and offset information of subframes allocated through the RRC signaling. Then, upon receiving a PDCCH for indicating deactivation from a base station (BS), the UE stops transmitting/receiving data. In the case where the UE receives a PDCCH indicating either the activation or the deactivation after stopping transmitting/receiving data, the UE restarts data transmission/reception using the period- and offset-information of each subframe allocated through the RRC signaling using the RB allocation and MCS information designated in the received PDCCH. In this case, the PDCCH including the activation-, deactivation-, and/or reactivation indication(s) may be a PDCCH from which an SPS cell radio network temporary identity (C-RNTI) is detected. In other words, while allocation of time resources is carried out through the RRC signaling, transmission/reception of actual signals can be carried out after a PDCCH indicating activation and reactivation of the SPS has been received. Interruption of signal transmission/reception occurs after the UE receives a PDCCH indicating SPS deactivation.

Presently, a variety of formats have been defined as PDCCH formats in the LTE system, for example, a format 0 for uplink, and formats 1, 1A, 1B, 1C, 1D, 2, 2A, 3, and 3A for downlink have been defined as PDCCH formats in the LTE system. Necessary control information may be selected from among a variety of control information according to usages of the above PDCCH formats, and a combination of the selected control information is formed, such that the necessary control information can be transmitted in the form of such a combination. For example, necessary control information may be selected from among hopping flag, RB allocation, MCS, Redundancy Version (RV), New Data Indicator (NDI), Transmission Power Control (TPC), a Cyclic Shift, Demodulation Reference Signal (DM RS), UL index, a Channel Quality Indicator (CQI) request, a DL allocation index, a Hybrid Automatic Repeat Request (HARQ) process number, a Transmitted Precoding Matrix Indicator (TPMI), and PMI confirmation.

SPS Activation and Reactivation

Basic information such as NDI, RB allocation, MCS information, and the like is needed for SPS activation or SPS reactivation. Each PDCCH format includes unnecessary information in addition to the basic information. In case of SPS deactivation, NDI, RB allocation, MCS information and the like are no longer required, and only the deactivation status information is required for the SPS deactivation.

SPS allocation and non-persistent allocation can be distinguished from each other according to whether a radio network temporary identity (RNTI) masked on a cyclic redundancy check (CRC) part of a PDCCH is an SPS C-RNTI or a C-RNTI. However, according to the present invention, when an SPS-based operation is performed, each of unnecessary bits among PDCCH formats is fixed to zero '0', such that this bit composed of '0' may be used to re-confirm SPS allocation information.

Detailed bit field structures of individual PDCCH formats during the SPS operation according to the present invention can be given as the following tables 2 to 5.

TABLE 2

| | | |
|---|---|---|
| Format 0/1A indicator | 1 bit → '0' | Format 0 |
| Hopping Flag | 1 bit | |
| Resource Block Allocation | N bit | |
| MCS | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI | 1 bit | |
| DM-RS | 3 bits → '000' | '000' → SPS Validation |
| TPC (PUSCH) | 2 bits → '00' | '00' → SPS Validation |
| CQI trigger | 1 bit | |
| UL index (TDD) | (2 bits) | |

Table 2 shows the 'format 0' for uplink, if it is assumed that all or some of the MCS, DM-RS, and TPC bit fields are set to zero '0' as shown in Table 2, the UE is able to confirm that the SPS C-RNTI is masked on the CRC part of a PDCCH, i.e., the UE is able to confirm SPS validation.

TABLE 3

| | | |
|---|---|---|
| Format 0/1A indicator | 1 bit → '1' | Format 1A |
| LVRB/DVRB Flag | 1 bit | |
| Resource Block Allocation | N bit | |
| MCS | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI | 1 bit | |
| HARQ index | 3 bits → '000' | 000' → SPS Validation |
| TPC (PUCCH) | 2 bits | |
| RV | 2 bits → '00' | '00' → SPS Validation |
| DL index (TDD) | (2 bits) | |

Table 3 shows the format 1A for a Single Input Multi Output (SIMO) downlink compact scheme. As shown in Table 3, if it is assumed that all or some of the MCS, HARQ index, and RV bit fields are set to zero '0' as shown in Table 3, the UE is able to confirm that the SPS C-RNTI is masked on the CRC part of a PDCCH.

TABLE 4

| | | |
|---|---|---|
| Allocation type Flag | 1 bit | |
| Resource Block Allocation | P bit | |
| MCS | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| HARQ index | 3 bits (4-bit TDD) → '000(0)' | '000(0)' → SPS Validation |
| NDI | 1 bit | |
| RV | 2 bits → '00' | '00' → SPS Validation |
| TPC (PUCCH) | 2 bits | |
| DL index (TDD) | 2 bits | |

Table 4 shows the format 1 for a Single Input Multi Output (SIMO) downlink scheme. As shown in Table 4, if it is assumed that all or some of the MCS, HARQ index, and RV bit fields are set to zero '0' as shown in Table 4, the UE is able to confirm that the SPS C-RNTI is masked on the CRC part of a PDCCH.

TABLE 5

| | |
|---|---|
| Allocation type Flag | 1 bit |
| Resource Block Allocation | P bits |

TABLE 5-continued

| | | |
|---|---|---|
| TPC (PUCCH) | 2 bits | |
| DL index (TDD) | 2 bits | |
| HARQ index | 3 bits (4-bit TDD) → '000(0)' | '000(0)' → SPS Validation |
| HARQ swap flag | 1 bit | |
| MCS 1 | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI 1 | 1 bit | |
| RV 1 | 2 bits → '00' | '00' → SPS Validation |
| MCS 2 | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI 2 | 1 bit | |
| RV 2 | 2 bits → '00' | '00' → SPS Validation |
| Precoding | 3 or 6 bits | |

Table 5 shows the 'format 2/2A' for a closed-loop/open-loop Spatial Multiplexing (SM). As shown in Table 5, if it is assumed that all or some of the MCS, HARQ index, and RV bit fields are set to zero '0' as shown in Table 5, the UE is able to confirm that the SPS C-RNTI is masked on the CRC part of a PDCCH.

SPS Deactivation

The SPS deactivation method according to the present invention will hereinafter be described in detail.

The compact resource allocation method is used in the formats 0, 1A, 1B, 1C, and 1D among the above-mentioned PDCCH formats. In this case, when some of RIVs are valid RIVs and the other RIVs are invalid RIVs, the invalid RIVs may be used for an event requesting no RB allocation.

In the present invention, when a downlink control signal format based on the compact-type RB allocation scheme is used for signaling SPS activation and/or SPS deactivation, an RIV contained in the PDCCH from which the SPS C-RNTI is detected may be used as signaling information for SPS deactivation indication. In this case, the RIV contained in the PDCCH from which the SPS C-RNTI is detected may have any one of values capable of being used as the above-mentioned invalid RIVs.

For example, according to the RIV construction method shown in Table 1, a valid RIV indicating a generable RB allocation combination may be any one of RIVs from 0 to 209 (where this RIV '209' is a maximum valid RIV). In this case, an invalid RIV may be any one of RIVs from 210 to 255. If the RIV detected from the PDCCH from which the SPS C-RNTI is detected belongs to the invalid RIV, the UE recognizes that signaling information indicating SPS deactivation is transmitted. A maximum value capable of being indicated by a binary field indicating each RIV is certainly included in values capable of belonging to the invalid RIV. That is, the above-mentioned invalid RIV certainly includes a specific value acquired when the entire binary field indicating each RIV is filled with '1'. Specifically, in the case where the RIV detected in the PDCCH from which the SPS C-RNTI was detected is determined to be the above specific value acquired when the entirety of the binary field is filled with '1', it can be recognized that signaling information indicating SPS deactivation is transmitted on the basis of the above specific value.

FIG. **17** shows an exemplary structure of a PDCCH field for signaling SPS deactivation according to the present invention. As shown in FIG. **17**, if the RIV binary field is composed of 8 bits, a binary number RIV (=$11111111_2$) is acquired. If the RIV (=$11111111_2$) is detected, this RIV (=$\mathbf{11111111}_2$) may indicate that signaling information indicating SPS deactivation was transmitted.

A method for indicating SPS deactivation when DVRB allocation is carried out in a PDCCH having a DCI format 1A will hereinafter be described in detail.

FIG. **18** shows individual fields acquired when DVRB allocation is carried out in a PDCCH having a DCI format 1A according to the present invention. FIG. **18**(*a*) shows an exemplary case in which an LVRB is used. FIGS. **18**(*b*) and **18**(*c*) illustrate exemplary cases, each of which shows the use of a DVRB. In more detail, FIG. **18**(*b*) shows the use of 'Gap**1**' and FIG. **18**(*c*) shows the use of 'Gap**2**'.

When using a DVRB as shown in FIGS. **18**(*b*) and **18**(*c*), one bit **1802** from among the entire bits **1801** used as an RIV field indicating LVRB allocation information as shown in FIG. **18**(*a*) is used for indicating 'Gap**1**'/'Gap**2**'. Only the remaining bit field **1803** is allocated as an RIV field. In this case, as shown in FIG. **18**, the maximum allocable number of RBs is limited to 16 so that the RIV does not exceed the maximum value which can be represented by the RIV field which is reduced by the one bit **1802**.

At least one invalid RIV unused for allocating valid resources exists, and this invalid RIV may be used as signaling information indicating SPS deactivation. Specifically, if the invalid RIV exists, the maximum value capable of being indicated by the binary field indicating an RIV is included in the existing invalid RIV, so that this maximum value can be used for deactivation. In other words, the value acquired when the entirety of the RIV binary field is filled with '1' may be used for deactivation. As can be seen from FIG. **18**, there may arise two cases according to indication **1802** of the 'Gap'. The SPS deactivation construction having 'Gap**2**' shown in FIG. **18**(*c*) has the same bit pattern as that of FIG. **18**(*a*) in which the RIV field for LVRB is configured to indicate the SPS deactivation.

In addition, in case of the SPS deactivation, a distinction between 'Gap**1**' and 'Gap**2**' and a distinction between LVRBs and DVRBs are meaningless. Therefore, even for a SPS UE which is using 'Gap**1**' shown in FIG. **18**(*b*), the entire RIV field for LVRB can be filled out with '1' in order to represent SPS deactivation. In other words, although 'Gap**1**' is currently used as shown in FIG. **18**(*b*), the 'Gap' indication field **1802** may be filled with '1' instead of '0' under the SPS deactivation.

Hereinafter, a method for indicating SPS deactivation when hopping is used for the PDCCH having the 'DCI format 0' according to the present invention will hereinafter be described.

FIG. **19** shows individual fields of a PDCCH having a 'DCI format 0' according to the present invention. FIG. **19**(*a*) shows an exemplary case in which the hopping is not used. FIGS. **19**(*b*) and **19**(*c*) show other cases in which the hopping is used when a system band is in the range from 50 RBs to 110 RBs.

In the case where the system band is in the range from 50 RBs to 110 RBs as shown in FIGS. **19**(*b*) and **19**(*c*) and hopping is carried out, 2 bits **1902** from among all bits **1901** used as an RIV field indicating VRB allocation information are used to indicate hopping information. Only the remaining bits **1903** are allocated as an RIV field. If it is assumed that the hopping is carried out in the format 0 and the system bandwidth is in the range from 6 RBs to 49 RBs, one bit (1 bit) from among all bits used as the VRB RIV field is used to indicate the hopping information.

For example, as shown in FIGS. **19**(*b*) and **19**(*c*), the length of RBs capable of being maximally allocated is limited, such that an RIV does not exceed a maximum value capable of being indicated by the RIV field **1903**. Even in the case, there exists at least one invalid RIV to be unused, and this invalid

RIV may be used for SPS deactivation. The invalid RIV includes the maximum value capable of being indicated by a binary field through which the RIV will be transferred, such that this maximum value can be used for deactivation. There may arise two cases according to the hopping information as shown in FIG. **19**. The SPS deactivation construction formed when each bit indicating the hopping information is set to '1' as shown in FIG. **19**(*c*) has the same bit pattern as that of FIG. **19**(*a*) in which the RIV field for VRB is configured to indicate the SPS deactivation.

In addition, as described above, the distinction based on hopping information is meaningless for the SPS deactivation. Therefore, even when a hopping is performed as like in FIG. **19**(*b*) or **19**(*c*), the entire RIV field **1901** can be filled with '1' to indicate SPS deactivation.

As described above, because it is enough to inform only the deactivation status without other control information to indicate a SPS deactivation, it is preferable that only one format be used for each of uplink and downlink. In other words, the format **0** may be used in uplink and the shortest format 1A may be used in downlink.

Tables 6 and 7 show examples of detailed field structures used when uplink SPS deactivation and downlink SPS deactivation are signaled by 'DCI format 0' and 'DCI format 1A', respectively.

TABLE 6

| | | |
|---|---|---|
| Format 0/1A indicator | 1 bit → '0' | Format 0 |
| Hopping Flag | 1 bit → 'x' | |
| Resource Block Allocation | N bit→ '11 . . . 11' | SPS deactivation |
| MCS | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI | 1 bit → 'x' | |
| DM-RS | 3 bits → '000' | '000' → SPS Validation |
| TPC (PUSCH) | 2 bits → '00' | 00' → SPS Validation |
| CQI trigger | 1 bit → 'x' | |
| UL index (TDD) | (2 bits) → 'xx' | |

Table 6 shows a PDCCH having a 'DCI format 0' for uplink. When a UE confirms that the SPS C-RNTI is masked on a CRC part of the PDCCH and that all or some of the MCS, DM-RS, and TPC bit fields are set to zero '0' as shown in Table 6, the UE is able to recognize that SPS is activated. In addition, a SPS deactivation can be signaled by setting the whole RIV field to '1' as described above. Because the bits in table 6, each of which is denoted by 'x', are irrelevant to SPS validation and SPS deactivation, an arbitrary value may be assigned to each of the bits. However, if all of the bits is fixed to '0' or '1', the UE may additionally confirm that the SPS is deactivated.

TABLE 7

| | | |
|---|---|---|
| Format 0/1A indicator | 1 bit → '1' | Format 1A |
| LVRB/DVRB Flag | 1 bit → 'x' | |
| Resource Block Allocation | N bit → '11 . . . 11' | SPS deactivation |
| MCS | 5 bits → '0xxxx' | First MSB '0': SPS Validation |
| NDI | 1 bit → 'x' | |



TABLE 7-continued

| | | |
|---|---|---|
| HARQ index | 3 bits → '000' | '000' → SPS Validation |
| TPC (PUCCH) | 2 bits → 'x' | |
| RV | 2 bits → '00' | '00' → SPS Validation |
| DL index (TDD) | (2 bits) → 'xx' | |

Table 7 shows a PDCCH having a 'DCI format 1A' for downlink. When a UE confirms that the SPS C-RNTI is masked on a CRC part of the PDCCH and that all or some of the MCS, HARQ index, and RV bit fields are set to zero '0' as shown in Table 7, the UE is able to recognize that SPS is activated. In addition, the SPS deactivation can be signaled by setting the entire RIV field to '1' as described above. Because the bits in table 7, each of which is denoted by 'x', are irrelevant to either SPS validation or SPS deactivation, an arbitrary value may be assigned to each of the bits. However, if all of the bits is fixed to '0' or '1', the UE may additionally confirm that the SPS is deactivated.

FIG. **20** is a block diagram illustrating constituent elements of a device **50** applicable to the present invention.

In FIG. **20**, the device **50** may be a UE or a base station (BS). In addition, the above-mentioned methods can be implemented by this device **50**. The device **50** includes a processor **51**, a memory **52**, a Radio Frequency (RF) unit **53**, a display unit **54**, and a user interface unit **55**. Layers of the radio interface protocol are realized in the processor **51**. The processor **51** provides a control plane and a user plane. Functions of individual layers can be implemented in the processor **51**. The processor **51** may include a contention resolution timer. The memory **52** is connected to the processor **51** and stores an operating system, applications, and general files. If the device **50** is a UE, the display unit **54** displays various information, and may use well-known elements such as a Liquid Crystal Display (LCD), an Organic Light Emitting Diode (OLED), and the like. The user interface unit **55** may be constructed of a combination of well-known user interfaces such as a keypad, a touch screen, and the like. The RF unit **53** is connected to the processor **51** so that it can transmit and receive RF signals to and from the processor **51**.

Embodiment 1

A method and apparatus for allowing the UE **50** shown in FIG. **20** to perform SPS deactivation according to a first embodiment of the present invention will hereinafter be described in detail.

The first embodiment of the present invention relates to a method and apparatus for deactivating semi-persistent scheduling (SPS) by the UE **50** of FIG. **20**. The processor **51** contained in the UE **50** receives a downlink control channel from a base station (BS) through the RF unit **53**. If the binary field indicating resource allocation information contained in the downlink control channel is entirely filled with '1', the processor **51** deactivates the SPS.

Embodiment 2

A method and apparatus for allowing the base station (BS) **50** shown in FIG. **20** to transmit a signal for SPS deactivation according to a second embodiment of the present invention will hereinafter be described in detail.

The second embodiment of the present invention relates to a method and apparatus for transmitting a signal for SPS deactivation by the base station (BS) **50** shown in FIG. **20**. When performing the SPS deactivation, the processor **51** of the base station (BS) **50** fills the entire binary field indicating resource allocation information contained in a downlink con-

trol channel with the value of '1'. Thereafter, the processor **51** transmits the downlink control channel through the RF unit **53**. In this case, the binary field filled with the value of '1' indicates SPS deactivation.

It is apparent to those skilled in the art that the first embodiment (Embodiment 1) and the second embodiment (Embodiment 2) can be reconstructed as a method invention embodied by a combination of steps executed in the RF unit and the processor.

Embodiment 3

FIG. **21** is a flowchart illustrating a method for deactivating a semi-persistent scheduling (SPS) according to the present invention.

In order to perform SPS deactivation, a base station (BS) fills the entire binary field indicating resource allocation information contained in a downlink control channel with the value of '1' at step S**2101**. The base station (BS) transmits the downlink control channel to the UE at step S**2102**. The UE receives the downlink control channel from the base station (BS) at step S**2103**. When the entire binary field indicating resource allocation information contained in the downlink control channel is filled with '1', the UE performs the SPS deactivation.

The first to third embodiments (Embodiment 1~Embodiment 3) can be restricted as follows. The downlink control channel may be a PDCCH, and a Downlink Control Information (DCI) format of the downlink control channel may be a 'Format 0' or a 'Format 1A'. The wireless mobile communication system uses a scheduling method based on the compact scheme, and the binary field may be composed of a field indicating an RIV. Otherwise, the above-mentioned binary field may be composed of a field indicating an RIV and a field indicating 'Gap' information used for distributed allocation of resources. For another example, the above-mentioned binary field may be composed of a field indicating an RIV and a field indicating hopping information.

The present invention uses a Resource Indication Value (RIV) not mapped for RB allocation in a Physical Downlink Control Channel (PDCCH) so as to indicate an SPS deactivation status, so that it can inform a UE of SPS deactivation without adding a bit field or a new format.

Although the present invention has been disclosed by referring to the above-mentioned embodiments, it should be noted that the aforementioned embodiments have been disclosed only for illustrative purposes, and those skilled in the art will appreciate that various modifications, additions and substitutions are possible, without departing from the scope and spirit of the invention as disclosed in the accompanying claims. Thus, it is intended that the present invention covers the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents. Therefore, the present invention is not limited to the above-mentioned embodiments, but can be applied to other examples which can satisfy the above principles and new characteristics of the present invention.

As apparent from the above description, the present invention is applicable to a transmitter and a receiver for use in a communication system.

It will be apparent to those skilled in the art that various modifications and variations can be made in the present invention without departing from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.



What is claimed is:

**1**. A method for deactivating Semi-Persistent Scheduling (SPS) transmission in a wireless mobile communication system, the method comprising:

performing, by a User Equipment (UE), a SPS transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;

receiving, by the UE, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and

performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for SPS deactivation include:

the RNTI is a SPS Cell RNTI (SPS C-RNTI); and

the first field is entirely filled with '1'.

**2**. The method of claim **1**,

wherein the PDCCH signal further includes a second field related to Transmission Power Control (TPC) and a third field related to a DeModulation Reference Signal (DM RS),

wherein the conditions for SPS deactivation further include:

the second field is entirely filled with '0', and

the third field is entirely filled with '1'.

**3**. The method of claim **1**, wherein the PDCCH signal carries a Downlink Control Information (DCI) format '0'.

**4**. The method of claim **1**, wherein the first field indicates a Resource Indication Value (RIV).

**5**. The method of claim **1**, further comprising:

continuing, by the UE, the SPS transmission if the PDCCH signal does not satisfy the conditions for SPS deactivation.

**6**. A method for deactivating Semi-Persistent Scheduling (SPS) reception in a wireless mobile communication system, the method comprising:

performing, by a Base Station (BS), a SPS reception at an interval of a subframe period configured by a radio resource control (RRC) signal;

transmitting, by the BS, a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and

performing a procedure for deactivating the SPS reception if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for SPS deactivation include:

the RNTI is a SPS Cell RNTI (SPS C-RNTI); and

the first field is entirely filled with '1'.

**7**. The method of claim **6**,

wherein the PDCCH signal further includes a second field related to Transmission Power Control (TPC) and a third field related to a DeModulation Reference Signal (DM RS),

wherein the conditions for SPS deactivation further include:

the second field is entirely filled with '0', and

the third field is entirely filled with '1'.

**8**. The method of claim **6**, wherein the PDCCH signal carries a Downlink Control Information (DCI) format '0'.

**9**. The method of claim **6**, wherein the first field indicates a Resource Indication Value (RIV).

**10**. The method of claim **6**, further comprising:

continuing, by the BS, the SPS reception if the PDCCH signal does not satisfy the conditions for SPS deactivation.

**11**. A User Equipment (UE) used for in a wireless mobile communication system, the UE configured to:

perform a Semi-Persistent Scheduling (SPS) transmission at an interval of a subframe period configured by a radio resource control (RRC) signal;

receive a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and

performing a procedure for deactivating the SPS transmission if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for SPS deactivation include:

the RNTI is a SPS Cell RNTI (SPS C-RNTI); and

the first field is entirely filled with ‘1’.

**12**. The UE of claim **11**, wherein the PDCCH signal further includes a second field related to Transmission Power Control (TPC) and a third field related to a DeModulation Reference Signal (DM RS),

wherein the conditions for SPS deactivation further include:

the second field is entirely filled with ‘0’, and

the third field is entirely filled with ‘1’.

**13**. The UE of claim **11**, wherein the PDCCH signal carries a Downlink Control Information (DCI) format ‘0’.

**14**. The UE of claim **11**, wherein the first field indicates a Resource Indication Value (RIV).

**15**. The UE of claim **11**, wherein the UE is further configured to continue the SPS transmission if the PDCCH signal does not satisfy the conditions for SPS deactivation.



**16**. A Base Station (BS) used for in wireless mobile communication system, the BS configured to:

perform a SPS reception at an interval of a subframe period configured by a radio resource control (RRC) signal;

transmit a Physical Downlink Control Channel (PDCCH) signal with a Radio Network Temporary Identifier (RNTI), wherein the PDCCH signal includes a first field related to a resource allocation; and

perform a procedure for deactivating the SPS reception if the PDCCH signal satisfies conditions for SPS deactivation,

wherein the conditions for SPS deactivation include:

the RNTI is a SPS Cell RNTI (SPS C-RNTI); and

the first field is entirely filled with ‘1’.

**17**. The BS of claim **16**, wherein the PDCCH signal further includes a second field related to Transmission Power Control (TPC) and a third field related to a DeModulation Reference Signal (DM RS),

wherein the conditions for SPS deactivation further include:

the second field is entirely filled with ‘0’, and

the third field is entirely filled with ‘1’.

**18**. The BS of claim **16**, wherein the PDCCH signal carries a Downlink Control Information (DCI) format ‘0’.

**19**. The BS of claim **16**, wherein the first field indicates a Resource Indication Value (RIV).

**20**. The BS of claim **16**, wherein the BS is further configured to continue the SPS reception if the PDCCH signal does not satisfy the conditions for SPS deactivation.

* * * * *

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 8,419 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin

*Attorney for Appellant*
*Sisvel S.p.A.*